# In the United States District Court for the Southern District of Georgia Waycross Division

JAMIE MCDANIEL,

    Plaintiff,

vs.

ROBERT SMITH; ALAN G. PAULK,
JR.; ALAN G. PAULK, SR.; JACK
HARPER; TODD WINKLER; JOHN
DOE 1; and JOHN DOES 2-5

    Defendants.

CV 507-079

## ORDER

Plaintiff filed the above-captioned case after an allegedly wrongful arrest and incarceration. Defendants Robert Smith, Jack Harper, and Todd Winkler are associated with the Coffee County Sheriff's Office, which made the arrest. Defendants Alan Paulk, Sr. and Alan Paulk, Jr. are private individuals from Coffee County who allegedly conspired with the other Defendants to unlawfully apprehend and incarcerate McDaniel. McDaniel's Complaint contains eighteen counts, some based on federal law and others based on state law.

Paulk, Jr. has moved for summary judgment on all claims against him. (Dkt. No. 144.) The Court **GRANTS** Paulk, Jr.'s Motion in part and **DENIES** it in part.

**BACKGROUND**

Although the Parties' versions of events differ on some important points, the Court recites all facts and draws all inferences in favor of the nonmovant for purposes of the instant motion. <u>Wilkie v. Robbins</u>, 551 U.S. 537, 543 n.2 (2007).

The evidence shows that on St. Patrick's Day, March 17, 2004, McDaniel went out drinking in Atlanta, Georgia with his childhood friend, Paulk, Jr. The evening ended for McDaniel when he was arrested for public urination and obstruction. (Citation, Dkt. No. 145 Ex. 4.)

The next day, Paulk, Jr. contacted Free at Last Bail Bonding and bailed McDaniel out of jail. McDaniel's bail was set at $1,706, but the nonrefundable fee that Paulk, Jr. paid to Free at Last was $204.22. Paulk, Jr. agreed that if McDaniel did not comply with the conditions of his bond -- e.g., if McDaniel failed to appear on his court date -- that Paulk, Jr. would owe Free at Last "the entire amount of the bond." (Bond Agreement, Dkt. No. 145 Ex. 5.)

Paulk, Jr. and McDaniel both signed a document provided by Free at Last labeled "Limited Power of Attorney, Release and Waiver." (Dkt. No. 145 Ex. 7.) The precise wording of that document -- in particular, the words used to describe the three parties concerned, Free at Last, Paulk, Jr., and McDaniel -- is important. The agreement began, "KNOW ALL MEN BY THESE PRESENT,

that the undersigned *principal* and *guarantor/indemnitor* do hereby appoint, constitute and make Fʀᴇᴇ ᴀᴛ Lᴀsᴛ (*surety*), its agents and assigns my lawful attorney in fact." (Id.) (italic emphasis added). The document was typewritten, but "Fʀᴇᴇ ᴀᴛ Lᴀsᴛ" was handwritten into a blank space. Paulk, Jr. signed the agreement over a blank labeled "Guarantor/indemnitor," and McDaniel signed over a blank labeled "Principal." (Id.) The second paragraph of the document, labeled "Waiver and Release," read as follows:

> In accordance with the decision of the United States Supreme Court in Taylor v. Taintor, 83 U.S. 366 (1873), when bail is given, the principal is regarded as delivered to the custody of the *surety* (bondsmen). The dominion over the principal is a continuation of the original imprisonment. The undersigned agrees that whenever the *surety* chooses to do so, the *surety*, or his agent, may seize the principal and deliver him/her to the proper authorities, and if this cannot be done at once, the surety may imprison him/her until such delivery may be effectuated. The *surety* may exercise this right in person, or through an agent, may pursue the principal into another state or even another country, may arrest on the Sabbath, may break and enter his/her place of residence, or other similar action to effectuate such an arrest. No new process is required to make such a seizure. I further hereby release said *surety*, and make its agents or assigns, from any liability by reason thereof.

(Id.) (emphasis added).

McDaniel failed to appear on his court date. No arrest warrant was issued, but McDaniel's bond was revoked. (Carter Dep. 18.) Free at Last declined to send a bail recovery agent after McDaniel, who had since moved to Florida, and instead

demanded reimbursement from Paulk, Jr. Free at Last ultimately sued Paulk, Jr. to recover the money. (Free at Last compl., Dkt. No. 115 Ex. 1.)

After speaking with an Atlanta Solicitor, Shirea Grant, Paulk, Jr. believed his debt on the bond would be forgiven if he could arrange to have McDaniel delivered to the Atlanta City Jail. (Paulk, Jr. Dep. 130, 134-35.) For financial reasons, and because he was "very mad" at McDaniel, Paulk, Jr. began exploring his options for returning McDaniel to Atlanta. (Id. at 158.) He turned to Coffee County, where he grew up and where he had been an Assistant District Attorney for two years.

Paulk, Jr. called his father, Defendant Alan Paulk, Sr., who had contacts with the Coffee County Sheriff's Office. Paulk, Sr. was a friend and political contributor of then-Coffee County Sheriff, Defendant Robert Smith.[1] Paulk, Sr. was also acquainted with Jack Harper, a reserve Coffee County Deputy Sheriff who occasionally performed tasks in that official capacity. (Harper Dep. 188-89, 213.) However, he also took instructions from Paulk, Sr., including patrolling Paulk, Sr.'s private lake and, on one occasion, bidding on a house in South Carolina. Harper described himself as Paulk, Sr.'s "flunky." (Id. at 78.)

---

[1] Smith was indicted on eight counts relating to misconduct while in office. He pled guilty to a single count, "malpractice and malfeasance," and received a suspended sentence in return for surrendering his P.O.S.T. certification. (Smith Dep. 294-97.) He subsequently resigned.

Paulk, Jr. also called Smith, who Paulk, Jr. knew not only through his father, but also from his time in the District Attorney's office. Paulk, Jr. and Smith spoke several times about the issues surrounding McDaniel's bail, and Smith tried to help Paulk, Jr. "think through what [Paulk, Jr.] could do, [and] what [Smith] could do." (Paulk, Jr. Dep. 109.)

Paulk, Sr. called Harper and told him to anticipate a call from his son about retrieving McDaniel from Florida. Paulk, Jr. then called Harper, whom he already knew from his days as an Assistant District Attorney. The two men did not discuss whether Harper was a bond agent, but Harper agreed, as a favor to the Paulks, to go to Flagler Beach, Florida and get McDaniel. When deposed about Harper's trip to pick up McDaniel, Paulk, Jr. said that he "requested" that Harper make the trip and admitted that Harper went "at [Paulk, Jr.'s] direction." (Id. at 107, 179.) When asked if he "retain[ed]" Harper, Paulk, Jr. answered affirmatively, although he denied having paid Harper. (Id. at 108.) Paulk, Jr. directed Harper to pick up McDaniel from Flagler Beach and deliver him to the Atlanta City Jail. (Id. at 183-85.)

Paulk, Jr. helped Harper locate McDaniel. Paulk, Jr. did not know McDaniel's residential address, so he called McDaniel's mother to get it. Paulk, Jr. told her that he had a new motorcycle that he wanted to show her son, but that he wanted

his visit to be a surprise. McDaniel's mother did not know McDaniel's then-present address, but she gave Paulk, Jr. the phone number for McDaniel's father, who lived in the Flagler Beach area. (Worrell Dep. 18.) Paulk, Jr. called McDaniel's father and, although he did not know McDaniel's address, the father told Paulk, Jr. that McDaniel worked at the Shark House restaurant. Paulk, Jr. passed that information on to Harper.

Harper drove to Flagler Beach to apprehend McDaniel. At Smith's suggestion, Harper made the drive in a marked Coffee County patrol car. When Harper arrived at the Shark House restaurant, he was dressed in plain clothes. He carried handcuffs, a gun, an "Authorized Fugitive Recovery Agent" ID card, and a "Bail Bond Investigator" badge, which he wore around his neck. Harper had no permit for the gun and had purchased the badge and ID card somewhere in Alabama. (Harper Dep. 187, 192-93, 205.)

Harper walked inside and, spotting an employee who resembled McDaniel, pinned the employee against a wall and began to handcuff him. McDaniel approached while Harper was in the process of apprehending this person, who turned out to be the restaurant's cook. The cook saw McDaniel and said, "That's Jamie McDaniel." (McDaniel Dep. 114-15.) Harper then walked up to McDaniel. "You're Jamie McDaniel?" he asked. (Id.) McDaniel said that he was. Harper said, "you're coming with

me," and McDaniel complied.  (Id.)  Harper took McDaniel by the arm, put him in the patrol car, and drove north.  (Id. at 127-28.)  Harper did not have a warrant because the City of Atlanta had not issued one.[2]  (Carter Dep. 20.)

Harper was too tired to drive McDaniel all the way to Atlanta.  While en route from Flagler Beach to Coffee County, Harper called Smith and, at Smith's direction, drove McDaniel to the Coffee County Jail.  (Harper Dep. 135-40.)

McDaniel remained incarcerated in the Coffee County Jail for approximately three days.  (McDaniel Dep. 116; Worrell Dep. 46.)  His presence in the jail was not recorded, he never saw a magistrate judge, and he was never informed of any charges pending against him.

After three days, Deputy Sheriff Todd Winkler came into the jail and told McDaniel, "I'm carrying you up to Atlanta." (McDaniel Dep. 117-18.)  McDaniel asked why, but Winkler only responded that he was following his supervisor's orders.

---

[2] Although there is some dispute as to whether a warrant for Plaintiff was issued, the only argument that Paulk, Jr. makes in support of the warrant's existence is based on the unsworn hearsay statement of Solicitor Grant that Plaintiff's arrest citation constituted a warrant.  Such evidence is not sufficient to create a factual dispute as to the existence of the warrant. See Macuba v. Deboer, 193 F.3d 1316, (11th Cir. 1999) ("[i]nadmissible hearsay cannot be considered on a motion for summary judgment." (internal quotation marks omitted)).  Plaintiff, however, has produced evidence showing that no warrant was ever issued for Plaintiff in connection with either the public urination and obstruction charges or the failure to appear citation. (Carter Dep. 20.)  As such, there is no genuine issue of material fact as to the existence of a warrant for Plaintiff.

Winkler put McDaniel in the back seat of his car and drove to the Atlanta City Jail.

The authorities at the Atlanta jail, however, could not find a warrant or other document authorizing them to take McDaniel into custody. An angry Winkler called Smith and explained that the Atlanta authorities would not take McDaniel without the proper paperwork. (Smith Dep. 151.) Smith advised Winkler to leave McDaniel at the jail, but when Winkler got in his car and tried to leave, the Atlanta jailers refused to let him out of the gate without McDaniel. So Winkler allowed McDaniel into the front seat of the patrol car and started driving back to Coffee County. (McDaniel Dep. 118-19.)

On the way back to Coffee County, Winkler called Smith and asked, "what are we going to do with this guy?" (Id. at 119.) Winkler drove McDaniel to the Coffee County police station, and McDaniel was released on Smith's orders. Harper called and apologized to McDaniel, and offered to give him a ride back to Florida. McDaniel responded, "I can get down there on my own. Thanks but no thanks." (Id.)

Upon returning to Florida, McDaniel learned that his boss had fired him on the mistaken assumption that he had committed a grave criminal offense. McDaniel's landlord had evicted him for the same reason.

At no point did Free at Last authorize any Defendant to act on its behalf. When Free at Last sued Paulk, Jr. to recover the money it forfeited for McDaniel's bond, Paulk, Jr. drafted his own Answer. The Answer said that Free at Last had failed "to assert available defenses to avoid judgment against it, though such defenses have been made available by [Paulk, Jr.'s] *extraordinary efforts, including delivering the body of the bonded defendant to the Atlanta City Jail*." (Paulk, Jr. Dep. 90-91.) (emphasis added). Paulk, Jr. and Free at Last ultimately resolved the suit. In Paulk, Jr.'s words, Free at Last agreed to let him pay only "three or $400 . . . in response to *my having succeeded in getting Jamie up to the jail*." (Id. at 148-49, 152-53.) (emphasis added).

On July 20, 2006, McDaniel sued the Defendants in the State Court of Cobb County, Georgia. He later voluntarily dismissed the suit, and on September 25, 2007, he filed the instant action in the Southern District of Georgia.

**DISCUSSION**

I.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must view all facts and draw all inferences in favor of the non-

movant.  <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007).  When the parties' evidence conflicts, the Court credits the evidence of the non-movant.  <u>Evans v. Stephens</u>, 407 F.3d 1272, 1277 (11th Cir. 2005).  The Court also credits undisputed evidence adduced by the movant.  <u>Reese v. Herbert</u>, 527 F.3d 1253, 1268-69 (11th Cir. 2008).  However, the court may not decide disputed issues of fact at the summary judgment stage.  <u>Transamerica Leasing, Inc. v. Inst. of London Underwriters</u>, 267 F.3d 1303, 1308 (11th Cir. 2001).

II.  "WAIVER AND RELEASE"

   Paulk, Jr.'s first argument, which applies to all counts in the Amended Complaint, is based on the paragraph labeled "Waiver and Release" in the document entitled "Limited Power of Attorney, Release and Waiver."  (Dkt. No. 145 Ex. 7.)  That paragraph said, in part, that "[t]he undersigned agrees that whenever the *surety* chooses to do so, the *surety*, or his agent, may seize the principal and deliver him/her to the proper authorities . . . I further hereby release said *surety*, and make its agents or assigns, from any liability by reason thereof." (<u>Id.</u>) (emphasis added).  Paulk, Jr. argues that this document released him from any liability stemming from McDaniel's recapture.

The "Waiver and Release" purports to release the "surety" from liability. The Court, therefore, must first determine which party constitutes a "surety" under the terms of the contract. Second, the Court must determine whether, when McDaniel failed to appear, the rights of the "surety" passed to any other party.

The first sentence of the contract reads, "KNOW ALL MEN BY THESE PRESENT, that the undersigned *principal* and *guarantor/indemnitor* do hereby appoint, constitute and make FREE AT LAST (*surety*), its agents and assigns my lawful attorney in fact." (Id.) (italic emphasis added). Paulk, Jr. signed the agreement as "Guarantor/indemnitor," and McDaniel signed as "Principal." (Id.)

This first sentence indicates that the parties distinguished between the "principal," the "guarantor/indemnitor," and the "surety." Based on the places where they signed the document, it is clear that McDaniel was the "principal" and Paulk, Jr. was the "guarantor/indemnitor." Based on the parenthetical label "surety" following the blank space where "FREE AT LAST" was handwritten, it is equally clear that the parties intended for "surety" to refer to Free at Last.

The release of liability applied only to the "surety" and its "agents or assigns." Paulk, Jr. was not an agent or an assignee of Free at Last. Therefore, although the agreement

might have released Free at Last from liability for apprehending him, it did not release Paulk, Jr.

In opposition, Paulk, Jr. cites O.C.G.A. § 10-7-1, which states that "[t]here shall be no distinction between contracts of suretyship and guaranty." This Code provision, however, does not control the definitions of "surety" and "guarantor" in the instant contract. "If the language of a contract is clear and unambiguous, we enforce those terms and need not look elsewhere to assist in the contract's interpretation." Mariner Healthcare v. Foster, 280 Ga. App. 406, 409-10, 634 S.E.2d 162, 166 (2006). Although the Georgia Assembly does not distinguish between the contracts of sureties and guarantors, the parties to this private contract were free to use those terms however they wanted. Where the terms of the agreement between the parties are clear, this Court will give those terms effect.

Here, the clear and unambiguous language of the agreement evinces the parties' intent that the term "surety" refer only to Free at Last. Paulk, Jr. was intended to be a guarantor for Plaintiff's repayment to Free at Last should Plaintiff fail to appear. The agreement, in essence, contemplated two distinct suretyships -- Free at Last was liable for McDaniel's bond if McDaniel failed to appear (first surety), and if Free at Last had to pay, then Paulk, Jr. would be liable to Free at Last (second surety). The contract used the word "surety" to refer

to the first surety (Free at Last), and the words "guarantor/indemnitor" to refer to the second surety (Paulk, Jr.). The release of liability, therefore, which purported to release only the party designated as the "surety," applied solely to Free at Last.

To the extent that Paulk, Jr. argues that he assumed Free at Last's rights under the contract or became Free at Last's agent when McDaniel failed to appear, that argument fails for three reasons. First, neither the "Limited Power of Attorney" nor any other document suggests that, if Plaintiff skipped bail, the rights that Plaintiff had ceded to Free at Last would automatically transfer to Paulk, Jr. or that Paulk, Jr. would automatically become an agent of Free at Last. The forfeiture of McDaniel's bond triggered Paulk, Jr.'s contractual duties as a guarantor, but nothing in the "Limited Power of Attorney, Release and Waiver" suggests that forfeiture of the bond would broaden the scope of the parties to whom McDaniel had granted rights over his person. (Bond Agreement, Dkt. No. 145 Ex. 5.)

Second, neither the contract nor Free at Last could have authorized Paulk, Jr. or Harper to act as bail recovery agents because both Paulk, Jr. and Harper were statutorily barred from performing that function. Neither law enforcement agents (e.g., Harper) nor attorneys (e.g., Paulk, Jr.) may "engage either directly or indirectly in the bail bond business." O.C.G.A. §

45-11-8(a).  Bail recovery agents must have valid firearms licenses.  O.C.G.A. § 17-6-56(b).  Bail recovery agents must undergo eight hours of continuing education each year.  O.C.G.A. § 17-6-56.1(c).  See also O.C.G.A. § 17-6-56(c) (bail recovery agents must be registered with sheriff in counties where they reside and "do[] business"); O.C.G.A. § 17-6-57(c) (bail recovery agents must carry identification cards).  The evidence does not indicate that either Paulk, Jr. or Harper satisfied these requirements.  Therefore, if any agreement purported to authorize Paulk, Jr. or Harper to act as bail recovery agents, that agreement would be void as illegal.  O.C.G.A. § 13-8-1 ("A contract to do an . . . illegal thing is void."); Harpagon Co. v. Huff, 296 Ga. App. 107, 111, 673 S.E.2d 592, 595 (2009).

Finally, even if Free at Last could have authorized Paulk, Jr. or Harper to act on its behalf, there is no evidence that Free at Last sought to do so.  Paulk, Jr. deposed that Free at Last never gave him the authority to apprehend Plaintiff on their behalf.  (Paulk, Jr. Dep. 125.)  Harper also denied any authorization to act as a bail recovery agent for Free at Last. (Harper Dep. 155.)

Accordingly, the Court holds that although the contract may have released Free at Last from liability for apprehending McDaniel, it did not release Paulk, Jr.

III. § 1983 CLAIM

In Count VII of the Amended Complaint, Plaintiff alleges that Paulk, Jr. is liable under 42 U.S.C. § 1983. Paulk, Jr. makes two arguments in opposition. First, he argues that there was no constitutional deprivation of McDaniel's rights because McDaniel was "constructively imprisoned" while he was out on bail. Second, Paulk, Jr. argues that he was not a state actor.

A.    Constructive Imprisonment

Paulk, Jr.'s constructive imprisonment argument is based on Taylor v. Taintor, 83 U.S. 366, 371 (1872). That case stated:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner.

Paulk, Jr. argues that, because he was a surety of Free at Last, and Free at Last was McDaniel's surety, Paulk, Jr. could rightfully exercise "dominion" over McDaniel. Therefore, he reasons, McDaniel waived the constitutional violations he alleges with respect to the acts of Paulk, Jr.

However, _Taylor_ is inapposite here.  _Taylor_ stands for the proposition that a bailed-out defendant remains under the "dominion" of his bondsmen while he is out on bond.  83 U.S. at 371; _accord_ _Outz v. Maryland Nat. Ins. Co._, 505 F.2d 547, 551 (9th Cir. 1974).  But _Taylor_ does not address the relationship between a bailed-out defendant and his bondsmen's surety -- i.e., the bailed-out defendant's surety's surety.  Therefore, while _Taylor_ speaks to the power that bail bondsmen such as Free at Last may have, it does not address what power, if any, an unlicensed guarantor such as Paulk, Jr. may have over the principal.

Cases decided after _Taylor_ make clear that the right of a bondsman over a bailed-out defendant "arises from the private relationship between the bondsman and his principal."  _McCoy v. Johnson_, 176 F.R.D. 676, 679 (N.D. Ga. 1997); _accord_ _Fitzpatrick v. Williams_, 46 F.2d 40, 40 (5th Cir. 1931) ("The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bond.").[3]  In this case, the "private relationship" between McDaniel, Paulk, Jr., and Free at Last was spelled out in a written agreement.  _See_ _McCoy_, 176 F.R.D. at 679.  As discussed above, that written agreement gave Free at

---

[3]  In _Bonner v. City of Prichard_, 661 F.3d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions predating September 30, 1981.

Last the right to "seize [McDaniel] and deliver him[] to the proper authorities," but did not go so far as to confer such a right on Paulk, Jr. Therefore, the "private relationship" between McDaniel, Free at Last, and Paulk, Jr. did not authorize Paulk, Jr. or his agents to seize McDaniel. See McCoy, 176 F.R.D. at 679; Fitzpatrick, 46 F.2d at 40.

Although Taylor does not address any rights that Paulk, Jr. might have had over McDaniel, the Georgia Code does. As noted above, Georgia law prohibits attorneys from engaging, directly or indirectly, in bail recovery. O.C.G.A. § 45-11-8(a). There is also no evidence that Paulk, Jr. had a firearms license, attended continuing education, registered with the Fulton County sheriff, or carried a card identifying him as a bail recovery agent. See O.C.G.A. §§ 17-6-56(b), 17-6-56.1(c), 17-6-56(c), 17-5-57(c). Therefore, while Taylor does not address whether Paulk, Jr. had the right to apprehend McDaniel, state law bars Paulk, Jr. from exercising "dominion" over McDaniel in the manner of a bail bondsman.

Because Taylor does not address the relationship between a bailed-out defendant and his unlicensed guarantor, because the "private relationship" between McDaniel and Paulk, Jr. did not authorize Paulk, Jr. to apprehend McDaniel, and because state law forbade Paulk, Jr. to act as a bondsman, the Court holds that Taylor did not authorize Paulk, Jr. to apprehend McDaniel.

- 17 -

See Taylor, 83 U.S. at 371; see also O.C.G.A. § 45-11-8(a);

McCoy, 176 F.R.D. at 679; Fitzpatrick, 46 F.2d at 40.


B.    State Actor

    Paulk, Jr. argues that he is not liable under § 1983
because he is not a state actor.

    Section 1983 imposes liability for unconstitutional actions
taken "under color of state law." Nelson v. Campbell, 541 U.S.
637, 643 (2004). Furthermore, most constitutional provisions
themselves -- including the right to liberty secured by the
Fourteenth Amendment -- proscribe only conduct that is "fairly
attributable" to the government. Lugar v. Edmonson Oil Co., 457
U.S. 922, 937 (1982). In the context of a § 1983 suit premised
on constitutional violations, these two tests -- "color of state
law" and "fair attribution" -- are identical. Id. at 928-29.
Paulk, Jr., therefore, may be liable under § 1983 if his conduct
passes the "fair attribution" test. Id.

    The "fair attribution" test has two prongs. Id. at 937;
accord Harvey, 949 F.2d at 1130. First, for § 1983 liability to
attach, "the deprivation must be caused by the exercise of some
right or privilege created by the State or by a rule of conduct
imposed by the State or by a person for whom the State is
responsible." Lugar, 457 U.S. at 937. Phrased differently,
this first prong asks whether the alleged violation "could in

any way be ascribed to a governmental decision." Id. at 937-38. The first prong tests the relationship between the allegedly unconstitutional conduct and the government. Id. (citing Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972)). Second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar, 457 U.S. at 937. This second prong tests the relationship between the government and the private party. Id. at 938-39 (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978)). Here, the first prong will test the relationship between McDaniel's allegedly unconstitutional arrest and the government, and the second prong will test the relationship between the government and Paulk, Jr.

Plaintiff's evidence regarding the first prong is adequate to withstand summary judgment -- i.e., the evidence would permit a jury to conclude that McDaniel's apprehension was sufficiently related to government action. See Lugar, 457 U.S. at 937-38. Harper was a sworn Coffee County Deputy driving an official Coffee County car. Therefore, Harper was "a person for whom the state is responsible," and his decisions to locate McDaniel at the address that Paulk, Jr. provided and to apprehend McDaniel in accordance with Paulk, Jr.'s instructions can be ascribed to the government. See id.; Harvey, 949 F.2d at 1130; see generally Soldal v. Cook County, 506 U.S. 56 (1992) (holding deputy sheriffs liable under § 1983).

Here, the rubber meets the road on the second prong.  The
second prong requires that the person "charged" with the
deprivation of rights be a state actor.  See Lugar, 457 U.S. at
937; Harvey, 949 F.2d at 1130.  This prong tests the
relationship between Paulk, Jr. and the government.  See Lugar,
457 U.S. at 137.  Only in rare circumstances can a private
party, like Paulk, Jr., be viewed as a state actor.  Harvey, 949
F.3d at 1130.  However, where a private party is "jointly
engaged" with government officials in the challenged action,
that private party may be considered a state actor and may be
liable under § 1983.  Dennis v. Sparks, 449 U.S. 24, 28 (1980);
accord Lugar, 457 U.S. at 931; Adickes v. S.H. Kress & Co., 398
U.S. 144, 152 (1970); Harvey, 949 F.2d at 1133.  This joint-
engagement theory of § 1983 liability is sometimes called a
theory of § 1983 "conspiracy."  See Harvey, 949 F.2d at 1133.

The Eleventh Circuit has elaborated on the "jointly
engaged" test and has traced the line upon which Plaintiff's
evidence survives or fails.  If Paulk, Jr. was "merely calling
upon" official authority, albeit insistently, without joining in
the exercise of that authority, then he was not a state actor
and cannot be liable under § 1983.  Dye v. Radcliff, 174 F.
App'x 480, 482-83 (11th Cir. 2006) ("[W]e join other circuits in
saying that a private party does not act under color of state
law merely by calling upon official state authority when he does

not also join in the exercise thereof."); see id. at 483 n.1

(collecting cases).  However, if the evidence would permit a

rational factfinder to conclude that Paulk, Jr. "reached an

understanding" with an official to deprive McDaniel of his

rights, then Plaintiff's § 1983 conspiracy claim may survive

summary judgment.  Rowe v. City of Ft. Lauderdale, 279 F.3d

1271, 1283 (11th Cir. 2002); Lowe v. Aldridge, 958 F.2d 1565,

1573 (11th Cir. 1992); N.A.A.C.P. v. Hunt, 891 F.2d 1555, 1563

(11th Cir. 1990).  To establish this "understanding," Plaintiff

need not show a "smoking gun," but must furnish "some evidence

of agreement among defendants."  Rowe, 279 F.3d at 1284;

Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir. 1990).

The pared-down question before this Court, therefore, is

whether a jury could reasonably conclude that Paulk, Jr.

"reached an understanding" with Coffee County officials, see

Rowe, 279 F.3d at 1283, or whether the most that could be

rationally inferred from the evidence adduced is that Paulk, Jr.

"call[ed] upon" those officials, see Dye, 174 F. App'x at 482-

83.[4]

_____

[4] The Court recognizes that some tension may exist between Dye and Rowe.  Dye
states that "a private party does not act under color of state law merely by
calling upon official state authority when he does not also join in the
exercise thereof."  174 F. App'x at 482-83.  Rowe reaffirmed earlier
decisions establishing that when a private party and an official "reach[] an
understanding" to violate a plaintiff's rights, the private party may be
liable under a theory of § 1983 conspiracy.  279 F.3d at 1283-84.  These
rules could overlap in the case of a private defendant who "reached an
understanding" with an official to violate a plaintiff's rights, but who did
not "join in the exercise" of official authority after conspiring with the

Adickes v. S.H. Kress & Co.[5] is instructive.  In that case Miss Adickes, a Caucasian schoolteacher, alleged that she entered the Kress restaurant in Hattiesburg, Mississippi to eat lunch with six African-American students.  Id. at 146-47.  After they sat down, a policeman entered and observed Adickes sitting with the students.  Id. at 149.  A waitress then took the students' orders, but refused to take Adickes's, allegedly because she was sitting with African-Americans.  Id.  The group left, but as Adickes stepped onto the sidewalk, the policeman who had observed the group at their table arrested Adickes on a trumped-up vagrancy charge.  Id.

Adickes's complaint alleged that "both the refusal of service and her subsequent arrest were the product of a conspiracy between Kress [a private entity] and the Hattiesburg police."  Id. at 148.  The Kress manager admitted that he had, by "a prearranged tacit signal" (a nod of his head), instructed the food counter supervisor not to serve Adickes.  Id. at 153-54.  But the Kress manager and all the police officers involved uniformly denied any communication between the Kress employees and the police force regarding whether to serve or arrest

official.  See Dye, 174 F. App'x at 482-83; Rowe, 279 F.3d at 1283-84.  In any event, the evidence pushes this case beyond any Dye and Rowe overlap into clear Rowe territory.  That is, by showing that Paulk, Jr. actively sought McDaniel's address, deceived McDaniel's mother to get that address, and ultimately discovered the work location where Harper apprehended McDaniel, Plaintiff has created an issue of fact as to whether Paulk, Jr. "join[ed] in the exercise" of official authority.  See Dye, 174 F. App'x at 482-83.

[5] 398 U.S. 144 (1970).

Adickes.  Id. at 153-55.  Adickes herself "had no knowledge of
any communication between any Kress employee and any member of
the Hattiesburg police, and was relying on circumstantial
evidence to support her contention that there was an arrangement
between Kress and the police."  Id. at 155-56.  Adickes pointed
out that "noncircumstantial evidence of the conspiracy could
only come from adverse witnesses."  Id. at 157.

The District Court granted summary judgment to Kress on the
§ 1983 conspiracy claim, and the Court of Appeals affirmed.  Id.
at 148.  The Supreme Court reversed.  Writing for the Court,
Justice Harlan stated:

> We think that on the basis of this record, it was
> error to grant summary judgment. As the moving party,
> respondent had the burden of showing the absence of a
> genuine issue as to any material fact, and for these
> purposes the material it lodged must be viewed in the
> light most favorable to the opposing party. Respondent
> here did not carry its burden because of its failure
> to foreclose the possibility that there was a
> policeman in the Kress store while petitioner was
> awaiting service, and that this policeman reached an
> understanding with some Kress employee that petitioner
> not be served. . . . If a policeman were present, we
> think it would be open to a jury, in light of the
> sequence that followed, to infer from the
> circumstances that the policeman and a Kress employee
> had a 'meeting of the minds' and thus reached an
> understanding that petitioner should be refused
> service.  Because on summary judgment the inferences
> to be drawn from the underlying facts contained in the
> moving party's materials must be viewed in the light
> most favorable to the party opposing the motion, we
> think respondent's failure to show there was no
> policeman in the store requires reversal.

Id. at 157-59 (internal citations omitted).  Thus, evidence that

a policeman entered the restaurant and observed Adickes, and that the same policeman arrested her outside, was sufficient to preclude summary judgment on the § 1983 conspiracy claim.  Id.

Here, the evidence as to whether a "meeting of the minds" occurred between Paulk, Jr. and Harper is conflicting.  See id. On one hand, Paulk, Jr. deposed that he called Harper and "requested for Jack Harper to go get [ McDaniel] and bring him up to the Atlanta Jail." (Paulk, Jr. Dep. 107.)  Harper then "said he would do it as a favor." (Id. at 109.)  When asked, "And what did Jack [ Harper] tell you?," Paulk, Jr. replied, "That he would go." (Id.)  When asked if "[ Harper] went down there at your direction to capture [ McDaniel] in Flagler Beach, Florida," Paulk, Jr. responded, "That's correct." (Id. at 179.)  This evidence suggests that Paulk, Jr. and Harper "reached an understanding" to seize McDaniel.  See Rowe, 279 F.3d at 1283.

There was also evidence from which a reasonable jury could infer that Paulk, Jr. had some influence over Harper.  Paulk, Jr. had been an Assistant District Attorney in Coffee County. Further, Paulk, Jr.'s father was a friend of, and political contributor to, Harper's boss, Sheriff Smith.  Harper, a reserve Deputy, was also Paulk, Sr.'s self-described "flunky." (Harper Dep. 78.)  All of these facts were known to Paulk, Jr.

Further, a jury could conclude that Paulk, Jr. assisted Harper in the exercise of official authority.  Paulk, Jr. called

both of McDaniel's parents in an attempt to find out where Harper might locate McDaniel, and went so far as to deceive McDaniel's mother by explaining that he was planning a surprise visit to show off a new motorcycle.  Paulk, Jr. passed the information he learned along to Harper, thereby providing indispensable assistance in Harper's efforts to apprehend McDaniel.  This evidence of assistance substantiates Paulk, Jr.'s claim in his Answer in the State Court of Fulton County that, through his own "extraordinary efforts," he had "deliver[ed] the body of the bonded defendant to the Atlanta City Jail," and his statement in deposition that he "ha[d] succeeded in getting Jamie up to the jail."  (answer to Free at Last, Dkt. No. 167 Ex. Q; Paulk, Jr. Dep. 148-49.)

The evidence is not one-sided, however.  Paulk, Jr. deposed that he did not know that Harper would take McDaniel to Coffee County, and did not know what vehicle Harper would drive to Flagler Beach.  There is some evidence indicating that Paulk, Jr. was told, and may have wrongfully believed, that Harper was a bond agent.

That Paulk, Jr. was unaware that Harper would take McDaniel to Coffee County does not, alone, negate his liability.  Even absent McDaniel's three-day stay in the Coffee County jail, Harper's seizure of McDaniel at the Shark House was an unauthorized warrantless arrest.  See Florida v. White, 526 U.S.

559, 565 (1999) (warrantless arrests in public places permissible when probable cause for commission of felony exists); (Carter Dep. 18) (City of Atlanta did not issue a warrant).  If Paulk, Jr. and Harper "reached an understanding" that Harper would arrest McDaniel, Paulk, Jr. may be liable under § 1983.  See Rowe, 279 F.3d at 1283.

Taking all of these facts together, there is sufficient evidence from which a jury could conclude that Paulk, Jr. "reached an understanding" with Harper and assisted in the exercise of Harper's authority.  See id.  The evidence supporting an "understanding" in this case is significantly stronger than the evidence adduced by the plaintiff in Adickes. Just as summary judgment on the § 1983 conspiracy claim was improper in Adickes, it is also improper here.  398 U.S. at 157.

The Court therefore **DENIES** Paulk, Jr.'s Motion for Summary Judgment on Count VII.


IV.  STATE LAW CLAIMS

A.  False Arrest

Count X of the Amended Complaint asserts a claim for false arrest.  Paulk, Jr. argues that Plaintiff's claim for false arrest fails because, according to Plaintiff's version of

events, there was no arrest warrant.[6] (Carter Dep. 18.)  Paulk, Jr. correctly points out that, unlike a claim for wrongful imprisonment, the tort of false arrest must be predicated on an arrest for which a warrant existed.  Ferrell v. Mikula, 295 Ga. App. 326, 333, 672 S.E.2d 7, 13 (2008).  No warrant has ever been produced, nor is there any admissible evidence that a warrant for Plaintiff was ever issued.  Accordingly, Plaintiff's false arrest claim necessarily fails.

The Court therefore **GRANTS** Paulk, Jr.'s Motion for Summary Judgment on Count X.


B.    Wrongful Imprisonment

Paulk, Jr. next argues that Plaintiff's wrongful imprisonment claim fails because McDaniel was constructively imprisoned under Taylor v. Taintor, 83 U.S. at 371, while out on bond.  However, O.C.G.A. § 510-7-20 defines false imprisonment as the "the *unlawful* detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."  (Emphasis added).  As explained above, Taylor may have given Free at Last the right to apprehend McDaniel, but it did not give that right to Paulk, Jr.  Therefore, if Paulk, Jr. effected an arrest of McDaniel, that seizure would be "unlawful" and Paulk, Jr. could be liable for wrongful imprisonment.

---

[6] See supra note 2.

The Court therefore **DENIES** Paulk, Jr.'s Motion for Summary Judgment on Count XI.


C.    Breach of Legal Duty

Plaintiff's claim entitled "Breach of Legal Duty," numbered Count XV, includes the following language: "[T]he laws, rules, and regulations pertaining to recovery of bail bonds, to bail recovery agents, to bail enforcement agents, and/or to recovery of debts, created legal obligations to Plaintiff." (Am. Compl. ¶ 114.) "Defendants intentionally or negligently, or with reckless disregard of the consequences to Plaintiff, breached their duty or duties of due care causing Plaintiff damages." (Am. Compl. ¶ 115.) "Defendants were negligent per se." (Am. Compl. ¶ 116.)

Paulk, Jr. focuses only on the portion of this claim that alleges negligence *per se*. Paulk, Jr. argues that Count XV fails because Plaintiff "failed to specify any law, rule, or regulation he contends Mr. Paulk, Jr. violated." (Paulk, Jr. Br. in Supp. 18-19.) Paulk, Jr. cites Quinn v. City of Cave Springs, 243 Ga. App. 598, 532 S.E.2d 131 (2000), for the proposition that where a plaintiff fails to specify the law that the defendant allegedly violated, summary judgment on a count of negligence *per se* is proper. In response, Plaintiff cites, *inter alia*, Fla. Stat. § 648.30 (bail recovery agents must be

registered), O.C.G.A. § 17-6-56(c) (requiring registration of bail recovery agents with county sheriff), O.C.G.A. § 17-6-56.1 (bail bondsmen must obtain continuing education), and O.C.G.A. § 45-11-8 (neither attorneys nor law enforcement officials may engage in bail recovery).

The court in Quinn affirmed summary judgment for the defendant on the plaintiff's claim of negligence *per se* only after the plaintiff failed to specify the allegedly violated rule either "in his complaint [] or in his response to the [defendant's] motion." 243 Ga. App. at 600. Because Plaintiff has specified the allegedly violated laws in his response to Paulk, Jr.'s motion, Quinn is distinguishable. See also Hamilton v. Allen-Bradley Co., 244 F.3d 819, 832 (11th Cir. 2001) ("A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests.").

The Court therefore **DENIES** Paulk, Jr.'s Motion for Summary Judgment on Count XV.


D.   Agency Liability

Count XVI of the Amended Complaint is labeled "Agency Liability." Paulk, Jr. argues that this count fails for two reasons.

First, Paulk, Jr. argues that "principles of agency liability do not apply to § 1983 claims." (Paulk, Jr. Br. in Supp. 19.) Paulk, Jr. is correct that principles of vicarious liability and respondeat superior do not apply to § 1983 claims. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948 (2009). However, Paulk, Jr.'s potential § 1983 liability in this case does not arise through a vicarious liability, respondeat superior, or agency theory, but instead through his alleged act of conspiring with law enforcement officials to deprive McDaniel of his rights. See Rowe, 279 F.3d at 1284. A § 1983 conspiracy differs from vicarious liability in that a defendant must perform an affirmative act -- i.e., he must "reach[] an understanding" with an official -- before § 1983 liability will attach, whereas vicarious liability allows a defendant to be held liable solely on the basis of his relationship with another actor. Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc., 286 F.3d 1233, 1256 (2002) (applying Florida law); accord Black's Law Dictionary 934 (8th ed. 2004).

Second, Paulk, Jr. argues, without citation to any legal authority, that "[i]n addition to the above, the undisputed facts establish Mr. Paulk, Jr. cannot be liable for the actions of the other Defendants." (Paulk, Jr. Br. in Supp. 19.) Because this sentence begins the paragraph following the paragraph in which Paulk, Jr. addressed § 1983 liability, this

sentence appears to be based on state law principles of agency. The Court therefore suspects, but is not certain, that Paulk, Jr. is arguing that the other Defendants were not his agents under applicable state law. In response, Plaintiff argues that Paulk, Jr. is liable under state law principles of agency, citing O.C.G.A. §§ 10-6-1, 10-6-60, 1-2-1, and 51-2-2.

In the absence of citation or elaboration from the parties, and because it is not clear what argument has been made, the Court is reluctant to issue a ruling as to whether any other Defendants may be state-law agents of Paulk, Jr. See Flanigan's Enters., Inc. v. Fulton County, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (argument waived in absence of citation or elaboration); Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (same). The Court does not now issue a ruling regarding state law agency. The Court does rule, however, that Paulk, Jr.'s second argument in support of summary judgment on Count XVI fails.

The Court therefore **DENIES** Paulk, Jr.'s Motion for Summary Judgment on Count XVI.


E.    Invasion of Privacy

Count XIII asserts a claim for "intruding into Plaintiff's private affairs and solitude." (Am. Compl. ¶ 108.) In order to prevail on such a claim, Plaintiff must show an "unreasonable

intrusion" into his privacy.  Yarbray v. So. Bell Tel. &
Telegraph Co., 261 Ga. 703, 705, 409 S.E.2d 835, 837 (1991).  To
prove an "unreasonable intrusion," Plaintiff must make two
showings: first, he must show a "prying or intrusion . . . into
private concerns," and second, he must show that the intrusion
"would be offensive or objectionable to a reasonable person."
Id.  Plaintiff focuses on Harper's actions and argues that those
actions constituted an "unreasonable intrusion," and that Harper
made that unreasonable intrusion at Paulk, Jr.'s direction.

Harper's conduct clearly meets the second prong of the
above-described test.  A reasonable person would find it
"offensive or objectionable" to be unlawfully arrested, forcibly
removed from his place of employment, and transported across
state lines hundreds of miles against his will.  See id.

The first prong of the test, however, asks whether the
challenged conduct constituted "prying or intrusion . . . into
private concerns."  See id.  Acts that occur in public places do
not generally constitute unreasonable intrusions.  See Summers
v. Bailey, 55 F.3d 1564, 1566 (11th Cir. 1995) ("Traditionally,
watching or observing a person in a public place is not an
intrusion upon one's privacy."); accord Pierri v. Cingular
Wireless, LLC, 397 F. Supp. 2d 1364, 1382-83 (N.D. Ga. 2005)
("To establish a claim of 'intrusion,' a plaintiff must usually
establish that the defendant committed a physical intrusion,

analogous to trespass, into the plaintiff's solitude or private affairs."). However, acts that occur in public places may constitute intrusions upon seclusion if they are sufficiently repetitive. See Anderson v. Mergenhagen, 283 Ga. App. 546, 552, 642 S.E.2d 105, 110 (2007) (unrelenting surveillance, picture-taking, and following, although in public places, could constitute unreasonable intrusion because "relatively harmless activity can become tortious with repetition"). Where the defendant's act does not affect the plaintiff's privacy, there has been no unreasonable intrusion even if the act was extraordinarily offensive. See generally Yarbray, 261 Ga. 703.

Harper's apprehension of McDaniel at Paulk, Jr.'s direction-- although it was offensive-- occurred in a public place and occurred only once. Therefore, Harper did not intrude on McDaniel's private seclusion, see Assoc. Serv., Inc. v. Smith, 249 Ga. App. 629, 636, 549 S.E.2d 454, 461 (2001), nor did Harper repetitively harass McDaniel, see Anderson, 283 Ga. App. at 552. Because Harper's actions did not constitute an "unreasonable intrusion" into Plaintiff's privacy, the privacy claim fails.

The Court therefore **GRANTS** Paulk, Jr.'s Motion for Summary Judgment on Count XIII.

F.    Intentional Infliction of Emotional Distress

Count XIV asserts a claim for intentional infliction of emotional distress.  Citing Everett v. Goodloe, 268 Ga. App. 536, 545, 602 S.E.2d 284, 292(2004), Defendant argues that Harper's conduct, even if it is attributable to Paulk, Jr., was not sufficiently "outrageous in character" to permit an action for intentional infliction of emotional distress.

"Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law."  Yarbray, 261 Ga. at 706.  However, "[ i] f a reasonable person might find the conduct extreme and outrageous, causing severe emotional distress, the jury then must find the facts and make its own determination."  Mableton Parkway CVS, Inc. v. Salter, 273 Ga. App. 477, 482-83, 615 S.E.2d 558, 564 (2005).

To be actionable, the conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Everett, 268 Ga. App. at 545.  "Only where the distress inflicted is so severe that no reasonable person could be expected to endure it does the law intervene."  Id.  "The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of

the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim, 'Outrageous!' " <u>Wilcher v. Confederate Packaging, Inc.</u>, 287 Ga. App. 451, 453, 651 S.E.2d 790, 792 (2007).

In <u>Fleming v. U-Haul Co. of Georgia</u>, 246 Ga. App. 681, 681, 541 S.E.2d 75, 76 (2000), the plaintiff had rented a U-Haul truck in October 1997. The truck broke down as the plaintiff was driving it, so he called the 1-800 number listed on the rental agreement. <u>Id.</u> Although the person who answered said that someone would come to the plaintiff's aid, no one ever arrived. <u>Id.</u> The plaintiff left the keys with the truck, hitchhiked home, and had no further contact with any U-Haul representative until February 1998, when he rented another U-Haul vehicle without mentioning the previous incident. <u>Id.</u> at 682-81. As he was driving the second truck, the plaintiff was pulled over by police for failing to maintain his lane. <u>Id.</u> at 682. Upon reviewing the plaintiff's driver's license and rental agreement, the officer told plaintiff that there was an outstanding warrant for his arrest. <u>Id.</u> The officer took the plaintiff to jail, where he remained for eight days before making bond. <u>Id.</u> He was indicted for conversion. <u>Id.</u> The plaintiff then brought suit against U-Haul for intentional infliction of emotional distress. The trial court granted summary judgment, but the Georgia Court of Appeals held that:

In our view, a rational and impartial jury could
decide that it is both atrocious and utterly
intolerable in a civilized society for the lessor of a
valuable motor vehicle to demand the arrest of its
lessee for conversion, simply because the lessee did
not return the vehicle to the designated place at the
designated time and did not return to claim a cash
deposit, where, as in this case, the lessor has
imputed knowledge of all the additional and
extenuating circumstances as reported by Fleming to
the 1-800 operator. The trial court erred in
concluding as a matter of law that the facts
authorized by this record do not rise to the requisite
level of outrage and egregiousness in character, and
extremity in degree, that no reasonable person is
expected to endure. The grant of summary judgment as
to Fleming's claim for the intentional infliction of
emotional distress was also in error.

Id. at 685.

In Nicholson v. Windham, 257 Ga. App. 429, 430, 571 S.E.2d

466, 468 (2002), the plaintiff worked for what she described as

a "real estate transaction closing mill."  The "mill" allegedly

engaged in illegal activity, including tampering with evidence,

obstruction of justice, mail fraud, and wire fraud.  Id. at 430-

31.  When the plaintiff complained about the illegal activity

and refused to participate in it, the "mill" fired her.  Id. at

431.  She brought a claim for intentional infliction of

emotional distress against her former employer.  Id.  The trial

court dismissed the claim, but on appeal, the Court of Appeals

wrote:

[The plaintiff] claimed that the defendants tried to
require her "to become a criminal in order to perform
her obligations under a contract" and that such
conduct was so outrageous and extreme "as to go beyond

all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized
community." Nicholson alleged that she "was directed
by members of the RICO Enterprise to ignore and not to
disclose the conduct or evidence of the illegal and
fraudulent conduct...." According to Nicholson, "[a]s
a result of the acts identified in this Complaint and
such other acts to be shown by evidence, including the
conspiracy ... to commit illegal acts ... and the
further conspiracy to cover up those acts, [she] ...
suffered injuries to person and property." She claimed
to have sustained "emotional distress that defies
description."

Id. at 433. The Court of Appeals then reversed the trial

court's dismissal of the claim. Id.

There is evidence from which a jury could find that the

facts of this case are at least as egregious as those in Fleming

and Nicholson. Plaintiff has adduced evidence that, as a favor

to friends of the Sheriff, Plaintiff was subjected to the

following: While McDaniel was waiting tables at the Shark

House, a large man with a gun and badge apprehended him and then

ordered him into a Coffee County Sheriff's car. McDaniel was

transported against his will from Flagler Beach, Florida to

Coffee County, Georgia. He spent three days in the Coffee

County jail with a large disabled man. No paperwork was filed,

his presence was not recorded, he was not informed of any

charges against him, and he never saw a judge. Upon his

eventual return to Florida, McDaniel discovered that, as a

result of his apprehension and abduction, he had lost his job

and his apartment.

Upon hearing a recitation of the foregoing facts, an average member of the community would likely exclaim, "Outrageous!"  See Wilcher, 287 Ga. App. at 453.  If proven, therefore, the facts could entitle Plaintiff to recover on his intentional infliction of emotional distress claim.  Because a reasonable person could find this conduct extreme and outrageous, summary judgment is improper.  Mableton Parkway, 273 Ga. App. at 482-83.

The Court therefore **DENIES** Paulk, Jr.'s Motion for Summary Judgment on Count XIV.


## G.   Assault and Battery

Count XII asserts claims for assault and battery.  The Court will first address Paulk, Jr.'s potential vicarious liability for these torts, and will then address each tort in turn.

As noted above, there is sufficient evidence from which a jury could find that Harper acted as Paulk, Jr.'s agent under Georgia law.  For purposes of Paulk, Jr.'s Motion for Summary Judgment, therefore, the Court assumes, in keeping with the evidence brought forth by Plaintiff, that Harper was Paulk, Jr.'s agent.  As such, Paulk, Jr. "may be held liable for [Harper's] tortious act . . . where the act was committed within the scope of the agency."  Stewart v. Storch, 274 Ga. App. 242,

245, 617 S.E.2d 218, 221 (2005).  Therefore, the Court must decide whether sufficient evidence exists from which a jury could find that if Harper assaulted or battered McDaniel while he was Paulk, Jr.'s agent, Harper committed those torts "within the scope of the agency."  Id.

In Ellison v. Burger King Corp., 294 Ga. App. 814, 815, 820, 670 S.E.2d 469, 471, 474 (2008), the manager of a Burger King restaurant, "who was charged with responding to customer complaints," came out from behind the counter to respond to a customer who said that she was not being served.  Things degenerated:

> [The plaintiff] averred that the manager "put her hands around my neck in a semi head lock position . . . and started shaking like three times or whatever. Then the manager turned loose and said, 'Are you all right now?'" The employees asked if Ellison was ready to order, and Ellison uneventfully ordered a grilled chicken salad, which she was served.

Id. at 815.  Because the manager was charged with responding to customers' complaints, the court held that the manager was acting in the course of her employment when she put the complaining customer-plaintiff in a headlock.  Id. at 820.  In the eyes of the Georgia Court of Appeals, the relationship between the manager's duties and the manager's actions was tight enough to support vicarious liability.  See id.  "Although [Ellison was] decided in the context of the employer/employee relationship, the same rules apply to the principal/agent

relationship." Stewart, 274 Ga. App. at 245 n.7.

To determine whether vicarious liability may exist here, the Court must test the tightness of the relationship between the instructions Harper received and Harper's alleged actions. The Ellison court held that when an employee tasked with responding to customers' complaints battered a complaining customer, that battery fell within the scope of employment. 294 Ga. App. at 820. In the present case, a jury could find that when an agent tasked with physically capturing a third party batters or assaults that third party, the battery or assault falls within the scope of the agency. See Stewart, 274 Ga. App. at 245 n.7 (same rules apply in principal/agent as employer/employee relationship.) Put differently, the relationship between physically capturing someone and assaulting or battering that person is tighter than the relationship between responding to a customer's complaint and battering that customer. See Ellison, 294 Ga. App. at 815. Therefore, if the latter battery falls within the scope of the agency, so does the former.

As to whether there is evidence sufficient for a jury to find that a battery or an assault occurred, the Court holds as follows: A battery is an "unlawful touching" to which the complainant did not consent. Ellison, 294 Ga. App. at 816-17. An "unlawful touching" means an objectively "offensive

touching." Id. For purposes of civil battery, "any unlawful touching of a person's body, even though no physical injury ensues, violates a personal right and constitutes a physical injury to that person." Vasquez v. Smith, 259 Ga. App. 79, 81, 576 S.E.2d 59, 61 (2003); accord Hill v. Mull, No. 504-329, 2006 WL 3022280, at *13 (M.D. Ga. Oct. 23, 2006). A touching made in the course of an unlawful arrest may be offensive. Perrin v. City of Elberton, No. 303-106, 2005 WL 1563530, at *18 (M.D. Ga. July 1, 2005).

McDaniel recalls that when Harper arrived at the Shark House to apprehend him, he took McDaniel by the arm. McDaniel deposed that Harper did not "physically drag [him] out" of the Shark House by the arm, and recalls no physical injury from being touched on the arm. (McDaniel Dep. 127-28.) However, a plaintiff need not allege any physical coercion or injury to recover on a battery claim in Georgia. Vasquez, 259 Ga. App. at 81. Moreover, because Harper touched McDaniel in the course of effecting an unlawful arrest, that touching could be reasonably viewed as offensive. Perrin, 2005 WL 1563530, at *18. If McDaniel proves that Harper took him by the arm, therefore, a jury could conclude that a battery occurred. Genuine issues of fact remain on Plaintiff's battery claim.

Assault is a different tort. Georgia's courts have indicated that assault has objective and subjective elements.

The test is more commonly stated in objective terms: "[a]n assault occurs when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another." Id.; Bullock v. Jeon, 226 Ga. App. 875, 878, 487 S.E.2d 692, 696 (1997); accord Brown v. Manning, 764 F. Supp. 183, 186 (M.D. Ga. 1991). A reasonable person's apprehension may be predicated on a threat instead of physical conduct. Wallace v. Stringer, 250 Ga. App. 850, 853, 250 S.E.2d 166, 169 (2001). Summary judgment may be proper if a subjective element is not met because the plaintiff "makes no claim that he . . . apprehended a violent injury." Kuritzky v. Emory Univ., 294 Ga. App. 370, 373, 669 S.E.2d 179, 183 (2008).

Disputed factual issues remain as to whether Harper's actions toward McDaniel, allegedly taken on Paulk, Jr.'s behalf as Paulk, Jr.'s agent, would have caused a person "reasonably to apprehend a violent injury." See Everett, 268 Ga. App. at 543. When McDaniel first saw Harper in the Shark House restaurant, Harper had the Shark House cook pinned against a wall and was handcuffing him. When the cook pointed out McDaniel, Harper walked up to McDaniel. "You're Jamie McDaniel?" he asked. (McDaniel Dep. 114-15.) The Court cannot conclude that, as a matter of law, a reasonable person would not have apprehended violent injury at this point. Whether a reasonable person would

have feared injury at this juncture is a disputed issue of material fact.

Whether Plaintiff has adduced evidence of subjective apprehension is a close question but, viewing the facts and drawing all inferences in McDaniel's favor, the Court holds that issues of material fact remain.  In describing Harper's visit to the Shark House, McDaniel deposed that after Harper asked who he was, "[Harper] said, you're coming with me.  And he had a gun.  He had a badge, and he's a pretty big guy, so I did exactly what he said."  (Id. at 115.)  "[H]e didn't have to physically drag me out," McDaniel explained later in his deposition, "because I was not going to put up any resistance, because like I said, he has a gun.  He's a big guy, you know.  I'm coming.  Sure.  Let's go."  (Id. at 128.)  Although McDaniel never expressly stated that he feared injury, a reasonable jury could infer from the foregoing language that McDaniel was apprehensive after seeing how Harper handled the cook.  Therefore, viewing the evidence as it must at this stage, the Court concludes that whether McDaniel apprehended violent injury is a disputed material fact.

The Court therefore **DENIES** Paulk, Jr.'s Motion for Summary Judgment on Count XII.

## H.    Punitive Damages

Count XVIII asserts a claim for punitive damages, and Paulk, Jr. moves to dismiss it.  Punitive damages are permitted

in § 1983 claims if the defendant acts with "reckless or callous indifference" to the plaintiff's federal rights, <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983), and on Georgia claims when clear and convincing evidence shows "willful misconduct . . . [or] wantonness," O.C.G.A. § 51-12-5.1(b). Based on the evidence adduced, the Court concludes that a jury could rationally find that these standards are met.

The Court therefore **DENIES** Paulk, Jr.'s Motion for Summary Judgment on Count XVIII.


## CONCLUSION

The Court **GRANTS** Paulk, Jr.'s Motion for Summary Judgment on Counts X, XIII, and XIV. (Dkt. No. 144.) The Court **DENIES** the Motion as to Counts VII, XI, XII, XV, XVI, and XVIII. (Dkt. No. 144.)


**SO ORDERED**, this __30th__ day of September, 2009.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA