# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| JAMIE MCDANIEL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CV 507-079 |
| | * | |
| ROBERT SMITH; ALAN G. PAULK, | * | |
| JR.; ALAN G. PAULK, SR.; JACK | * | |
| HARPER; TODD WINKLER; JOHN | * | |
| DOE 1; and JOHN DOES 2-5 | * | |
| | * | |
| Defendants. | * | |

## ORDER

Plaintiff filed the above-captioned case after an allegedly wrongful arrest and incarceration. Defendants Robert Smith, Jack Harper, and Todd Winkler are associated with the Coffee County Sheriff's Office, which made the arrest. Defendants Alan Paulk, Sr. and Alan Paulk, Jr. are private individuals from Coffee County who allegedly conspired with the other Defendants to unlawfully arrest and incarcerate Jamie McDaniel. McDaniel's Complaint contains eighteen counts, some arising under federal law and others under state law.

Defendant Alan Paulk, Sr. has moved for summary judgment on all claims against him. (Dkt. No. 154.) The Court **GRANTS** Paulk, Sr.'s Motion in part and **DENIES** it in part.

**BACKGROUND**

Although the Parties' versions of events differ on some important points, the Court construes the facts in the light most favorable to the nonmovant for the purposes of Paulk, Sr.'s Motion for Summary Judgment. <u>Wilkie v. Robbins</u>, 551 U.S. 537, 543 n.2 (2007).

The evidence shows that on March 17, 2004, McDaniel celebrated St. Patrick's Day in Atlanta, Georgia with Paulk, Jr., a childhood friend. In the early morning hours of March 18, after Paulk, Jr. had retired for the night, McDaniel was arrested for public urination and obstruction. (Citation, Dkt. No. 145 Ex. 4.) Later that day, after learning of McDaniel's incarceration, Paulk, Jr. contacted Free at Last Bail Bonding and bailed McDaniel out of the Atlanta City Jail. McDaniel's bail was set at $1,706, and Paulk, Jr. agreed to pay Free at Last Bail Bonding a nonrefundable fee of $204.22. As part of the transaction, Paulk, Jr. also agreed that if McDaniel did not comply with the conditions of his bond -- e.g., if McDaniel failed to appear on his court date -- that Paulk, Jr. would owe Free at Last "the entire amount of the bond." (Bond Agreement, Dkt. No. 145 Ex. 5.)

Paulk, Jr. and McDaniel both signed a document provided by Free at Last labeled "Limited Power of Attorney, Release and Waiver." (Dkt. No. 145 Ex. 7.) The precise wording of that

document -- in particular, the words used to describe the three
parties concerned, Free at Last, Paulk, Jr., and McDaniel -- is
significant.  The agreement began, "KNOW ALL MEN BY THESE
PRESENT, that the undersigned *principal* and *guarantor/indemnitor*
do hereby appoint, constitute and make F<small>REE AT</small> L<small>AST</small> (*surety*), its
agents and assigns my lawful attorney in fact."  (Id.) (italic
emphasis added).  The document was typewritten, but "F<small>REE AT</small> L<small>AST</small>"
was handwritten into a blank space.  Paulk, Jr. signed the
agreement over a blank labeled "Guarantor/indemnitor," and
McDaniel signed over a blank labeled "Principal."  (Id.)  The
second paragraph of the document, labeled "Waiver and Release,"
read as follows:

> In accordance with the decision of the United States
> Supreme Court in Taylor v. Taintor, 83 U.S. 366
> (1873), when bail is given, the principal is regarded
> as delivered to the custody of the *surety* (bondsmen).
> The dominion over the principal is a continuation of
> the original imprisonment.  The undersigned agrees
> that whenever the *surety* chooses to do so, the *surety*,
> *or his agent*, may seize the principal and deliver
> him/her to the proper authorities, and if this cannot
> be done at once, the surety may imprison him/her until
> such delivery may be effectuated.  The *surety* may
> exercise this right in person, *or through an agent*,
> may pursue the principal into another state or even
> another country, may arrest on the Sabbath, may break
> and enter his/her place of residence, or other similar
> action to effectuate such an arrest.  No new process
> is required to make such a seizure.  I further hereby
> release said *surety*, and make *its agents or assigns*,
> from any liability by reason thereof.

(Id.) (emphasis added).

McDaniel failed to appear on his court date. Although no arrest warrant was issued, McDaniel's bond was revoked. (Carter Dep. 18.) Free at Last declined to send a bail recovery agent after McDaniel, who had since moved to Florida, and instead demanded bond payment from Paulk, Jr. Free at Last ultimately sued Paulk, Jr. to recover the money. (Free at Last compl., Dkt. No. 115 Ex. 1.)

After speaking with an Atlanta Solicitor, Shirea Grant, Paulk, Jr. believed that his debt on the bond would be forgiven if he arranged to have McDaniel delivered to the Atlanta City Jail. (Paulk, Jr. Dep. 130, 134-35.) For financial reasons, and because he was "very mad" at McDaniel, Paulk, Jr. began exploring his options for returning McDaniel to Atlanta. (Id. at 158.) He ultimately turned to his father, who had contacts with the Coffee County Sheriff's Office, for assistance.

Paulk, Sr. was a friend and political contributor of then-Coffee County Sheriff Robert Smith.[1] Paulk, Sr. was also acquainted with Jack Harper, a reserve Coffee County Deputy Sheriff and self-described "flunky" who occasionally performed various tasks at Paulk, Sr.'s direction. (Harper Dep. 78.)

Paulk, Sr. called Harper and told him about Paulk, Jr.'s situation. Harper told Paulk, Sr. that if he could provide an

---

[1] Smith was indicted on eight counts relating to misconduct while in office. He pled guilty to a single count, "malpractice and malfeasance," and received a suspended sentence in return for surrendering his P.O.S.T. certification. (Smith Dep. 294-97.) He subsequently resigned.

address, picture, and arrest warrant for McDaniel, then Harper
would try and help the Paulks. (Paulk, Jr. Dep. 94-95.) The
next day, Paulk, Sr. called Harper with the Flagler Beach,
Florida address of the restaurant where McDaniel was working.
(Id. at 96.) As for the warrant and picture, Harper advised
Paulk, Sr. that the Atlanta authorities would probably only be
willing to fax a copy to law enforcement authorities, so he
would have to go through the Sheriff's Office to get these
items.

Paulk, Sr. then visited the Coffee County Sheriff's Office
to speak with the Sheriff about his son's predicament. (Smith
Dep. 94.) Smith advised Paulk, Sr. that he could not send
deputies across state lines to arrest on a bench warrant or
citation. Smith was able, however, to have the City of Atlanta
fax a copy of McDaniel's failure to appear citation to his
office. (Id.)

Paulk, Sr. and Smith then called Harper to come and pick up
the copy of the citation. (Id. at 108.) In addition to
providing Harper with the failure to appear citation, Smith
suggested that Harper take a marked Coffee County patrol car to
Flagler Beach to apprehend McDaniel. As a favor to the Paulks,
Harper agreed to make the trip without compensation. (Paulk,
Jr. Dep. 109.)

When Harper arrived at the Shark House restaurant in Flagler Beach, he was dressed in plain clothes. He carried handcuffs, a gun, an "Authorized Fugitive Recovery Agent" ID card, and a "Bail Bond Investigator" badge, which he wore around his neck. Harper had no permit for the gun and had purchased the badge and ID card somewhere in Alabama. (Harper Dep. 187, 192-93, 205.)

Harper walked inside and, spotting an employee who looked like McDaniel, pinned the employee against a wall and began to handcuff him. McDaniel approached while Harper was in the process of apprehending this person, who turned out to be the restaurant's cook. The cook saw McDaniel and said, "That's Jamie McDaniel." (McDaniel Dep. 114-15.) Harper then walked up to McDaniel. "You're Jamie McDaniel?" he asked. (Id.) McDaniel said that he was. Harper said, "You're coming with me," and McDaniel complied. (Id.) Harper took McDaniel by the arm, put him in the patrol car, and drove north. (Id. at 127-28.) Harper did not have a warrant because the City of Atlanta had not issued one.[2] (Carter Dep. 20.)

---

[2] Although there is some dispute as to whether a warrant for Plaintiff was issued, the only argument that Paulk, Jr. makes in support of the warrant's existence is based on the unsworn hearsay statement of Solicitor Grant that Plaintiff's arrest citation constituted a warrant. Such evidence is not sufficient to create a factual dispute as to the existence of the warrant. See Macuba v. Deboer, 193 F.3d 1316, (11th Cir. 1999) ("[I]nadmissible hearsay cannot be considered on a motion for summary judgment." (internal quotation marks omitted)). Plaintiff, however, has produced evidence showing that no warrant was ever issued for Plaintiff in connection with either the public urination and obstruction charges or the failure to appear citation.

Harper was too tired to drive McDaniel all the way to Atlanta. Instead, Harper called Smith about what to do with McDaniel and, at Smith's direction, drove McDaniel back to the Coffee County jail. (Harper Dep. 135-40.)

McDaniel remained incarcerated in the Coffee County jail for approximately three days. (McDaniel Dep. 117; Worrell Dep. 46.) His presence in the jail was not recorded, he never saw a magistrate judge, and he was never informed of any charges pending against him.

After three days, Deputy Sheriff Todd Winkler came into the jail and told McDaniel, "I'm carrying you up to Atlanta." (McDaniel Dep. 117-18.) McDaniel asked why, but Winkler only responded that he was following his supervisor's orders. Winkler put McDaniel in the back seat of his car and drove to the Atlanta City Jail.

The authorities at the Atlanta jail, however, could not find a warrant or other document authorizing them to take McDaniel into custody. An angry Winkler called Smith and explained that the Atlanta authorities would not take McDaniel without the proper paperwork. (Smith Dep. 151.) Smith advised Winkler to "turn [McDaniel] loose." (Id.) Winkler tried to leave McDaniel at the jail, but the Atlanta authorities refused to allow the Deputy Sheriff to leave without McDaniel. So

(Carter Dep. 20.) As such, there is no genuine issue of material fact as to the existence of a warrant for Plaintiff.

Winkler let McDaniel sit in the front seat of the patrol car and started driving back to Coffee County. (McDaniel Dep. 118-19.)

Winkler called Smith on the way and asked, "What are we going to do with this guy?" (Id. at 119.) He drove McDaniel to the Coffee County police station, where McDaniel was released on Smith's orders. Harper called and apologized to McDaniel, then offered to give McDaniel a ride back to Florida. McDaniel responded, "I can get down there on my own. Thanks but no thanks." (Id.)

Upon returning to Florida, McDaniel learned that his boss had fired him on the mistaken assumption that he had committed a grave criminal offense. McDaniel's landlord had evicted him for the same reason.

On July 20, 2006, McDaniel sued in the State Court of Cobb County, Georgia. He later voluntarily dismissed the suit, and on September 25, 2007, he filed the instant action in the Southern District of Georgia.

## DISCUSSION

I. SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must view all facts and draw all inferences in favor of the

nonmovant.  <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007).  When the

parties' evidence conflicts, the Court credits the evidence of

the nonmovant.  <u>Evans v. Stephens</u>, 407 F.3d 1272, 1277 (11th

Cir. 2005).  The Court also credits undisputed evidence adduced

by the movant.  <u>Reese v. Herbert</u>, 527 F.3d 1253, 1268-69 (11th

Cir. 2008).  However, the court may not decide issues of fact at

the summary judgment stage.  <u>Transamerica Leasing, Inc. v. Inst.</u>

<u>of London Underwriters</u>, 267 F.3d 1303, 1308 (11th Cir. 2001).


## II. WAIVER AND RELEASE

Defendant Paulk, Sr.'s first argument, which applies to all

counts in the Amended Complaint, is based on the paragraph

labeled "Waiver and Release" in the document entitled "Limited

Power of Attorney, Release and Waiver."  (Dkt. No. 145 Ex. 7.)

That paragraph stated, in part, that "[t]he undersigned agrees

that whenever the *surety* chooses to do so, the *surety*, or his

*agent*, may seize the principal and deliver him/her to the proper

authorities . . . . I further hereby release said *surety*, and

make its *agents or assigns*, from any liability by reason

thereof."  (<u>Id.</u>) (emphasis added).  Because Paulk, Sr.'s son,

Paulk, Jr., signed this release document as a "guarantor,"

Paulk, Sr. argues that McDaniel discharged Paulk, Jr. from all

liability stemming from McDaniel's recapture.  Paulk, Sr. thus

claims that he cannot be held liable for his role in effecting

McDaniel's arrest because he was only helping Paulk, Jr. exercise his contractual rights.

Paulk, Sr.'s argument does not succeed unless his son was contractually authorized to seize McDaniel.  The "Limited Power of Attorney, Release and Waiver" purports to release the "surety[] or his agent" from liability.  The Court, therefore, must first determine which party constitutes a "surety" under the terms of the contract.  Second, the Court must determine whether the rights of the "surety" passed to any other party when McDaniel failed to appear in court.

The first sentence of the contract reads, "KNOW ALL MEN BY THESE PRESENT, that the undersigned *principal* and *guarantor/indemnitor* do hereby appoint, constitute and make FREE AT LAST (*surety*), its agents and assigns my lawful attorney in fact."  (Id.) (italic emphasis added).  Paulk, Jr. signed the agreement as "Guarantor/indemnitor," and McDaniel signed as "Principal."  (Id.)

This first sentence indicates that the parties distinguished between the "principal," the "guarantor/indemnitor," and the "surety."  Based on the places where they signed the document, it is clear that McDaniel was the "principal" and Paulk, Jr. was the "guarantor/indemnitor." Based on the parenthetical label "surety" following the blank

space where "FREE AT LAST" was handwritten, it is equally clear that the parties intended for "surety" to refer to Free at Last.

The release of liability applied only to the "surety" and its "agents or assigns." Paulk, Jr. was neither an agent nor an assignee of Free at Last; nor, by extension, was his father, Paulk, Sr. Therefore, although the agreement might have released Free at Last from liability for apprehending McDaniel, it did not release Paulk, Jr. or any of his agents and assigns, including his father, Paulk, Sr.

Paulk, Sr. correctly observes that O.C.G.A. § 10-7-1 states that there "shall be no distinction between" a guarantor and a surety. This Code provision, however, does not control the definitions of "surety" and "guarantor" in the instant contract. "If the language of a contract is clear and unambiguous, we enforce those terms and need not look elsewhere to assist in the contract's interpretation." Mariner Healthcare v. Foster, 280 Ga. App. 406, 409-10, 634 S.E.2d 162, 166 (2006). Although the Georgia Assembly does not distinguish between the contracts of sureties and guarantors, the parties to this private contract were free to use those terms however they wanted. Where the terms of the agreement between the parties are clear, this Court will give those terms effect.

Here, the clear and unambiguous language of the agreement evinces the parties' intent that the term "surety" refer only to

Free at Last. Paulk, Jr. was intended to be a guarantor for Plaintiff's repayment to Free at Last should Plaintiff fail to appear. The agreement, in essence, contemplated two distinct suretyships -- Free at Last was liable for McDaniel's bond if McDaniel failed to appear (first surety), and if Free at Last had to pay, then Paulk, Jr. would be liable to Free at Last (second surety). The contract used the word "surety" to refer to the first surety (Free at Last), and the words "guarantor/indemnitor" to refer to the second surety (Paulk Jr.). The release of liability, therefore, which purported to release only the party designated as the "surety," applied solely to Free at Last. Because Paulk, Sr. was not an agent or assignee of the "surety" contemplated by the parties in the "Waiver and Release," the document does not release him from any liability arising out of his role as an agent for his son.

To the extent Paulk, Sr. argues that Paulk, Jr. assumed Free at Last's rights under the contract when McDaniel failed to appear, his argument fails for three reasons. First, neither the "Limited Power of Attorney" nor any other document suggests that, if McDaniel skipped bail, the rights McDaniel ceded to Free at Last would automatically transfer to Paulk, Jr., or that Paulk, Jr. would automatically become an agent of Free at Last. The forfeiture of McDaniel's bond triggered Paulk, Jr.'s contractual duties as a guarantor, but nothing in the "Limited

Power of Attorney, Release and Waiver" suggests that forfeiture of the bond would broaden the scope of the parties to whom McDaniel had granted rights over his person. (Bond Agreement, Dkt. No. 145 Ex. 5.)

Second, neither the contract nor Free at Last could have authorized Paulk, Jr. or Harper to act as bail recovery agents, because both Paulk, Jr. and Harper were statutorily barred from performing that function. Neither law enforcement agents (e.g., Harper) nor attorneys (e.g., Paulk, Jr.) may "engage either directly or indirectly in the bail bond business." O.C.G.A. § 45-11-8(a). Bail recovery agents must have valid firearms licenses. O.C.G.A. § 17-6-56(b). Bail recovery agents must undergo eight hours of continuing education each year. O.C.G.A. § 17-6-56.1(c). See also O.C.G.A. § 17-6-56(c) (bail recovery agents must be registered with sheriff in counties where they reside and "do[] business"); O.C.G.A. § 17-6-57(c) (bail recovery agents must carry identification cards). The evidence does not indicate that either Paulk, Jr. or Harper satisfied these requirements. Therefore, if any agreement purported to authorize Paulk, Jr. or Harper to act as bail recovery agents, that agreement would be void as illegal. O.C.G.A. § 13-8-1 ("A contract to do an . . . illegal thing is void."); Harpagon Co. v. Huff, 296 Ga. App. 107, 111, 673 S.E.2d 592, 595 (2009).

Finally, even if Free at Last could have authorized Paulk, Jr. or Harper to act on its behalf, there is no evidence that Free at Last sought to do so. Paulk, Jr. deposed that Free at Last never gave him the authority to apprehend Plaintiff on their behalf. (Paulk, Jr. Dep. 125.) Harper also denied any authorization to act as a bail recovery agent for Free at Last. (Harper Dep. 155.)

Accordingly, the Court holds that although the contract may have released Free at Last from liability for apprehending McDaniel, it did not release Paulk, Jr. And because Paulk, Jr. is not protected by the terms of the release, neither are his agents and assigns. Thus, the "Limited Power of Attorney, Release and Waiver" does not release Paulk, Sr. from liability for any role he may have played in the apprehension and detention of Plaintiff.


III. SECTION 1983 CLAIM

In Count VII of the Amended Complaint, Plaintiff alleges that Paulk, Sr. is liable under 42 U.S.C. § 1983. Paulk, Sr. makes two arguments suggesting there was no violation of this statute. First, he argues that there was no constitutional deprivation of McDaniel's rights because McDaniel was "constructively imprisoned" while he was out on bail. Second, Paulk, Sr. argues that he was not a state actor.

A.   Constructive Imprisonment

Citing Taylor v. Taintor, 83 U.S. 366 (1872), Paulk, Sr.
argues that McDaniel remained "constructively imprisoned" while
released on bond.  Thus, Paulk, Sr. suggests, "any subsequent
re-arrest, imprisonment, or interstate pursuit of McDaniel did
not infringe on any constitutional right."  (Paulk, Sr.'s Br. in
Supp. 9.)  This argument is rooted in the following language
from Taylor:

> When bail is given, the principal is regarded as
> delivered to the custody of his sureties. Their
> dominion is a continuance of the original
> imprisonment. Whenever they choose to do so, they may
> seize him and deliver him up in their discharge; and
> if that cannot be done at once, they may imprison him
> until it can be done. They may exercise their rights
> in person or by agent. They may pursue him into
> another State; may arrest him on the Sabbath; and, if
> necessary, may break and enter his house for that
> purpose. The seizure is not made by virtue of new
> process. None is needed. It is likened to the rearrest
> by the sheriff of an escaping prisoner.

83 U.S. at 371.  Paulk, Sr. argues that because his son was a
surety of Free at Last, and Free at Last was McDaniel's surety,
Paulk, Jr. could rightfully exercise "dominion" over Plaintiff
after he failed to appear in court.  And because McDaniel had
waived his rights in exchange for his release on bond, Paulk,
Sr. continues, there was no constitutional deprivation when
McDaniel was later apprehended through the efforts of Paulk, Jr.
and his co-conspirators.

*Taylor*, however, is inapposite in this case. *Taylor* stands for the proposition that a bailed-out defendant remains under the "dominion" of his bondsmen while he is out on bond. *Id.* at 371; *accord* *Outz v. Maryland Nat. Ins. Co.*, 505 F.2d 547, 551 (9th Cir. 1974). But *Taylor* does not address the relationship between a bailed-out defendant and his bondsmen's surety -- i.e., the bailed-out defendant's surety's surety. Therefore, while *Taylor* speaks to the power that bail bondsmen such as Free at Last may have, it does not address what, if any, power an unlicensed guarantor may have over the principal.

Cases decided after *Taylor* make clear that the right of a bondsman over a bailed-out defendant "arises from the private relationship between the bondsman and his principal." *McCoy v. Johnson*, 176 F.R.D. 676, 679 (N.D. Ga. 1997); *accord* *Fitzpatrick v. Williams*, 46 F.2d 40, 40 (5th Cir. 1931) ("The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bond.").[3] In this case, the "private relationship" between McDaniel, Paulk, Jr., and Free at Last was spelled out in a written agreement. As discussed above, that written agreement gave Free at Last the right to "seize [McDaniel] and deliver him[] to the proper authorities," but did

_____

[3] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

not go so far as to confer such a right on Paulk, Jr. The "private relationship" between McDaniel, Free at Last, and Paulk, Jr., therefore, did not authorize Paulk, Jr. or his agents to seize McDaniel. See McCoy, 176 F.R.D. at 679; Fitzpatrick, 46 F.2d at 40.

Although Taylor does not address any rights that Paulk, Jr. might have had over McDaniel, the Georgia Code does. As noted above, Georgia law prohibits attorneys from engaging, directly or indirectly, in bail recovery. O.C.G.A. § 45-11-8(a). There is also no evidence that Paulk, Jr. had a firearms license, attended continuing education courses, registered with the Fulton County sheriff, or carried a card identifying him as a bail recovery agent. See O.C.G.A. §§ 17-6-56(b), 17-6-56.1(c), 17-6-56(c), 17-5-57(c). Therefore, while Taylor does not address whether Paulk, Jr. had the right to apprehend McDaniel, state law bars Paulk, Jr. from exercising "dominion" over McDaniel in the manner of a bail bondsman.

Because Taylor does not address the relationship between a bailed-out defendant and his unlicensed guarantor, because the "private relationship" between McDaniel and Paulk, Jr. did not authorize Paulk, Jr. to apprehend McDaniel, and because state law forbade Paulk, Jr. to act as a bondsman, Taylor did not authorize Paulk, Sr. to assist his son in the apprehension of McDaniel. See Taylor, 83 U.S. at 371; see also O.C.G.A. § 45-

17

11-8(a); <u>McCoy</u>, 176 F.R.D. at 679; <u>Fitzpatrick</u>, 46 F.2d at 40.


B.    <u>State Actor</u>

Paulk, Sr. argues that he is not liable under § 1983 because he is not a state actor.  Section 1983 imposes liability for unconstitutional actions taken "under color of state law." <u>Nelson v. Campbell</u>, 541 U.S. 637, 643 (2004).  Furthermore, most constitutional provisions themselves -- including the right to liberty secured by the Fourteenth Amendment -- proscribe only conduct that is "fairly attributable" to the government.  <u>Lugar v. Edmonson Oil Co.</u>, 457 U.S. 922, 937 (1982).  In the context of a § 1983 suit premised on constitutional violations, these two tests -- "color of state law" and "fair attribution" -- are identical.  <u>Id.</u> at 928-29.  Paulk, Sr., therefore, may be liable under § 1983 if his conduct passes the "fair attribution" test. <u>Id.</u>

The "fair attribution" test has two prongs.  <u>Id.</u> at 937; <u>accord Harvey</u>, 949 F.2d at 1130.  First, for § 1983 liability to accrue, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible."  <u>Lugar</u>, 457 U.S. at 937.  Phrased differently, this first prong asks whether the alleged violation "could in any way be ascribed to a governmental decision."  <u>Id.</u> at 937-38.

18

The first prong tests the relationship between the allegedly unconstitutional conduct and the government.  Id. (citing Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972)).  Second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  Lugar, 457 U.S. at 937. This second prong tests the relationship between the government and the private party.  Id. at 938-39 (citing Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978)).  Here, the first prong will test the relationship between McDaniel's allegedly unconstitutional arrest and the government, and the second prong will test the relationship between the government and Paulk, Sr.

Plaintiff's evidence regarding the first prong is adequate to withstand summary judgment -- i.e., the evidence would permit a jury to conclude that McDaniel's apprehension was sufficiently related to government action.  See Lugar, 457 U.S. at 937-38. Harper was a sworn Coffee County Deputy driving an official Coffee County car.  Therefore, Harper was "a person for whom the state is responsible," and his decisions to locate McDaniel at the address that Paulk, Sr. provided[4] and to apprehend McDaniel in accordance with Paulk, Sr.'s instructions can be ascribed to the government.  See id.; Harvey, 949 F.2d at 1130; see

---

[4] Although the evidence suggests that it may have been Paulk, Jr. who discovered Plaintiff's work location through conversations with Plaintiff's parents, Harper deposed that it was Paulk, Sr. who actually provided Harper the address where Plaintiff could be found.  (Harper Dep. 113.)

generally <u>Soldal v. Cook County</u>, 506 U.S. 56 (1992) (holding deputy sheriffs liable under § 1983).

Here, the rubber meets the road on the second prong. The second prong requires that the person "charged" with the deprivation of rights be a state actor. See <u>Lugar</u>, 457 U.S. at 937; <u>Harvey</u>, 949 F.2d at 1130. This prong tests the relationship between Paulk, Sr. and the government. See <u>Lugar</u>, 457 U.S. at 137. Only in rare circumstances can a private party, like Paulk, Sr., be viewed as a state actor. <u>Harvey</u>, 949 F.3d at 1130. However, where a private party is "jointly engaged" with government officials in the challenged action, that private party may be considered a state actor and may be liable under § 1983. <u>Dennis v. Sparks</u>, 449 U.S. 24, 28 (1980); <u>accord Lugar</u>, 457 U.S. at 931; <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 152 (1970); <u>Harvey</u>, 949 F.2d at 1133. This joint-engagement theory of § 1983 liability is sometimes called a theory of § 1983 "conspiracy." See <u>Harvey</u>, 949 F.2d at 1133.

The Eleventh Circuit has elaborated on the "jointly engaged" test and has traced the line upon which Plaintiff's evidence survives or fails. If Paulk, Sr. was "merely calling upon" official authority, albeit insistently, without joining in the exercise of that authority, then he would not be a state actor and cannot be liable under § 1983. <u>Dye v. Radcliff</u>, 174 F. App'x 480, 482-83 (11th Cir. 2006) ("[W]e join other circuits

in saying that a private party does not act under color of state law merely by calling upon official state authority when he does not also join in the exercise thereof."); see id. at 483 n.1 (collecting cases).  If, however, the evidence would permit a rational factfinder to conclude that Paulk, Sr. "reached an understanding" with an official to deprive McDaniel of his rights, then Plaintiff's § 1983 conspiracy claim may survive summary judgment.  Rowe v. City of Ft. Lauderdale, 279 F.3d 1271, 1283 (11th Cir. 2002); Lowe v. Aldridge, 958 F.2d 1565, 1573 (11th Cir. 1992); N.A.A.C.P. v. Hunt, 891 F.2d 1555, 1563 (11th Cir. 1990).  To establish this "understanding," Plaintiff need not show a "smoking gun," but must furnish "some evidence of agreement among defendants."  Rowe, 279 F.3d at 1284; Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir. 1990).

The question this Court must decide, therefore, is whether a jury could reasonably conclude that Paulk, Sr. "reached an understanding" with Coffee County officials, see Rowe, 279 F.3d at 1283, or whether the most that could be rationally inferred from the evidence adduced is that Paulk, Sr. "call[ed] upon" those officials, see Dye, 174 F. App'x at 482-83.[5]

---

[5] The Court recognizes that some tension may exist between Dye and Rowe.  Dye states that "a private party does not act under color of state law merely by calling upon official state authority when he does not also join in the exercise thereof."  174 F. App'x at 482-83.  Rowe reaffirmed earlier decisions establishing that when a private party and an official "reach[] an understanding" to violate a plaintiff's rights, the private party may be liable under a theory of § 1983 conspiracy.  279 F.3d at 1283-84.  These rules could overlap in the case of a private defendant who "reached an

Adickes v. S.H. Kress & Co.[6] is instructive.  In that case

Miss Adickes, a Caucasian schoolteacher, alleged that she

entered the Kress restaurant in Hattiesburg, Mississippi to eat

lunch with six African-American students.  Id. at 146-47.  After

they sat down, a policeman entered and observed Adickes sitting

with the students.  Id. at 149.  A waitress then took the

students' orders, but refused to take Adickes's, allegedly

because she was sitting with African-Americans.  Id.  The group

left, but as Adickes stepped onto the sidewalk, the policeman

who had observed the group at their table arrested Adickes on a

trumped-up vagrancy charge.  Id.

Adickes's complaint alleged that "both the refusal of

service and her subsequent arrest were the product of a

conspiracy between Kress [a private entity] and the Hattiesburg

police."  Id. at 148.  The Kress manager admitted that he had,

by "a prearranged tacit signal" (a nod of his head), instructed

the food counter supervisor not to serve Adickes.  Id. at 153-

54.  But the Kress manager and all the police officers involved

---

understanding" with an official to violate a plaintiff's rights, but who did
not "join in the exercise" of official authority after conspiring with the
official.  See Dye, 174 F. App'x at 482-83; Rowe, 279 F.3d at 1283-84.  In
any event, the evidence pushes this case beyond any Dye and Rowe overlap into
clear Rowe territory.  That is, by showing that Paulk, Sr. used his contacts
at the Sheriff's Office to obtain a blown-up photograph of McDaniel and
caucused with the Coffee County Sheriff and a mutual associate about
apprehending McDaniel, Plaintiff has created an issue of fact as to whether
Paulk, Sr. "join[ed] in the exercise" of official authority.  See Dye, 174 F.
App'x at 482-83.

[6] 398 U.S. 144 (1970).

uniformly denied any communication between the Kress employees and the police force regarding whether to serve or arrest Adickes. <u>Id.</u> at 153-55. Adickes herself "had no knowledge of any communication between any Kress employee and any member of the Hattiesburg police, and was relying on circumstantial evidence to support her contention that there was an arrangement between Kress and the police." <u>Id.</u> at 155-56. Adickes pointed out that "noncircumstantial evidence of the conspiracy could only come from adverse witnesses." <u>Id.</u> at 157.

The District Court granted summary judgment to Kress on the § 1983 conspiracy claim, and the Court of Appeals affirmed. <u>Id.</u> at 148. The Supreme Court reversed. Writing for the Court, Justice Harlan stated:

> We think that on the basis of this record, it was error to grant summary judgment. As the moving party, respondent had the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party. Respondent here did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some Kress employee that petitioner not be served . . . . If a policeman were present, we think it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a Kress employee had a "meeting of the minds" and thus reached an understanding that petitioner should be refused service.  Because on summary judgment the inferences to be drawn from the underlying facts contained in the moving party's materials must be viewed in the light most favorable to the party opposing the motion, we

> think respondent's failure to show there was no
> policeman in the store requires reversal.

Id. at 157-59 (internal citations omitted).  Thus, evidence that

a policeman entered the restaurant and observed Adickes, and

that the same policeman arrested her outside, was sufficient to

preclude summary judgment on the § 1983 conspiracy claim.  Id.

Here, there is conflicting evidence as to whether a

"meeting of the minds" occurred between Paulk, Sr. and Harper.

See id.  On one hand, Paulk, Sr. deposed that his involvement

in McDaniel's apprehension was limited to accompanying his son

"to speak with an assistant district attorney in Atlanta about

the legality of sending a bounty hunter" after McDaniel.

(Paulk, Sr. Dep. 117.)  Paulk, Sr. denies participating in the

hiring or securing of a bounty hunter.  (Id.)  He also claims to

have been unaware that Harper traveled to Flagler Beach in a

marked patrol car.  (Id. at 121.)

Other evidence, however, could lead a reasonable jury to

infer that Paulk, Sr. "reached an understanding" with Smith and

Harper regarding McDaniel's apprehension.  Paulk, Sr. and Smith

were friends, and Paulk, Sr. made a political campaign

contribution to the Sheriff shortly before the events giving

rise to this litigation.  (Paulk, Jr. Dep. 163-64.)  Harper was

also a long-time associate of Paulk, Sr.  Harper referred to

himself as Paulk, Sr.'s "flunky" and occasionally provided

security at Paulk, Sr.'s lake property. (Id. at 75-77; Harper Dep. 78.)

There is other evidence beyond these associations from which a jury could conclude that Paulk, Sr. assisted Harper and Smith in the exercise of their official authority. According to Harper, Paulk, Sr. provided Harper with the Florida address of the restaurant where McDaniel worked, along with a blown-up photograph of McDaniel that appeared to have been taken by law enforcement. (Harper Dep. 96-97.) Paulk, Sr. also went to Smith's office for help with getting a bench warrant for McDaniel's arrest.[7] (Smith Dep. 94-96.) Paulk, Sr. turned over the alleged warrant to Harper at the Coffee County Sheriff's Office with the mandate to "find [McDaniel] and bring him back to meet the judge." (Harper Dep. 135.) Harper agreed and Smith, in the presence of Paulk, Sr., volunteered to let Harper drive a patrol car to Flagler Beach. (Smith Dep. 117-18.) Evidence exists, therefore, to suggest that Paulk, Sr. conspired with Harper and Smith to effect McDaniel's unauthorized warrantless arrest. If Paulk, Sr. did reach an agreement with Harper and Smith to violate McDaniel's rights, then Paulk, Sr. may be liable under § 1983 as a state actor.

---

[7] As explained above, there is no admissible evidence that a warrant was ever actually obtained, but Smith was able to acquire a faxed copy of McDaniel's failure to appear citation. (Smith Dep. 96.) See also supra note 2.

There is also sufficient evidence to suggest that Paulk, Sr.'s actions went beyond merely "calling on state authority and reporting a crime." (Paulk, Sr. Br. in Supp. 12); see also Dye, 174 F. App'x at 482-83. Paulk, Sr. procured the failure to appear citation through the Sheriff's Office, provided Harper with McDaniel's photograph and the address where he could be found, and ultimately directed Harper to "go pick up [McDaniel] for him." (Smith Dep. 117.) Taking all of these facts together, a jury could conclude that Paulk, Sr. "reached an understanding" with Harper and assisted in the exercise of Harper's authority. See Rowe, 279 F.3d at 1283. The evidence supporting an "understanding" in this case is significantly stronger than the evidence adduced by the plaintiff in Adickes. Because summary judgment on the § 1983 conspiracy claim was improper in Adickes, it is also improper here.

The Court therefore **DENIES** Paulk, Sr.'s Motion for Summary Judgment on Count VII.


IV.  STATE LAW CLAIMS

A.  False Arrest

Count X of the Amended Complaint asserts a claim for false arrest. Paulk, Sr. argues that Plaintiff's claim for false arrest fails because, according to Plaintiff's version of

events, there was no arrest warrant.[8] (Carter Dep. 20.) Paulk, Sr. correctly points out that, unlike a claim for wrongful imprisonment, the tort of false arrest must be predicated on an arrest for which a warrant existed. Ferrell v. Mikula, 295 Ga. App. 326, 333, 672 S.E.2d 7, 13 (2008). No warrant has ever been produced, nor is there any admissible evidence that a warrant for Plaintiff was ever issued. Accordingly, Plaintiff's false arrest claim necessarily fails.

The Court therefore **GRANTS** Paulk, Sr.'s Motion for Summary Judgment on Count X.

B.  Wrongful Imprisonment

Paulk, Sr. next argues that Plaintiff's wrongful imprisonment claim fails because McDaniel was constructively imprisoned under Taylor v. Taintor, 83 U.S. at 371, while out on bond. However, O.C.G.A. § 510-7-20 defines false imprisonment as the "the *unlawful* detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." (emphasis added). As explained above, Taylor may have given Free at Last the right to apprehend McDaniel, but it did not give that right to Paulk, Jr. or any of his agents or assigns -- including Paulk, Sr. Therefore, if Paulk, Sr. assisted in effecting McDaniel's arrest, that seizure would be

---

[8] See supra note 2.

"unlawful" and Paulk, Sr. could be liable for wrongful imprisonment.

The Court therefore **DENIES** Paulk, Sr.'s Motion for Summary Judgment on Count XI.


C.    Breach of Legal Duty

Plaintiff's claim entitled "Breach of Legal Duty," numbered Count XV, includes the following language: "[T]he laws, rules, and regulations pertaining to recovery of bail bonds, to bail recovery agents, to bail enforcement agents, and/or to recovery of debts, created legal obligations to Plaintiff." (Am. Compl. ¶ 114.) "Defendants intentionally or negligently, or with reckless disregard of the consequences to Plaintiff, breached their duty or duties of due care causing Plaintiff damages." (Am. Compl. ¶ 115.) "Defendants were negligent per se." (Am. Compl. ¶ 116.)

Paulk, Sr. focuses only on the portion of this claim that alleges negligence *per se*. He argues that Count XV fails because Plaintiff did not specify the particular rule or regulations that the defendant allegedly violated. (Paulk, Sr. Br. in Supp. 14.) According to Paulk, Sr.'s understanding of Quinn v. City of Cave Springs, 243 Ga. App. 598, 532 S.E.2d 131 (2000), a defendant is entitled to summary judgment on a count

of negligence *per se* if a plaintiff fails to specify the law that the plaintiff contends the defendant violated.

But the Quinn court affirmed summary judgment for the defendant on the plaintiff's claim of negligence *per se* only after the plaintiff failed to specify the allegedly violated rule either "in his complaint [] or in his response to the [defendant's] motion." 243 Ga. App. at 600. In Plaintiff's Brief in Response to Paulk, Sr.'s Motion for Summary Judgment, Plaintiff cites, *inter alia*, Fla. Stat. § 648.30 (bail recovery agents must be registered), O.C.G.A. § 17-6-56 (outlining qualifications for bail recovery agents and requiring registration of all such agents with county sheriff), O.C.G.A. § 17-6-56.1 (bail bondsmen must obtain continuing education), and O.C.G.A. § 45-11-8(a) (neither attorneys nor law enforcement officials may engage in bail recovery). Because Plaintiff has specified the allegedly violated laws in his response, Quinn is distinguishable. See also Hamilton v. Allen-Bradley Co., 244 F.3d 819, 823 (11th Cir. 2001) ("A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests.").

The Court therefore **DENIES** Paulk, Sr.'s Motion for Summary Judgment on Count XV.

D.  Agency Liability

Count XVI of the Amended Complaint is labeled "Agency
Liability."  Paulk, Sr. argues that this count fails for two
reasons.

First, Paulk, Sr. argues that "principles of agency
liability do not apply to § 1983 claims."  (Paulk, Sr. Br. in
Supp. 15.)  Paulk, Sr. is correct that principles of vicarious
liability and respondeat superior do not apply to § 1983 claims.
Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948 (2009).  However, Paulk,
Sr.'s potential § 1983 liability in this case does not arise
through a vicarious liability, respondeat superior, or agency
theory, but instead through his alleged act of conspiring with
law enforcement officials to deprive McDaniel of his rights.
See Rowe, 279 F.3d at 1284.  A § 1983 conspiracy differs from
vicarious liability in that a defendant must perform an
affirmative act -- i.e., he must "reach[] an understanding" with
an official -- before § 1983 liability will attach, whereas
vicarious liability allows a defendant to be held liable solely
on the basis of his relationship with another actor.  Nat'l R.R.
Passenger Corp. v. Rountree Transp. and Rigging, Inc., 286 F.3d
1233, 1256 (11th Cir. 2002) (applying Florida law); accord
Black's Law Dictionary 934 (8th ed. 2004).

Second, Paulk, Sr. argues, without citation to any legal
authority, that "[i]n addition to the above, the undisputed

facts establish Paulk, Sr. cannot be liable for the actions of the other Defendants." (Paulk, Sr. Br. in Supp. 15.) Because this sentence begins the paragraph following the paragraph in which Paulk, Sr. addressed § 1983 liability, this sentence appears to be based on state law principles of agency. The Court therefore suspects, but is not certain, that Paulk, Sr. is arguing that the other Defendants were not his agents under applicable state law. In response, Plaintiff argues that Paulk, Sr. is liable under state law principles of agency, citing O.C.G.A. §§ 10-6-1, 10-6-60, 51-2-1, and 51-2-2.

In the absence of citation or elaboration from the parties, and because it is not clear what argument has been made, the Court is reluctant to issue a ruling as to whether any other Defendants may be state-law agents of Paulk, Sr. See Flanigan's Enters., Inc. v. Fulton County, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (argument waived in absence of citation or elaboration); Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (same). The Court does not now issue a ruling regarding state law agency. The Court does rule, however, that Paulk, Sr.'s second argument in support of summary judgment on Count XVI fails.

The Court therefore **DENIES** Paulk, Sr.'s Motion for Summary Judgment on Count XVI.

E.   Invasion of Privacy

Count XIII asserts a claim for "intruding into Plaintiff's
private affairs and solitude." (Am. Compl. ¶ 108.) In order to
prevail on such a claim, Plaintiff must show an "unreasonable
intrusion" into his privacy. Yarbray v. So. Bell Tel. &
Telegraph Co., 261 Ga. 703, 705, 409 S.E.2d 835, 837 (1991). To
prove an "unreasonable intrusion," Plaintiff must make two
showings: first, he must show a "prying or intrusion . . . into
private concerns," and second, he must show that the intrusion
"would be offensive or objectionable to a reasonable person."
Id. Plaintiff focuses on Harper's actions and argues that those
actions constituted an "unreasonable intrusion," and that Harper
made that unreasonable intrusion at Paulk, Sr.'s direction.

Harper's conduct clearly meets the second prong of the
above-described test. A reasonable person would find it
"offensive or objectionable" to be unlawfully arrested, forcibly
removed from his place of employment, and transported across
state lines hundreds of miles against his will. Id.

The first prong of the test, however, asks whether the
challenged conduct constituted "prying or intrusion . . . into
private concerns." See id. Acts that occur in public places do
not generally constitute unreasonable intrusions. See Summers
v. Bailey, 55 F.3d 1564, 1566 (11th Cir. 1995) ("Traditionally,
watching or observing a person in a public place is not an

intrusion upon one's privacy."); accord Pierri v. Cingular Wireless, LLC, 397 F. Supp. 2d 1364, 1382-83 (N.D. Ga. 2005) ("To establish a claim of 'intrusion,' a plaintiff must usually establish that the defendant committed a physical intrusion, analogous to trespass, into the plaintiff's solitude or private affairs.").  However, acts that occur in public places may constitute intrusions upon seclusion if they are sufficiently repetitive.  See Anderson v. Mergenhagen, 283 Ga. App. 546, 552, 642 S.E.2d 105, 110 (2007) (unrelenting surveillance, picture-taking, and following, although in public places, could constitute unreasonable intrusion because "relatively harmless activity can become tortious with repetition").  Where the defendant's act does not affect the plaintiff's privacy, there has been no unreasonable intrusion, even if the act was extraordinarily offensive.  See generally Yarbray, 261 Ga. 703.

Harper's apprehension of McDaniel at Paulk, Sr.'s direction-- although it was offensive -- occurred in a public place and occurred only once.  Therefore, Harper did not intrude on McDaniel's private seclusion, see Assoc. Serv., Inc. v. Smith, 249 Ga. App. 629, 636, 549 S.E.2d 454, 461 (2001), nor did Harper repetitively harass McDaniel, see Anderson, 283 Ga. App. at 552.  Because Harper's actions did not constitute an "unreasonable intrusion" into Plaintiff's privacy, the privacy claim fails.

The Court therefore **GRANTS** Paulk, Sr.'s Motion for Summary
Judgment on Count XIII.


F.    Intentional Infliction of Emotional Distress

Count XIV asserts a claim for intentional infliction of
emotional distress.  Citing Everett v. Goodloe, 268 Ga. App.
536, 545, 602 S.E.2d 284, 292 (2004), Defendant argues that
Harper's conduct, even if it is attributable to Paulk, Sr., was
not sufficiently "outrageous in character" to permit an action
for intentional infliction of emotional distress.

"Whether a claim rises to the requisite level of
outrageousness and egregiousness to sustain a claim for
intentional infliction of emotional distress is a question of
law."  Yarbray, 261 Ga. at 706.  However, "[i]f a reasonable
person might find the conduct extreme and outrageous, causing
severe emotional distress, the jury then must find the facts and
make its own determination."  Mableton Parkway CVS, Inc. v.
Salter, 273 Ga. App. 477, 482-83, 615 S.E.2d 558, 564 (2005).

To be actionable, the conduct alleged must be "so
outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community."
Everett, 268 Ga. App. at 545.  "Only where the distress
inflicted is so severe that no reasonable person could be

expected to endure it does the law intervene." Id. "The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim, 'Outrageous!'" Wilcher v. Confederate Packaging, Inc., 287 Ga. App. 451, 453, 651 S.E.2d 790, 792 (2007).

In Fleming v. U-Haul Co. of Georgia, 246 Ga. App. 681, 681, 541 S.E.2d 75, 76 (2000), the plaintiff rented a U-Haul truck in October 1997. The truck broke down as the plaintiff was driving it, so he called the 1-800 number listed on the rental agreement. Id. Although the person who answered said that someone would come to the plaintiff's aid, no one ever arrived. Id. The plaintiff left the keys with the truck, hitchhiked home, and had no further contact with any U-Haul representative until February 1998, when he rented another U-Haul vehicle without mentioning the previous incident. Id. at 682-81. As he was driving the second truck, the plaintiff was pulled over by police for failing to maintain his lane. Id. at 682. Upon reviewing the plaintiff's driver's license and rental agreement, the officer told plaintiff that there was an outstanding warrant for his arrest. Id. The officer took the plaintiff to jail, where he remained for eight days before making bond. Id. He was indicted for conversion. Id. The plaintiff then brought

suit against U-Haul for intentional infliction of emotional
distress. The trial court granted summary judgment, but the
Georgia Court of Appeals reversed:

> In our view, a rational and impartial jury could
> decide that it is both atrocious and utterly
> intolerable in a civilized society for the lessor of a
> valuable motor vehicle to demand the arrest of its
> lessee for conversion, simply because the lessee did
> not return the vehicle to the designated place at the
> designated time and did not return to claim a cash
> deposit, where, as in this case, the lessor has
> imputed knowledge of all the additional and
> extenuating circumstances as reported by Fleming to
> the 1-800 operator. The trial court erred in
> concluding as a matter of law that the facts
> authorized by this record do not rise to the requisite
> level of outrage and egregiousness in character, and
> extremity in degree, that no reasonable person is
> expected to endure. The grant of summary judgment as
> to Fleming's claim for the intentional infliction of
> emotional distress was also in error.

Id. at 685.

In Nicholson v. Windham, 257 Ga. App. 429, 430, 571 S.E.2d
466, 468 (2002), the plaintiff worked for what she described as
a "real estate transaction closing mill." The "mill" allegedly
engaged in illegal activity, including tampering with evidence,
obstruction of justice, mail fraud, and wire fraud. Id. at 430-
31. When the plaintiff complained about the illegal activity
and refused to participate in it, the "mill" fired her. Id. at
431. She brought a claim for intentional infliction of
emotional distress against her former employer. Id. The trial

court dismissed the claim, but on appeal, the Court of Appeals
wrote:

> [The plaintiff] claimed that the defendants tried to
> require her "to become a criminal in order to perform
> her obligations under a contract" and that such
> conduct was so outrageous and extreme "as to go beyond
> all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized
> community." Nicholson alleged that she "was directed
> by members of the RICO Enterprise to ignore and not to
> disclose the conduct or evidence of the illegal and
> fraudulent conduct...." According to Nicholson, "[a]s
> a result of the acts identified in this Complaint and
> such other acts to be shown by evidence, including the
> conspiracy ... to commit illegal acts ... and the
> further conspiracy to cover up those acts, [she] ...
> suffered injuries to person and property." She claimed
> to have sustained "emotional distress that defies
> description."

Id. at 433. The Court of Appeals then reversed the trial
court's dismissal of the claim. Id.

The facts of this case are at least as egregious as those
in Fleming and Nicholson. There is evidence from which a jury
could find that, as a favor to friends of the Sheriff, McDaniel
was subjected to the following: While McDaniel was waiting
tables at the Shark House, a large man with a gun and badge
apprehended him, and then ordered him into a Coffee County
Sheriff's car. McDaniel was transported against his will from
Flagler Beach, Florida to Coffee County, Georgia. He spent
three days in the Coffee County jail with a large disabled man.
No paperwork was filed, his presence was not recorded, he was
not informed of any charges against him, and he was never

37

brought before a judge.  Upon returning to Florida, McDaniel discovered that, as a result of his apprehension and abduction, he had lost his job and his apartment.

Upon hearing a recitation of the foregoing facts, an average member of the community would likely exclaim, "Outrageous!"  See Wilcher, 287 Ga. App. at 453.  If proven, these facts could entitle Plaintiff to recover on his intentional infliction of emotional distress claim.  Because a reasonable person could find this conduct extreme and outrageous, summary judgment is improper.  Mableton Parkway, 273 Ga. App. at 482-83.

The Court therefore **DENIES** Paulk, Sr.'s Motion for Summary Judgment on Count XIV.

G.   Assault and Battery

Count XII asserts claims for assault and battery.  The Court will first address Paulk, Sr.'s potential vicarious liability for these torts, and will then address each tort in turn.

As noted above, there is sufficient evidence from which a jury could find that Harper acted as Paulk, Sr.'s agent under Georgia law.  For purposes of Paulk, Sr.'s Motion for Summary Judgment, therefore, the Court assumes, in keeping with the evidence brought forth by the Plaintiff, that Harper was Paulk,

Sr.'s agent. As such, Paulk, Sr. "may be held liable for [Harper's] tortious act . . . where the act was committed within the scope of the agency." Stewart v. Storch, 274 Ga. App. 242, 245, 617 S.E.2d 218, 221 (2005). Therefore, the Court must decide whether sufficient evidence exists from which a jury could find that if Harper assaulted or battered McDaniel while he was Paulk, Sr.'s agent, Harper committed those torts "within the scope of the agency." Id.

In Ellison v. Burger King Corp., 294 Ga. App. 814, 815, 820, 670 S.E.2d 469, 471, 474 (2008), the manager of a Burger King restaurant, "who was charged with responding to customer complaints," came out from behind the counter to respond to a customer who said that she was not being served. Things degenerated:

> [The plaintiff] averred that the manager "put her hands around my neck in a semi head lock position ... and started shaking like three times or whatever. Then the manager turned loose and said, 'Are you all right now?'" The employees asked if Ellison was ready to order, and Ellison uneventfully ordered a grilled chicken salad, which she was served.

Id. at 815. Because the manager was charged with responding to customers' complaints, the court held that the manager was acting in the course of her employment when she put the complaining customer-plaintiff in a headlock. Id. at 820. In the eyes of the Georgia Court of Appeals, the relationship between the manager's duties and the manager's actions was tight

39

enough to support vicarious liability.  See id.  "Although
[Ellison was] decided in the context of the employer/employee
relationship, the same rules apply to the principal/agent
relationship."  Stewart, 274 Ga. App. at 245 n.7.

       To determine whether vicarious liability may exist here,
the Court must test the tightness of the relationship between
the instructions Harper received and Harper's alleged actions.
The Ellison court held that when an employee tasked with
responding to customers' complaints battered a complaining
customer, that battery fell within the scope of employment.  294
Ga. App. at 820.  In the present case, a jury could find that
when an agent tasked with physically capturing a third party
batters or assaults that third party, the battery or assault
falls within the scope of the agency.  See Stewart, 274 Ga. App.
at 245 n.7 (same rules apply in principal/agent as
employer/employee relationship.)  Put differently, the
relationship between physically capturing someone and assaulting
or battering that person is tighter than the relationship
between responding to a customer's complaint and battering that
customer.  See Ellison, 294 Ga. App. at 815.  Therefore, if the
latter battery falls within the scope of the agency, so does the
former.

       As to whether there is evidence sufficient for a jury to
find that a battery or an assault occurred, the Court finds as

follows:  A battery is an "unlawful touching" to which the complainant did not consent.  Ellison, 294 Ga. App. at 816-17.  An "unlawful touching" means an objectively "offensive touching."  Id.  For purposes of civil battery, "any unlawful touching of a person's body, even though no physical injury ensues, violates a personal right and constitutes a physical injury to that person."  Vasquez v. Smith, 259 Ga. App. 79, 81 (2003); accord Hill v. Mull, No. 504-329, 2006 WL 3022280, at *13 (M.D. Ga. Oct. 23, 2006).  A touching made in the course of an unlawful arrest may be offensive.  Perrin v. City of Elberton, No. 303-106, 2005 WL 1563530, at *18 (M.D. Ga. July 1, 2005).

McDaniel recalls that when Harper arrived at the Shark House restaurant to apprehend him, he took McDaniel by the arm.  McDaniel deposed that Harper did not "physically drag [him] out" of the Shark House by the arm, and recalls no physical injury from being touched on the arm.  (McDaniel Dep. 127-28.)  However, a plaintiff need not allege any physical coercion or injury to recover on a battery claim in Georgia.  Vasquez, 259 Ga. App. at 81.  Moreover, because Harper touched McDaniel in the course of effecting an unlawful arrest, that touching could be reasonably viewed as offensive.  Perrin, 2005 WL 1563530, at *18.  If McDaniel proves at trial that Harper took him by the arm, a jury could conclude that a battery occurred.  Genuine

41

issues of fact remain on Plaintiff's battery claim.

Assault is a different tort.  Georgia courts have indicated that assault has objective and subjective elements.  The test is more commonly stated in objective terms: "An assault occurs when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another."  Id.; Bullock v. Jeon, 226 Ga. App. 875, 878, 487 S.E.2d 692, 696 (1997); accord Brown v. Manning, 764 F. Supp. 183, 186 (M.D. Ga. 1991).  A reasonable person's apprehension may be predicated on a threat instead of physical conduct.  Wallace v. Stringer, 250 Ga. App. 850, 853, 250 S.E.2d 166, 169 (2001).  Summary judgment may be proper if a subjective element is not met because the plaintiff "makes no claim that he . . . apprehended a violent injury."  Kuritzky v. Emory Univ., 294 Ga. App. 370, 373, 669 S.E.2d 179, 183 (2008).

Disputed factual issues remain as to whether Harper's actions toward McDaniel, allegedly taken at Paulk, Sr.'s request, would have caused a person "reasonably to apprehend a violent injury."  See Everett, 268 Ga. App. at 543.  When McDaniel first saw Harper in the Shark House restaurant, Harper had the Shark House cook pinned against a wall and was handcuffing him.  When the cook pointed out McDaniel, Harper walked up to McDaniel.  "You're Jamie McDaniel?" he asked. (McDaniel Dep. 114-15.)  The Court cannot conclude that, as a

matter of law, a reasonable person would not have apprehended violent injury at this point. Whether a reasonable person would have feared injury at this juncture is a disputed issue of material fact.

Whether Plaintiff has adduced evidence of subjective apprehension is a close question but, viewing the facts and drawing all inferences in McDaniel's favor, the Court holds that issues of material fact remain. In describing Harper's visit to the Shark House, McDaniel deposed that after Harper asked who he was, "[Harper] said, you're coming with me. And he had a gun. He had a badge, and he's a pretty big guy, so I did exactly what he said." (McDaniel Dep. 115.) "[H]e didn't have to physically drag me out," McDaniel explained later in his deposition, "because I was not going to put up any resistance, because like I said, he has a gun. He's a big guy, you know. I'm coming. Sure. Let's go." (Id. at 128.) Although McDaniel never expressly stated that he feared injury, a reasonable jury could infer from the foregoing language that McDaniel was apprehensive after seeing how Harper handled the cook. Therefore, viewing the evidence as it must at this stage, the Court concludes that whether McDaniel apprehended violent injury is a disputed material fact.

The Court therefore **DENIES** Paulk, Sr.'s Motion for Summary Judgment on Count XII.

H.   Punitive Damages

Count XVIII asserts a claim for punitive damages, and
Paulk, Sr. moves to dismiss it.  Punitive damages are permitted
in § 1983 claims if the defendant acts with "reckless or callous
indifference" to the plaintiff's federal rights, Smith v. Wade,
461 U.S. 30, 56 (1983), and on Georgia claims when clear and
convincing evidence shows "willful misconduct . . . [or]
wantonness," O.C.G.A. § 51-12-5.1(b).  Based on the evidence
adduced, the Court concludes that a jury could rationally find
that these standards are met.

The Court therefore **DENIES** Paulk, Sr.'s Motion for Summary
Judgment on Count XVIII.

**CONCLUSION**

The Court **GRANTS** Paulk, Sr.'s Motion for Summary Judgment
on Counts X, XIII, and XIV.  (Dkt. No. 154.)  The Court **DENIES**
the Motion as to Counts VII, XI, XII, XV, XVI, and XVIII.  (Dkt.
No. 154.)

**SO ORDERED,** this   30th   day of September, 2009.

_____
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA