# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| JAMIE MCDANIEL, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CV 507-079 |
| | * | |
| ROBERT SMITH; ALAN G. PAULK, | * | |
| JR.; ALAN G. PAULK, SR.; JACK | * | |
| HARPER; TODD WINKLER; JOHN | * | |
| DOE 1; and JOHN DOES 2-5 | * | |
| | * | |
| Defendants. | * | |

## ORDER

Plaintiff filed the above-captioned case after an allegedly wrongful arrest and incarceration.  Defendants Robert Smith, Jack Harper, and Todd Winkler are associated with the Coffee County Sheriff's Office, which made the arrest.  Defendants Alan Paulk, Sr. and Alan Paulk, Jr. are private individuals from Coffee County who allegedly conspired with the other Defendants to unlawfully arrest and incarcerate McDaniel.  McDaniel's Complaint contains eighteen counts, some based on federal law and some based on state law.

Defendant Robert Smith, the former Sheriff of Coffee County, has moved for summary judgment on all claims against

him.  The Court **GRANTS** Smith's Motion in part and **DENIES** it in

part.  (Dkt. No. 151.)


## BACKGROUND

Although the Parties' versions of events differ on some

important points, the Court recites all facts and draws all

inferences in favor of the nonmovant for purposes of the instant

motion.  Wilkie v. Robbins, 551 U.S. 537, 543 n.2 (2007).

The evidence shows that on St. Patrick's Day, March 17,

2004, McDaniel went out drinking in Atlanta, Georgia with his

childhood friend, Paulk, Jr.  The evening ended for McDaniel

when he was arrested for public urination and obstruction.

(Citation, Dkt. No. 145 Ex. 4.)

The next day, Paulk, Jr. contacted Free at Last Bail

Bonding and bailed McDaniel out of jail.  McDaniel's bail was

set at $1,706, but the nonrefundable fee that Paulk, Jr. paid to

Free at Last was $204.22.  Paulk, Jr. agreed that if McDaniel

did not comply with the conditions of his bond -- e.g., if

McDaniel failed to appear on his court date -- that Paulk, Jr.

would owe Free at Last "the entire amount of the bond."  (Bond

Agreement, Dkt. No. 145 Ex. 5.)

Paulk, Jr. and McDaniel both signed a document provided by

Free at Last labeled "Limited Power of Attorney, Release and

Waiver."  (Dkt. No. 145 Ex. 7.)  The precise wording of that

document -- in particular, the words used to describe the three parties concerned, Free at Last, Paulk, Jr., and McDaniel -- is important.  The agreement began, "KNOW ALL MEN BY THESE PRESENT, that the undersigned *principal* and *guarantor/indemnitor* do hereby appoint, constitute and make F<small>REE AT</small> L<small>AST</small> (*surety*), its agents and assigns my lawful attorney in fact."  (Id.) (italic emphasis added).  The document was typewritten, but "F<small>REE AT</small> L<small>AST</small>" was handwritten into a blank space.  Paulk, Jr. signed the agreement over a blank labeled "Guarantor/indemnitor," and McDaniel signed over a blank labeled "Principal."  (Id.)  The second paragraph of the document, labeled "Waiver and Release," read as follows:

> In accordance with the decision of the United States Supreme Court in Taylor v. Taintor, 83 U.S. 366 (1873), when bail is given, the principal is regarded as delivered to the custody of the *surety* (bondsmen). The dominion over the principal is a continuation of the original imprisonment.  The undersigned agrees that whenever the *surety* chooses to do so, the *surety*, or his agent, may seize the principal and deliver him/her to the proper authorities, and if this cannot be done at once, the surety may imprison him/her until such delivery may be effectuated.  The *surety* may exercise this right in person, or through an agent, may pursue the principal into another state or even another country, may arrest on the Sabbath, may break and enter his/her place of residence, or other similar action to effectuate such an arrest.  No new process is required to make such a seizure.  I further hereby release said *surety*, and make its agents or assigns, from any liability by reason thereof.

(Id.) (emphasis added).

- 3 -

McDaniel failed to appear on his court date.  No arrest warrant was issued, but McDaniel's bond was revoked.  (Carter Dep. 18-20.)  Free at Last declined to send a bail recovery agent after McDaniel, who had since moved to Florida, and instead demanded reimbursement from Paulk, Jr.  Free at Last ultimately sued Paulk, Jr. to recover the money.  (Free at Last compl., Dkt. No. 115 Ex. 1.)

After speaking with Atlanta Solicitor Shirea Grant, Paulk, Jr. believed his debt on the bond would be forgiven if he could arrange to have McDaniel delivered to the Atlanta City Jail. (Paulk, Jr. Dep. 130, 134-35.)  For financial reasons, and because he was "very mad" at McDaniel, Paulk, Jr. began exploring his options for returning McDaniel to Atlanta.  He turned to Coffee County, where he grew up and where he had been an Assistant District Attorney for two years.

Paulk, Jr. called his father, Defendant Alan Paulk, Sr., who had contacts with the Coffee County Sheriff's Office. Paulk, Sr. was a friend and political contributor of then-Coffee County Sheriff Robert Smith.[1]  Paulk, Sr. was also acquainted with Jack Harper, a reserve Coffee County Deputy Sheriff and self-described "flunky" who occasionally performed various tasks at Paulk, Sr.'s direction.  (Harper Dep. 78.)

---

[1] Smith was indicted on eight counts relating to misconduct while in office. He pled guilty to a single count, "malpractice and malfeasance," and received a suspended sentence in return for surrendering his P.O.S.T. certification. (Smith Dep. 294-97.)  He subsequently resigned.

Paulk, Sr. called Harper and told him about Paulk, Jr.'s situation.  Harper told Paulk, Sr. that if he could provide an address, picture, and arrest warrant for McDaniel, then Harper would try and help the Paulks.  (Id. at 94-95.)  The next day, Paulk, Sr. called Harper with the Flagler Beach, Florida address of the restaurant where McDaniel was working.  (Id. at 96.)  As for the warrant and picture, Harper advised Paulk, Sr. that the Atlanta authorities would probably only be willing to fax a copy to law enforcement authorities, so he would have to go through the Sheriff's Office to get these items.

Paulk, Sr. then visited the Coffee County Sheriff's Office to speak with Smith about his son's predicament.  (Smith Dep. 94.)  Smith advised Paulk, Sr. that he could not send deputies across state lines to arrest on a bench warrant or citation. Smith was able, however, to have the City of Atlanta fax a copy of McDaniel's failure to appear citation to his office.  (Id.)

Paulk, Sr. and Smith then called Harper to come and pick up the copy of the citation.  (Id. at 108.)  In addition to providing Harper with the failure to appear citation, Sheriff Smith suggested that Harper take a marked Coffee County patrol car to Flagler Beach to apprehend McDaniel.  As a favor to the Paulks, Harper agreed to make the trip without compensation. (Paulk, Jr. Dep. 109.)

Harper drove to Flagler Beach to apprehend McDaniel.  When Harper arrived at the Shark House restaurant, he was dressed in plain clothes.  He carried handcuffs, a gun, an "Authorized Fugitive Recovery Agent" ID card, and a "Bail Bond Investigator" badge, which he wore around his neck.  Harper had no permit for the gun and had ordered the badge and ID card from a company in Alabama.  (Harper Dep. 187, 192-93, 205.)

Harper walked inside and, spotting an employee who resembled McDaniel, pinned the employee against a wall and began to handcuff him.  McDaniel approached while Harper was in the process of apprehending this person, who turned out to be the restaurant's cook.  The cook saw McDaniel and said, "That's Jamie McDaniel."  (McDaniel Dep. 114-15.)  Harper then walked up to McDaniel.  "You're Jamie McDaniel?" he asked.  (Id.) McDaniel said that he was.  Harper said, "you're coming with me," and McDaniel complied.  (Id.)  Harper took McDaniel by the arm, put him in the patrol car, and drove north.  (Id. at 27-28.)  Harper did not have a warrant because the City of Atlanta had not issued one.[2]  (Carter Dep. 20.)

---

[2] Although there is some dispute as to whether a warrant for Plaintiff was issued, the only argument that Paulk, Jr. makes in support of the warrant's existence is based on the unsworn hearsay statement of Solicitor Grant that Plaintiff's arrest citation constituted a warrant.  Such evidence is not sufficient to create a factual dispute as to the existence of the warrant. See Macuba v. Deboer, 193 F.3d 1316, (11th Cir. 1999) ("[ I] nadmissible hearsay cannot be considered on a motion for summary judgment." (internal quotation marks omitted)).  After two years, multiple motions, and several depositions, Defendants have produced no admissible evidence that a warrant ever existed.  Plaintiff, however, has produced evidence showing that no

Harper was too tired to drive McDaniel all the way to Atlanta. While en route from Flagler Beach to Coffee County, Harper called Smith and, at Smith's direction, drove McDaniel to the Coffee County Jail. (Harper Dep. 135-40.)

McDaniel remained incarcerated in the Coffee County Jail for approximately three days. (McDaniel Dep. 117; Worrell Dep. 46.) His presence in the jail was not recorded, he never saw a magistrate judge, and he was never informed of any charges pending against him. For at least part of the time, McDaniel shared a cell with an inmate he described as a "big white guy who was semi-retarded or semi-mentally challenged." (McDaniel Dep. 116-17.) A jailer told McDaniel that the man was placed in the cell with him "because some of the inmates ha[d] been raping him." (Id.) The man begged for McDaniel's food, spilled hot sauce all over himself, and, McDaniel believed, may have defecated in his pants. (Id.)

After three days, Deputy Sheriff Todd Winkler came into the jail and told McDaniel, "I'm carrying you up to Atlanta." (McDaniel Dep. 117-18.) McDaniel asked why, but Winkler only responded that he was following his supervisor's orders. Winkler put McDaniel in the back seat of his car and drove to the Atlanta City Jail.

---

warrant was ever issued for Plaintiff in connection with either the public urination and obstruction charges or the failure to appear citation. (Carter Dep. 20.)

The authorities at the Atlanta jail, however, could not find a warrant or other document authorizing them to take McDaniel into custody.  Winkler called Smith and explained that the Atlanta authorities would not take McDaniel without the proper paperwork.  (Smith Dep. 151.)  Smith advised Winkler to leave McDaniel at the jail, but the Atlanta jailers refused to let Winkler out of the gate without McDaniel.  So Winkler allowed McDaniel into the front seat of the patrol car and started driving back to Coffee County.  (McDaniel Dep. 118-19.)

On the way back to Coffee County, Winkler called Smith and asked, "what are we going to do with this guy?"  (Id. at 119.) Winkler drove McDaniel to the Coffee County police station, and McDaniel was released on Smith's orders.  Harper called and apologized to McDaniel, and offered to give him a ride back to Florida.  McDaniel responded, "I can get down there on my own. Thanks but no thanks."  (Id.)

Upon returning to Florida, McDaniel learned that his boss had fired him on the mistaken assumption that he had committed a grave criminal offense.  McDaniel's landlord had evicted him for the same reason.

**DISCUSSION**

I.   SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if "there is no

- 9 -

genuine issue as to any material fact."  Fed. R. Civ. P. 56(c).

When considering a motion for summary judgment, the Court must

view all facts and draw all inferences in favor of the

nonmovant.  Scott v. Harris, 550 U.S. 372, 378 (2007).  When the

parties' evidence conflicts, the Court credits the evidence of

the nonmovant.  Evans v. Stephens, 407 F.3d 1272, 1277 (11th

Cir. 2005).  The Court also credits undisputed evidence adduced

by the movant.  Reese v. Herbert, 527 F.3d 1253, 1268-69 (11th

Cir. 2008).  However, the court may not decide issues of fact at

the summary judgment stage.  Transamerica Leasing, Inc. v. Inst.

of London Underwriters, 267 F.3d 1303, 1308 (11th Cir. 2001).


## II.  ARGUMENTS AFFECTING ALL CLAIMS

### A.   "Limited Power of Attorney, Waiver, and Release"

Citing the "Limited Power of Attorney, Waiver and Release,"

Smith argues that, as a condition of being released on bond,

Plaintiff consented to being re-arrested by his bail bondsmen in

the event that he failed to appear.  (Dkt. No. 145 Ex. 7.)

Smith argues that this right to arrest applied not only to Free

at Last, but also to Paulk, Jr. and anyone assisting Paulk, Jr.

in effecting such an arrest.  If Smith played any role in

effecting Plaintiff's arrest in Flagler Beach, Smith argues, he

cannot be liable for that role because he was only helping

Paulk, Jr. exercise his contractual rights.  Smith's argument

- 10 -

thus has two parts: (1) Paulk, Jr. was contractually authorized to apprehend Plaintiff, and (2) because Smith did no more than help Paulk, Jr. exercise his contractual rights, Plaintiff cannot hold Smith liable.  The Court first determines whether Paulk, Jr. was contractually authorized to apprehend McDaniel. Because the answer to that question is determinative, examination of the second issue in unnecessary.

Smith bases his argument that Paulk, Jr. was contractually authorized to seize McDaniel on the paragraph labeled "Waiver and Release."  (Dkt. No. 145 Ex. 7.)  That paragraph said, in part, that "[t]he undersigned agrees that whenever the *surety* chooses to do so, the *surety*, or his agent, may seize the principal and deliver him/her to the proper authorities . . . I further hereby release said *surety*, and make its agents or assigns, from any liability by reason thereof."  (Id.) (emphasis added).

The "Waiver and Release" purports to release the "surety" from liability.  The Court, therefore, must first determine which party constitutes a "surety" under the terms of the contract. Second, the Court must determine whether, when Plaintiff failed to appear, the rights of the "surety" passed to any other party.

The first sentence of the contract reads, "KNOW ALL MEN BY THESE PRESENT, that the undersigned *principal* and

*guarantor/indemnitor* do hereby appoint, constitute and make F<small>REE</small> A<small>T</small> L<small>AST</small> (*surety*), its agents and assigns my lawful attorney in fact." (Id.) (italic emphasis added). Paulk, Jr. signed the agreement as "Guarantor/indemnitor," and Plaintiff signed as "Principal." (Id.)

This first sentence indicates that the parties distinguished between the "principal," the "guarantor/indemnitor," and the "surety." Based on the places where they signed the document, it is clear that Plaintiff was the "principal" and Paulk, Jr. was the "guarantor/indemnitor." Based on the parenthetical label "surety" following the blank space where "F<small>REE</small> A<small>T</small> L<small>AST</small>" was handwritten, it is equally clear that the parties intended for "surety" to refer to Free at Last.

The authorization to arrest applied only to the "surety" and its "agents or assigns." Neither Paulk, Jr. nor Smith was an agent or an assignee of Free at Last. Therefore, although the agreement might have released Free at Last from liability for apprehending Plaintiff, it did not release Paulk, Jr or his agents or assigns.

In opposition, Smith cites O.C.G.A. § 10-7-1, which states that "[t]here shall be no distinction between contracts of suretyship and guaranty." This Code provision, however, does not control the definitions of "surety" and "guarantor" in the instant contract. "If the language of a contract is clear and

- 12 -

unambiguous, we enforce those terms and need not look elsewhere to assist in the contract's interpretation." Mariner Healthcare v. Foster, 280 Ga. App. 406, 409-10, 634 S.E.2d 162, 166 (2006). Although the Georgia Assembly does not distinguish between the contracts of sureties and guarantors, the parties to this private contract were free to use those terms in whatever way they saw fit. Where the terms of the agreement between the parties are clear, this Court will give effect to the language of the contract.

Here, the clear and unambiguous language of the agreement evinces the parties' intent that the term "surety" refer only to Free at Last. Paulk, Jr. was intended to be a guarantor for Plaintiff's repayment to Free at Last should Plaintiff fail to appear. The agreement, in essence, contemplated two distinct suretyships -- Free at Last was liable for Plaintiff's bond if Plaintiff failed to appear (first surety), and if Free at Last had to pay, then Paulk, Jr. would be liable to Free at Last (second surety). The contract used the word "surety" to refer to the first surety (Free at Last), and the words "guarantor/indemnitor" to refer to the second surety (Paulk, Jr.). The release of liability, therefore, which purported to release only the party designated as the "surety," applied solely to Free at Last.

To the extent that Smith argues that, when Plaintiff failed to appear, Paulk, Jr. assumed Free at Last's rights under the contract or became Free at Last's agent, that argument fails for three reasons.  First, neither the "Limited Power of Attorney" nor any other document suggests that, if Plaintiff skipped bail, the rights that Plaintiff had ceded to Free at Last would automatically transfer to Paulk, Jr., or that Paulk, Jr. would automatically become an agent of Free at Last.  The forfeiture of Plaintiff's bond triggered Paulk, Jr.'s contractual duties as a guarantor, but nothing in the "Limited Power of Attorney, Release and Waiver" suggests that forfeiture of the bond would broaden the scope of the parties to whom Plaintiff had granted rights over his person.  (Bond Agreement, Dkt. No. 145 Ex. 5.)

Second, neither the contract nor Free at Last could have authorized Paulk, Jr., Smith, or Harper to act as bail recovery agents because Paulk, Jr., Smith, and Harper were statutorily barred from performing that function.  Neither law enforcement agents (e.g., Smith or Harper) nor attorneys (e.g., Paulk, Jr.) may "engage either directly or indirectly in the bail bond business."  O.C.G.A. § 45-11-8(a).  Bail recovery agents must have valid firearms licenses.  O.C.G.A. § 17-6-56(b).  Bail recovery agents must undergo eight hours of continuing education each year.  O.C.G.A. § 17-6-56.1(c).  See also O.C.G.A. § 17-6-56(c) (bail recovery agents must be registered with sheriff in

counties where they "do[] business"); O.C.G.A. § 17-6-57(c)
(bail recovery agents must carry identification cards).  The
evidence does not indicate that Paulk, Jr., Smith, or Harper
satisfied these requirements.  Indeed, their primary occupations
conclusively prohibit them from becoming bail recovery agents.
Therefore, if any agreement purported to authorize Paulk, Jr.,
Smith, or Harper to act as bail recovery agents, that agreement
would be void as illegal.  O.C.G.A. § 13-8-1 ("A contract to do
an . . . illegal thing is void."); Harpagon Co. v. Huff, 296 Ga.
App. 107, 111, 673 S.E.2d 592, 595 (2009).  Absurd results and
an emasculation of the Georgia laws governing bail bondsmen
would result if parties could ignore the statutory requirements
and assume the status and protections of bail bondsmen by
private contractual fiat.

Finally, even if Free at Last could have authorized Paulk,
Jr., Smith, or Harper to act on its behalf, there is no evidence
that Free at Last sought to do so.  Paulk, Jr. deposed that Free
at Last never gave him the authority to apprehend Plaintiff on
its behalf.  (Paulk, Jr. Dep. 125.)  Harper also denied any
authorization to act as a bail recovery agent for Free at Last.
(Harper Dep. 155.)

Accordingly, the Court holds that although the contract may
have released Free at Last from liability for apprehending
Plaintiff, it did not release Paulk, Jr.  And because Paulk, Jr.

is not protected by the terms of the release, neither are his
agents and assigns, including Defendant Smith.  Thus, the
"Limited Power of Attorney, Release and Waiver" does not release
Smith from liability for any role he may have played in the
apprehension and detention of Plaintiff.

B.   Constructive Custody

Citing Taylor v. Taintor, Smith argues that Plaintiff
remained in Paulk, Jr.'s "constructive custody" while released
on bond.  See 83 U.S. 366 (1872).  Therefore, Smith argues,
"Plaintiff was subject to apprehension -- at any time and any
place -- by Paulk, Jr. or a person acting to enforce the bond."
(Smith's Br. in Supp. 7.)  Smith argues that, at most, he was "a
person acting to enforce the bond" and therefore had the right
to effect an arrest of Plaintiff "at any time and any place."
See id.

This argument is rooted in the following language from
Taylor:

> When bail is given, the principal is regarded as
> delivered to the custody of his sureties. Their
> dominion is a continuance of the original
> imprisonment. Whenever they choose to do so, they may
> seize him and deliver him up in their discharge; and
> if that cannot be done at once, they may imprison him
> until it can be done. They may exercise their rights
> in person or by agent. They may pursue him into
> another State; may arrest him on the Sabbath; and, if
> necessary, may break and enter his house for that
> purpose. The seizure is not made by virtue of new

> process. None is needed. It is likened to the rearrest
> by the sheriff of an escaping prisoner.

83 U.S. at 371.  Smith argues that, because Paulk, Jr. was a
surety of Free at Last, and Free at Last was Plaintiff's surety,
Paulk, Jr. could rightfully exercise "dominion" over Plaintiff
after he failed to appear.  Therefore, Smith reasons, Plaintiff
waived the constitutional violations he alleges with respect to
the acts of Paulk, Jr., or anyone helping him to "enforce the
bond."  Like Smith's contractual argument, this argument has two
parts: (1) Taylor authorizes Paulk, Jr. to arrest Plaintiff, and
(2) Taylor also protects Smith, who did no more than help Paulk,
Jr. effect a lawful arrest.  Because analysis of the first part
of this argument proves determinative, the Court stops there.

Taylor does not address Paulk, Jr.'s rights over Plaintiff.
Taylor merely stands for the proposition that a bailed-out
defendant remains under the "dominion" of his bondsmen while he
is out on bond.  83 U.S. at 371; accord Outz v. Maryland Nat.
Ins. Co., 505 F.2d 547, 551 (9th Cir. 1974).  But Taylor does
not address the relationship between a bailed-out defendant and
his bondsmen's surety -- i.e., the bailed-out defendant's
surety's surety.  Therefore, while Taylor speaks to the power
that bail bondsmen such as Free at Last may have, it does not
address what, if any, power an unlicensed guarantor such as

- 17 -

Paulk, Jr., or anyone assisting that unlicensed guarantor, may have over the principal.

Cases decided after Taylor make clear that the right of a bondsman over a bailed-out defendant "arises from the private relationship between the bondsman and his principal." McCoy v. Johnson, 176 F.R.D. 676, 679 (N.D. Ga. 1997); accord Fitzpatrick v. Williams, 46 F.2d 40, 40 (5th Cir. 1931) ("The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bond.").[3]  In this case, the "private relationship" between Plaintiff, Paulk, Jr., and Free at Last was spelled out in a written agreement.  See McCoy, 176 F.R.D. at 679.  As discussed above, that written agreement gave Free at Last the right to "seize [Plaintiff] and deliver him[] to the proper authorities," but did not go so far as to confer such a right on Paulk, Jr.  Therefore, the "private relationship" between Plaintiff, Free at Last, and Paulk, Jr. did not authorize Paulk, Jr. to seize Plaintiff, much less Smith.  See McCoy, 176 F.R.D. at 679; Fitzpatrick, 46 F.2d at 40.

Although Taylor does not address any rights that Paulk, Jr. might have had over Plaintiff, the Georgia Code does.  As noted above, Georgia law prohibits attorneys or law enforcement

---

[3]  In Bonner v. City of Prichard, 661 F.3d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions predating September 30, 1981.

officials from engaging, directly or indirectly, in bail recovery.  O.C.G.A. § 45-11-8(a).  There is also no evidence that either Paulk, Jr. or Smith met any of the other statutory requirements for bail recovery agents.  See O.C.G.A. §§ 17-6-56(b), 17-6-56.1(c), 17-6-56(c), 17-5-57(c).  Therefore, while Taylor does not address whether Paulk, Jr. had the right to re-arrest McDaniel, state law barred Paulk, Jr. or Smith from exercising "dominion" over Plaintiff in the manner of bail bondsmen.

Because Taylor does not address the relationship between a bailed-out defendant and his unlicensed guarantor, because the "private relationship" between Plaintiff and Paulk, Jr. did not authorize Paulk, Jr. to arrest Plaintiff, and because state law forbade Paulk, Jr. and Smith to act as bondsmen, the Court holds that Taylor did not authorize Smith to assist Paulk, Jr. in arresting Plaintiff.  See Taylor, 83 U.S. at 371; O.C.G.A. § 45-11-8(a); McCoy, 176 F.R.D. at 679; Fitzpatrick, 46 F.2d at 40.

## III. ARGUMENTS AFFECTING FEDERAL CLAIMS

### A.   Qualified Immunity

Smith argues that he is entitled to qualified immunity on Plaintiff's § 1983 claims.  An officer is entitled to qualified immunity for his discretionary acts unless those acts were both unlawful and clearly established as such.  Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982); Reese v. Herbert, 527 F.3d 1252, 1271 (11th Cir. 2008).  Although they have discretion to do otherwise, courts usually address the unlawfulness of the alleged conduct first, then determine whether any violated laws were clearly established at the time of the violation.  Pearson v. Callahan, 129 S.Ct. 808, 818 (2009).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violated the law."  Hope v. Pelzer, 536 U.S. 730, 752 (2002).  Because it offers immunity from suit, not merely immunity from liability, "the availability of qualified immunity should be evaluated early in the proceedings."  McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).

To receive qualified immunity, a defendant must show that he was acting within the scope of his discretionary authority.  Crenshaw v. Lister, 556 F.3d 1283, 1289 (11th Cir. 2009).  Smith argues that he exercised discretionary authority in this case, and Plaintiff presents no argument to the contrary.  Therefore, for purposes of this motion, the Court holds that Smith's actions were discretionary.  Local Rule 7.5 ("Failure to respond within the applicable time period shall indicate that there is no opposition to a motion."); Brasseler U.S.A., I, L.P. v. Stryker Sales Corp., 93 F. Supp. 2d. 1255, 1265 (S.D. Ga. 1999).

Plaintiff has alleged violations of extradition law and violations of the Fourth, Fifth, and Fourteenth Amendments.

Smith rejoins that he is not liable for Harper's acts, that no federal law was violated, and that if federal law was violated, Smith's conduct was not clearly established as unlawful.  The Court will first determine whether Smith may be liable for Harper's acts under a supervisory liability theory.  The Court will then determine whether genuine issues of material fact remain as to any of the alleged violations of federal law.  Finally, the Court will determine whether any violated law was "clearly established."  See Harlow, 457 U.S. at 818.

   1.  *Supervisory Liability*

       In Count V of the Complaint, Plaintiff alleges that Smith is liable for Plaintiff's arrest and incarceration under a supervisory liability theory.  Smith argues that because Plaintiff cannot meet the high standard for supervisory liability and because Smith did not personally arrest or imprison Plaintiff, Smith is not liable for Plaintiff's arrest or imprisonment.

       Theories of vicarious liability and respondeat superior are inapplicable in § 1983 actions.  Collins v. City of Harker Heights, 503 U.S. 115, 123 (1992).  Because vicarious liability and respondeat superior are unavailable to § 1983 plaintiffs, a supervisor may not be held liable for the acts of his subordinate "based solely on [the] relationship between the two persons."  Nat'l R.R. Passenger Corp. v. Rountree Transp. and

Rigging, Inc., 286 F.3d 1233, 1256 (2002).  However, where "the supervisor personally participates in the alleged constitutional violation or when there is a *causal connection* between actions of the supervising official and the alleged constitutional violation," the supervisor may be liable for his subordinate's acts.  Amnesty Int'l v. Battle, 559 F.3d 1170, 1180-81 (11th Cir. 2009) (emphasis added); accord Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560-61 (11th Cir. 1993).  The standard for supervisory liability in this Circuit is "extremely rigorous."  Gonzales v. Reno, 325 F.3d 1228, 1234 (2003).  However, "[a] causal connection can . . . be established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  Dalrymple v. Reno, 334 F.3d 991, 996 (11th Cir. 2003).  Here, the Court must determine whether there is sufficient evidence of such a "causal connection" between Smith's actions and Plaintiff's arrest and imprisonment.  Battle, 559 F.3d at 1180-81.

Based upon the evidence submitted, a jury could reasonably determine that there was a "causal connection" between Smith's conduct and Plaintiff's arrest and incarceration.  See id. Harper deposed that Smith ordered him to apprehend McDaniel. (Harper Dep. 101.)  Viewed in the light most favorable to

Plaintiff, this instruction from Smith constituted a direct order to arrest Plaintiff.   Smith then suggested that Harper drive a Coffee County patrol car to Flagler Beach.   (Id.)   Smith also told Harper to bring Plaintiff across state lines to the Coffee County jail.   (Id. at 135-40, 203.)   Finally, Smith admitted that he obtained the failure to appear citation that was ultimately presented to Harper by asking the City of Atlanta to fax it to him.   (Smith Dep. 94-96, 106-09.)

The evidence presented shows that Smith not only facilitated, but affirmatively ordered, Plaintiff's arrest and imprisonment.   The evidence, if believed by the jury, is therefore sufficient to meet even the Eleventh Circuit's "extremely rigorous" standard for supervisory liability.

Accordingly, the Court **DENIES** Smith's Motion for Summary judgment on Count V.

### 2. *Asserted Violations of Federal Law*

#### a. *Extradition*

In Count I of the Complaint, Plaintiff asserts violations of the Fifth and Fourteenth Amendments and alleges that Smith "fail[ed] to follow extradition procedures."   (Am. Compl. ¶ 54-55.)   Smith moves for summary judgment on Count I on a variety of grounds.

Generally, § 1983 liability only accrues for violations of federal law.   Arrington v. Cobb County, 139 F.3d 865, 872 (11th

Cir. 1998); <u>Charles v. Scarberry</u>, No. 08-10773, 2009 WL 2424546, at *1 (11th Cir. Aug. 10, 2009) (unpublished opinion).  In many states, including Georgia and Florida, extradition is governed by the Uniform Criminal Extradition Act ("UCEA") as adopted by the states' legislatures.  <u>See</u> O.C.G.A. §§ 17-13-20 to 17-13-49; Fla. Stat. Ann. §§ 941.01 to 941.30.  Although extradition is generally a matter of state law, the Eleventh Circuit has expressly joined several other circuits in holding that "a violation of state extradition law can serve as the basis of a section 1983 action where the violation of state law causes the deprivation of rights protected by the Constitution and statutes of the United States."  <u>Harden v. Pataki</u>, 320 F.3d 1289, 1293 (11th Cir. 2003).  Under <u>Harden</u>, therefore, Plaintiff may rely on Smith's and Harper's violations of state extradition law to maintain his § 1983 claim.[4]

Plaintiff has produced sufficient facts from which a jury could conclude that Smith and Harper violated the UCEA. Plaintiff had a right not to be extradited without a signed governor's warrant from the extraditing state (Florida), a right that exists under the UCEA and can also be "derived from the language and intent of" the federal statute governing

---

[4] Smith does not argue that the violation of state extradition law was causally unrelated to the constitutional violations alleged.  <u>See</u> <u>Harden</u>, 320 F.3d at 1293.

extradition.[5]  Id. at 1293 n.5; see Fla. Stat. Ann. § 941.07.  No
governor's warrant existed in this case.  Parts of the UCEA
codified at Fla. Stat. §§ 941.03 and 941.06 require a formal
demand from the state to which the extraditee is being
transported (Georgia).  There was no such demand in this case.
Defendants' rapid removal of Plaintiff from Florida simply
ignored extradition law.

Smith argues that extradition laws are inapplicable because
private bail bondsmen recovering fugitives need not extradite
their arrestees.  But Harper was not a private bail bondsman.
Viewing the facts as is appropriate at this stage, Harper was a
sworn, reserve deputy driving a Coffee County patrol car and
carrying a badge he ordered from a company in Alabama.  As a law
enforcement officer, he was statutorily forbidden to work as a
bail recovery agent.  O.C.G.A. § 45-11-8(a).  He was operating
under Smith's express instructions.  (Harper Dep. at 101.)
Evidence has been submitted that he was not, as Defendants
sometimes assert, merely a private bail bondsman.

---

[5] See 18 U.S.C. § 3182 ("Whenever the executive authority of any State or
Territory demands any person as a fugitive from justice, of the executive
authority of any State, District, or Territory to which such person has fled,
and produces a copy of an indictment found or an affidavit made before a
magistrate of any State or Territory, charging the person demanded with
having committed treason, felony, or other crime, as certified as authentic
by the governor or chief magistrate of the State or Territory from whence the
person so charged has fled, the executive authority of the State, District,
or Territory to which such person has fled shall make and cause him to be
arrested and secured, and notify the executive authority making such demand,
or the agent of such authority appointed to receive the fugitive, and shall
cause the fugitive to be delivered to such agent when he shall appear.  If no
such agent appears within thirty days of from the time of the arrest, the
prisoner may be discharged.").

The Court therefore holds that Plaintiff has adequately demonstrated a violation of extradition law upon which a § 1983 claim may be based.

  b.  *Fourth Amendment*

Count IV of Plaintiff's Amended Complaint asserts that Smith violated the Fourth Amendment.  The Fourth Amendment entitles an arrestee to a determination of probable cause by a judicial officer "either before or promptly after arrest." Gerstein v. Pugh, 420 U.S. 103, 125 (1975).  When officers make an arrest without a warrant, a subsequent judicial determination of probable cause is presumptively "prompt[]" under the Fourth Amendment if it occurs within forty-eight hours of arrest, and is presumptively un-prompt -- and therefore presumptively unconstitutional -- if it occurs more than forty-eight hours after arrest.  County of Riverside v. McLaughlin, 500 U.S. 44, 56-57 (1991); accord Rodriguez v. Farrell, 294 F.3d 1276, 1277 (11th Cir. 2002).  If an arrestee has not received a judicial determination of probable cause within forty-eight hours of his arrest, then "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." McLaughlin, 500 U.S. at 57.

Here, Plaintiff's evidence indicates that Plaintiff was arrested without a warrant and incarcerated in the Coffee County jail for up to three days.  (Worrell Dep. 46); see also

- 26 -

(McDaniel Dep. 116-17.)  It is undisputed that no judicial officer ever determined whether probable cause existed.  No evidence of record "demonstrate[s] the existence of a bona fide emergency or other extraordinary circumstance" that would justify the government's delay.  See McLaughlin, 500 U.S. at 57. There is evidence, therefore, that entitles Plaintiff to reach the jury on the question of whether his detention in Coffee County without a judicial determination of probable cause violated the Fourth Amendment.

Smith argues that, even if the failure to present Plaintiff to a magistrate violated the Fourth Amendment, that violation is not attributable to Smith.  If a "causal connection" existed between Smith's actions and Plaintiff's incarceration without a judicial determination of probable cause, however, Smith may be liable in his supervisory capacity.  Battle, 559 F.3d at 1180-81.  Direct evidence attributing this constitutional failure to Smith would be understandably difficult to come by; Plaintiff would have to show not that Smith caused an event, but that Smith caused the non-occurrence of an event (i.e., the non-occurrence of presentment to a magistrate).  But in Georgia, sheriffs are responsible for maintaining county jails.  Lawson v. Lincoln County, 292 Ga. App. 527, 529, 664 S.E.2d 900, 902 (2008).  Because Smith ordered that Plaintiff be confined in the Coffee County jail, and because Smith bore the responsibility

for maintaining that jail, a jury could find that the requisite causal connection exists between Smith's conduct and Plaintiff's incarceration without presentment.

        *c.   Fifth Amendment*

In addition to asserting claims based on extradition and the Fourteenth Amendment, Count I of the Complaint asserts a § 1983 claim premised upon an alleged violation of Fifth Amendment due process.  Defendant argues that, because Plaintiff alleges no intrusion upon his rights by the federal government, Plaintiff's Fifth Amendment due process claim fails.  Plaintiff makes no response, so the motion is unopposed.  Local Rule 7.5; Brasseler, 93 F. Supp. 2d. at 1265.

The Court holds that Plaintiff has not adequately demonstrated a violation of the Fifth Amendment.  The Court therefore partially **GRANTS** Smith's Motion for Summary Judgment as to Count I insofar as Count I alleges a violation of Fifth Amendment due process.

        *d.   Fourteenth Amendment*

Count I also asserts that Smith violated the Fourteenth Amendment.  Smith argues that, even viewing the facts as is appropriate at this stage, the conduct attributable to him does not "shock[] the conscience" and therefore does not violate the Fourteenth Amendment.

The Fourteenth Amendment prohibits state action that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998); accord Rochin v. California, 342 U.S. 165, 172 (1952); Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1075 (11th Cir. 2000).  This standard is a high one because courts have been "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).  "[T]he official conduct most likely to rise to the conscience-shocking level is the conduct intended to injure in some way unjustifiable by any government interest."  Chavez v. Martinez, 538 U.S. 760, 775 (1994).  The conscience-shocking standard is, by design, not an exact one -- "the constitutional concept of conscience shocking duplicates no traditional category of common-law fault."  Lewis, 523 U.S. at 848.  As such, the conscience-shocking standard "is no calibrated yard stick, [but] it does . . . point the way."  Id. at 847.

Courts have not specified a minimum degree of culpability -- e.g., purposefulness, knowledge, or recklessness -- that a defendant must always exhibit to meet this substantive due process standard.  Id. at 849-50.  Instead, the degree of culpability required to sustain liability varies by context.

Id.; Carr v. Tatangelo, 338 F.3d 1259, 1271 n. 24 (11th Cir. 2003).  It is clear, however, that purposeful conduct can sustain liability in some circumstances, and that negligent conduct never can.  Lewis, 523 U.S. at 849.  "[C]ulpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." Id.  In this circuit, the culpability standard is at least "deliberate indifference" for noncustodial claims, although the standard may be higher.  Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300, 1306, 1306 n.5 (11th Cir. 2003).

Before assessing Smith's level of culpability with regard to McDaniel's injury, the Court must first define McDaniel's injury.  It was not physical.  However, nonphysical injuries are cognizable under the Fourteenth Amendment.  The Supreme Court has held that "the [Eighth] Amendment proscribes more than physically barbarous punishments," and that the Eighth Amendment may be transgressed by nonphysical penological acts like "[c]onfinement in a prison or in an isolation cell."  Estelle v. Gamble, 429 U.S. 97, 102 (1976); Hutto v. Finney, 437 U.S. 678, 685 (1978); accord Marsh v. Butler County, 268 F.3d 1014, 1034 (11th Cir. 2001).  "[P]sychological harm[,] without corresponding physical harm" is a cognizable Eighth Amendment injury.  Boxer X v. Harris, 459 F.3d 1114, 1118 (11th Cir. 2006)

- 30 -

(Carnes, J., concurring in denial of rehearing en banc) (quoting Hudson v. McMillan, 503 U.S. 1, 16 (1992) (Blackmun, J., concurring)).  The Fourteenth Amendment affords pretrial detainees (like Plaintiff) the same rights that the Eighth Amendment affords convicted prisoners.  Lewis, 523 U.S. at 849-50; Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009). Therefore, Plaintiff's injuries need not be physical for his Fourteenth Amendment claim to be cognizable.  Plaintiff's injury was his loss of liberty -- i.e., his "confinement" -- and the resulting psychological pain.  See Hutto, 437 U.S. at 685.

With regard to these injuries, the evidence presented by Plaintiff suggests that Smith's level of culpability exceeds "deliberate indifference."  See Waddell, 329 F.3d at 1306 n.5. Smith was not merely "deliberate[ly] indifferen[t]" to a "risk" that Plaintiff would be arrested, hauled across state lines, and detained in the Coffee County jail.  See id.  Instead, Plaintiff has presented evidence that Smith knew that these things would happen because he ordered each of them.  The record does not show that Smith's purpose was to physically injure Plaintiff -- to the extent that the evidence suggests Smith's purpose, it suggests that Smith may have been trying to satisfy the Paulks -- but it does show that Smith acted with knowledge that Plaintiff would be deprived of his liberty and subjected to

psychological pain.  This evidence would authorize a jury to find that Smith acted "knowingly."

Although some language from the Supreme Court and Eleventh Circuit could be read to limit substantive due process liability to "purpose[ful]" acts, such a heightened culpability standard applies only when law enforcement officers must make snap judgments and lack time to deliberate.  Vaughan v. Cox, 343 F.3d 1323, 1333 (11th Cir. 2003); Lewis, 523 U.S. at 836.  In Vaughan, the Eleventh Circuit wrote:

> The Supreme Court has held that *in cases in which police officers are required to make quick judgments about the proper course of action and therefore cannot deliberate before acting*, even a showing that the officer's recklessness caused the plaintiff's injury is insufficient to support a substantive due process claim. Instead, a violation of substantive due process will be found only when a plaintiff can show that the officer had a purpose to cause harm unrelated to the legitimate object of arrest.

343 F.3d at 1333 (emphasis added).  And in Lewis, the case the Vaughan court interpreted in the foregoing quotation, the Supreme Court held that:

> The issue in this case is whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life *in a high-speed automobile chase* aimed at apprehending a suspected offender. We answer no, and hold that *in such circumstances* only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation.

523 U.S. at 836 (emphasis added).

- 32 -

If the second sentence from the above-quoted passage in
Vaughan -- "a violation of substantive due process will be found
only when a plaintiff can show that the officer had a purpose to
cause harm" -- is lifted out of context, it could appear that
only "purpose[ful]" acts could incur Fourteenth Amendment
liability.  See Vaughan, 343 F.3d at 1333.  However, taking into
account the first sentence from the Vaughan passage, and
considering the Supreme Court's limitation of its holding in
Lewis to "such circumstances" as high speed pursuit, this Court
concludes that the rule that an officer-defendant must act
purposefully before substantive due process liability may attach
only applies when officers must make snap decisions.  This
conclusion accords with language appearing later in the Lewis
opinion: "[C]ulpability falling within the middle range,
following from something more than negligence but less than
intentional conduct, such as recklessness or gross negligence,
is a matter for closer calls" with regard to substantive due
process liability.  523 U.S. at 849.

Here, Smith was not "required to make quick judgments about
the proper course of action [that deprived him of the
opportunity to] deliberate before acting."  See Vaughan, 343
F.3d at 1333.  The record indicates not only that Smith could
have deliberated before sending Harper to arrest Plaintiff, but
that Smith actually did deliberate.  According to Smith, after

reviewing the bond paperwork and the information he had received from the City of Atlanta, Smith told Paulk, Sr. that he could not send a deputy to retrieve Plaintiff. (Smith Dep. 114-15.) But then Smith sent Harper anyway. (Harper Dep. 101.) Because Smith had time to deliberate, Smith need not have purposefully harmed Plaintiff to have violated the Fourteenth Amendment.

This Court must decide whether Plaintiff has presented evidence sufficient to show that Smith's alleged conduct "shock[s] the judicial conscience." See Peterson v. Baker, 504 F.3d 1331, 1340 (11th Cir. 2007). Substantive due process claims have commonly been rejected by the Supreme Court and Eleventh Circuit and are rarely allowed to proceed. Little guidance exists as to what facts could support a § 1983 claim based on a violation of substantive due process. The Eleventh Circuit did allow such a claim to proceed in Neal v. Fulton County Bd. of Educ., where a high school football coach knocked a student's eye out with a metal lock in an apparent effort to discipline the student for fighting a teammate. 229 F.3d at 1071, 1076-77. The Eleventh Circuit's holding was based partly on the coach's use of extraordinary force only weakly related to any legitimate educational aim. Id. at 1073-74; accord Chavez, 538 U.S. at 775 (referring to "conduct intended to injure in some way unjustifiable by any government interest"). Aside from the Eleventh Circuit's focus on the disproportionality of the

force used, however, <u>Neal</u> was decided in the specific context of corporal punishment in schools, a discrete body of law with little application here.  <u>Neal</u>, 229 F.3d at 1071, 1076-77.

But the scarcity of guideposts in this uncharted area does not release this Court from its duty to answer the question that the parties have asked.  That there are few decisions to guide the Court should come as no surprise -- the "shocks the conscience" standard is only met in exceptional cases, and exceptional cases are, by definition, without direct precursor. This is such a case.

Viewing the evidence as it must at this stage, the Court holds that the evidence of Smith's conduct as brought forth by Plaintiff shocks the conscience.  From his Coffee County office, Smith called the Atlanta authorities and learned that no warrant existed for Plaintiff's arrest.  Knowing that Plaintiff was in Florida, Smith advised Paulk, Sr., who was standing in the Sheriff's Office with Smith, that he could not lawfully send a deputy to capture McDaniel.  (Smith Dep. 114.)  Then Smith sent a deputy anyway.  He called Harper into the office, handed him Plaintiff's failure to appear citation, offered him a Coffee County patrol car, and told Harper to "serve the warrant." (Harper Dep. 101.)  After Harper apprehended Plaintiff, Smith told Harper to take Plaintiff to the Coffee County jail.  (<u>Id.</u> at 135-40.)  Despite Smith's knowledge of extradition law, there

was no pretense of extradition.  See (Smith Dep. 114-15.)
Plaintiff remained in the Coffee County jail for three days.
The Sheriff's Office did not book Plaintiff, photograph him,
present him to a magistrate, or create any record of his
presence.  Smith ordered Plaintiff's release only when the
Atlanta City Jail refused to let him stay.

The actions used by Smith -- ordering Plaintiff's seizure,
incarceration, and transportation across hundreds of miles --
was grossly disproportionate to any government interest in
apprehending him.  A jury would be entitled to infer that Smith
was vindicating no *governmental* interest whatsoever, but merely
a personal interest as a favor for a friend.  Any government
interest in apprehending Plaintiff came from the City of
Atlanta, whose ordinances Plaintiff had violated.  The City of
Atlanta aptly demonstrated its level of concern with Plaintiff
by declining to issue an arrest warrant, declining to take him
into custody when he was delivered to the jail, and dismissing
the charges against him. (Carter Dep. 20-24.)  Viewing the facts
as presented by Plaintiff, Smith's actions were clearly
disproportionate to any government interest invoked to justify
it.  See Neal, 229 F.3d at 1073-74; accord Chavez, 538 U.S. at
775.

The evidence presented by Plaintiff suggests that Smith's
conduct was "so egregious, so outrageous, that it may fairly be

- 36 -

said to shock the contemporary conscience." Lewis, 523 U.S. at
847.   Therefore, the Court holds that Plaintiff has adequately
demonstrated a violation of the Fourteenth Amendment upon which
a § 1983 claim may be based.

    3.   *Whether Federal Laws Were Clearly Established*

    Having determined that genuine issues of material fact
exist as to whether Smith violated extradition law, the Fourth
Amendment, and the Fourteenth Amendment, the Court must now
determine whether the violated laws were "clearly established"
in August 2004 when Harper seized Plaintiff.  Harlow, 457 U.S.
at 818.

    The touchstone of qualified immunity is whether defendant-
officers "[we]re on notice their conduct is unlawful." Hope v.
Pelzer, 536 U.S. 730, 739 (2002); accord Marsh v. Butler County,
268 F.3d 1014, 1031 (11th Cir. 2001) (en banc).  The plaintiff
bears the burden of demonstrating that the defendant had "fair
warning" that his conduct violated the law.  Crenshaw, 556 F.3d
at 1290; Hope, 536 U.S. at 739-40.

    A plaintiff may use existing constitutional, statutory, or
decisional law to demonstrate that an officer was "on notice" as
to the unlawfulness of his conduct.  Preexisting law can satisfy
the "clearly established" requirement of Harlow in several ways:

> (1) case law with indistinguishable facts clearly
> establishing the constitutional right; (2) a broad
> statement of principle within the Constitution,

> statute, or case law that clearly establishes a
> constitutional right; or (3) conduct so egregious that
> a constitutional right was clearly violated, even in
> the total absence of case law.

Lewis v. City of West Palm Beach, 561 F.3d 1288, 1291-92 (11th

Cir. 2009) (internal citations omitted).  In order for case law

to clearly establish the unlawfulness of an action, the case law

must fairly put the officer "on notice" regarding the legality

of his conduct.  Id. at 1291.  It is not necessary, however,

that "the very action in question has previously been held

unlawful" or that a preexisting case present "fundamentally

similar" or "materially similar" facts.  Hope, 536 U.S. at 739,

741.  This rule that qualified immunity may be overcome even in

the absence of precisely analogous case law is especially

important in extraordinary cases, because "widespread compliance

with a clearly apparent law may have prevented the issue from

previously being litigated."  Baird v. Renbarger, 576 F.3d 340,

345 (7th Cir. 2009).

> a.   Extradition

The strongest evidence that Smith was "on notice" as to

extradition law comes from Smith's own deposition.  According to

Smith, before Harper drove to Flagler Beach, Paulk, Sr. asked

whether Smith or his deputies could go to Florida to retrieve

Plaintiff.  (Smith Dep. 114.)  Smith deposed, "I told [Paulk

Sr.], no, that we couldn't go get [Plaintiff]."  (Id.)  When

asked why, Smith told Paulk, Sr. that he could not send a deputy after McDaniel because of extradition laws.  (Id. at 114-15.) "[A]ctually you can't even extradite on a misdemeanor," Smith explained.  (Id. at 114.)  Smith's deposition testimony thus unequivocally establishes that he was "on notice" as to extradition law.  See Hope, 536 U.S. at 739.

Further, decisional and statutory law put Smith "on notice" as to what extradition law required.  As noted above, the Eleventh Circuit has given state extradition laws the force of federal law.  Harden, 320 F.3d at 1293, 1301-02.  The extradition laws of both Georgia and Florida clearly require, inter alia, (1) a signed governor's warrant from the extraditing state, Fla. Stat. Ann. § 941.07; O.C.G.A. § 17-13-27, and (2) a formal demand from the jurisdiction whose laws have been violated, Fla. Stat. Ann. §§ 941.03, 941.06; O.C.G.A. §§ 17-13-23, 17-13-25.  Moreover, as Harden expressly stated, the need for a governor's warrant "is derived from the language and intent of" the federal statute governing extradition.  320 F.3d at 1293 n.5.  Neither a governor's warrant nor a formal demand existed for Plaintiff's transport.

Direct deposition evidence shows that Smith was "on notice" of the need to extradite out-of-state detainees.  Further, the extradition laws that Smith allegedly violated were clearly established.  To the extent that those extradition laws were

- 39 -

state statutes, <u>Harden</u> gave them the force of federal law.
Therefore, qualified immunity does not protect Smith for his
alleged violation of extradition law.

The Court therefore **DENIES** Smith's Motion for Summary
Judgment on Count I insofar as Count I alleges a violation of
extradition law.

> b.   *Fourth Amendment*

In August 2004, applicable law clearly established that,
absent "a bona fide emergency or other extraordinary
circumstance," failing to present a detainee who had been
arrested without a warrant to a judicial officer for a
determination of probable cause within forty-eight hours
violated the Fourth Amendment.  <u>McLaughlin</u>, 500 U.S. at 57
(1991); <u>accord</u> <u>Rodriguez</u>, 294 F.3d at 1277 (2002).  This clearly
established law put Smith "on notice" that the Constitution
required Plaintiff to be presented to a judicial officer within
forty-eight hours.  See <u>Lewis</u>, 561 F.3d at 1291-92.

Smith was "on notice" that Plaintiff's arrest was generally
unreasonable and that McDaniel had to be presented to a judicial
officer within forty-eight hours.  Thus, qualified immunity does
not shield Smith from liability for his alleged violations of
the Fourth Amendment.

The Court therefore **DENIES** Smith's Motion for Summary
Judgment on Count IV.

c.   *Fourteenth Amendment*

The Court must also determine whether Smith was "on notice" that his acts regarding Plaintiff could lead to substantive due process liability.  Hope, 536 U.S. at 739.  As noted above, neither Plaintiff, Defendant, nor this Court have found a case with facts materially similar to those presented here, perhaps because "widespread compliance with . . . clearly apparent law may have prevented the issue from previously being litigated." Baird, 2009 WL 2357882, at *4.  The Court therefore looks for "a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right." Lewis, 561 F.3d at 1291-92.

Neal clearly establishes that "conscience shocking" state action violates the substantive component of the Due Process Clause.  229 F.3d at 1074.  Neal further establishes that conduct will most likely be "conscience shocking" when the severity of the government's action is way out of proportion to the government's legitimate interests.  Id. at 1073-74. Although these propositions from Neal are broadly phrased, they can "clearly establish" the illegality of conduct that is not near the borderline of permissibility -- especially where that conduct is so egregious that it is without direct precursor.

Here, the legitimate governmental interests in seizing Plaintiff were weaker than a duckling's first wingbeats.  There

is no evidence that Plaintiff ever posed a threat to any officer.  The City of Atlanta declined to issue an arrest warrant, declined to incarcerate Plaintiff when Winkler delivered him to the jailhouse door, and dismissed all charges against Plaintiff.  In light of <u>Neal</u> and the egregiousness of Smith's actions, the Court holds that Smith was "on notice" that his alleged conduct concerning Plaintiff violated the Fourteenth Amendment.  Thus, qualified immunity does not protect Smith for his alleged violation of the Fourteenth Amendment.  There simply is no case law which could arguably support what Plaintiff's evidence shows Smith did -- nothing remotely close.

The Court therefore **DENIES** Smith's Motion for Summary Judgment on Count I insofar as Count I alleges a violation of the Fourteenth Amendment.


B.   <u>Liability Under a "Custom, Policy or Practice"</u>

Count VI of Plaintiff's Amended Complaint alleges that Smith employed a policy, practice, or custom of misusing "the Office of Sheriff of Coffee County . . . for personal and/or political motives including to perform favors for private individuals," and that such practice caused Plaintiff to suffer constitutional violations.  (Am. Compl. ¶ 83.)  Smith rejoins that Plaintiff has failed to identify any "policy, practice, or custom" causing the alleged constitutional deprivations, as

Plaintiff relies solely on the single incident underlying his
Amended Complaint to support his claim.

A suit against an individual in his official capacity is
"in all respects other than name, to be treated as a suit
against the [governmental] entity." Kentucky v. Graham, 474
U.S. 159, 165-66 (1985).   To establish liability against a
governmental entity under § 1983, the plaintiff must show that
the governmental actors were acting pursuant to a policy,
practice, or custom.   Monell v. Dep't of Soc. Servs., 436 U.S.
658, 690-91 (1978).   The Monell standard necessarily requires a
plaintiff to make two showings:   First, the plaintiff must
establish the existence of an unconstitutional policy or custom.
Second, the plaintiff must show that the governmental actor was
acting pursuant to the custom or policy when he caused the
alleged harm.   If the policy or custom relied upon is not itself
unconstitutional, "considerably more proof than the single
incidence will be necessary in every case to establish both the
requisite fault . . ., and the causal connection between the
'policy' and the constitutional deprivation." City of Oklahoma
City v. Tuttle, 471 U.S. 808, 824 (1985).

Here, Plaintiff asserts that Smith had a custom or policy
of misusing "the Office of Sheriff . . . for personal or
political motives." (Am. Compl. ¶ 83.)   Plaintiff presents no
evidence that this custom or policy caused any constitutional

deprivations other than the single incident which underlies
Plaintiff's Amended Complaint.  While malfeasance in office and
misuse of authority is certainly egregious behavior, it is not,
in and of itself, unconstitutional.  Therefore, evidence of the
"single incident" complained of here is not enough to establish
the "causal connection between the 'policy' and the
constitutional deprivation."  Tuttle, 471 U.S. at 824.

     The Court therefore **GRANTS** Smith's Motion for Summary
Judgment on Count VI.


     C.   Section 1983 Conspiracy

     In Count VII of the Amended Complaint, Plaintiff asserts
that Smith "conspired to violate Plaintiff's Constitution [ sic]
rights in violation of 42 U.S.C. § 1983."  (Am. Compl. ¶ 89.)
As a threshold matter, a party alleging a § 1983 conspiracy must
show "an underlying actual denial of [ the party's]
constitutional rights."  GJR Invs., Inc. v. County of Escambia,
132 F.3d 1359, 1370 (11th Cir. 1998).  Next, the plaintiff must
show that the defendants "reached an understanding to violate
his rights."  Rowe v. City of Fort Lauderdale, 279 F.3d 1271,
1283 (11th Cir. 2002).  "For a conspiracy claim to survive a
motion for summary judgment, a mere scintilla of evidence will
not suffice; there must be enough of a showing that the jury

could reasonably find for that party." Id. at 1284 (internal quotation marks and citation omitted).

This Court has already found that Plaintiff has presented sufficient evidence from which a finder of fact could conclude that there was an actual denial of Plaintiff's constitutional rights. The Court therefore turns to the question of whether Plaintiff has presented sufficient evidence to establish that Smith "reached an understanding" with other Defendants to deny Plaintiff's rights. Rowe, 279 F.3d at 1283.

The Eleventh Circuit has opined that "the linchpin for conspiracy is agreement, which presupposes communication." Bailey v. Bd. of County Commr's of Alachua County, 956 F.2d 1112, 1122 (11th Cir. 1992). Here, it is undisputed that Smith communicated with Paulk, Sr. about the possibility of obtaining paperwork on Plaintiff's bond. (Smith Dep. 96-97, 111-12.) Smith claims, however, that these communications were merely an attempt to "assist a citizen" and not an "agreement to violate [Plaintiff's] civil rights." (Smith's Br. in Supp. 31.)

Evidence exists, however, from which a factfinder could conclude that Smith "reached an understanding" with the other Defendants to seize and detain Plaintiff in violation of his constitutional rights. The facts viewed in the light most favorable to Plaintiff indicate that there was no warrant for Plaintiff's arrest. (Carter Dep. 20.) After speaking with

Paulk, Sr., however, Smith obtained a copy of Plaintiff's
failure to appear citation and "told [Harper] to serve the
warrant." (Harper Dep. 101.) Smith even suggested that Harper
use a Coffee County patrol car for the task. (Id. at 97);
(Smith Dep. 134.) Finally, after Plaintiff was apprehended,
Smith instructed Harper to take Plaintiff to the Coffee County
jail. (Harper Dep. 134.) Although Plaintiff spent three days
in the jail, he never went before a magistrate and he was never
informed of any charges pending against him. (Worrell Dep. 46.)
Thus, a jury could reasonably conclude that Smith conspired with
other Defendants to violate Plaintiff's rights.

The Court therefore **DENIES** Smith's Motion for Summary
Judgment on Count VII.


D.   Section 1985 Conspiracy

In Count VIII of the Amended Complaint, Plaintiff asserts a
conspiracy claim against Smith under 42 U.S.C. § 1985. "Section
1985(3) creates a cause of action for damages against
conspiracies which deprive persons of the equal protection of
law or other federal rights, privileges or immunities." Arnold
v. Bd. of Educ. of Escambia County, 880 F.2d 305, 317 (11th Cir.
1989). In order to state a claim for relief under § 1985(3), a
plaintiff must establish that there was "some racial, or perhaps
otherwise class-based, invidiously discriminatory animus behind

the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). Plaintiff's Amended Complaint alleges that Smith conspired against Plaintiff by seizing him and detaining him for more than seventy-two hours without presentment. (Am. Compl. ¶ 92.) Plaintiff does not allege that Smith was motivated by any racial or other class-based discriminatory animus.[6] Accordingly, Plaintiff has failed to provide sufficient evidence to establish a § 1985 conspiracy claim.

The Court therefore **GRANTS** Smith's Motion for Summary Judgment on Count VIII.

E.   Fair Debt Collection Practices Act

Count IX asserts a claim against Smith under the federal Fair Debt Collection Practices Act (FDCPA). 15 U.S.C. §§ 1692-1692p. Smith argues that he is not subject to the FDCPA because he is not a "debt collector" under the terms of the Act, and because any claim under the FDCPA is time-barred by the Act's one-year statute of limitations. (Smith's Br. in Supp. 33.) Not even Plaintiff could craft a single argument in opposition to Smith's Motion for Summary Judgment on the FDCPA claim.

---

[6] The Court notes that at one point during the course of this litigation, Plaintiff suggested that Defendants were motivated by discriminatory animus toward Plaintiff based on his status as a non-Georgia resident. However, "non-Georgians" do not qualify as a protected class under § 1985(3). See Ekweani v. Maricopa County Sheriff's Office, 2009 WL 976520, at *3 (D. Ariz. 2009) ("[C]ourts that have considered the issue have concluded that out of state residents are not a protected class under Section 1985.").

Because Plaintiff presents no argument to the contrary, Local Rule 7.5 requires entry of summary judgment on Plaintiff's FDCPA claim.  <u>See</u> Local Rule 7.5 ("Failure to respond within the applicable time period shall indicate that there is no opposition to the motion.").

The Court therefore **GRANTS** Smith's Motion for Summary Judgment on Count IX for the reasons outlined in Smith's Motion and for the added reason that Plaintiff failed to offer any opposition.

### F.   <u>Service of Process</u>

Smith argues that service of process was deficient because Plaintiff has not complied with state law rules for service in a renewal action.  (Smith's Br. in Supp. 44-45.)  Further, "Defendant [Smith] acknowledges the Court's ruling on Defendant Paulk Jr.'s Motion to Dismiss, anticipates a similar ruling on this point, and raises the point so as to avoid any appearance of waiver, to invoke a ruling, and to preserve the issue for appeal."  <u>Id.</u> at 44.

As Smith notes, the Court has already ruled on this issue. The Court has held that Federal Rule of Civil Procedure 4(m), not state law, governs the timeliness of service.  9/30/08 Order 24-31 (Dkt. No. 122.)  The Court does not now revisit the issue,

and the prior Order is not incorporated by reference in this one.

III. ARGUMENTS AFFECTING STATE CLAIMS

    A.   <u>Application of Florida Law</u>

    Counts X, XI, XII, XIII, and XIV assert claims against Defendant Smith based on violations of both Georgia and Florida state law.  Smith argues that he is not subject to Florida law because he had insufficient "minimum contacts" with the State of Florida to make him subject to Florida tort law in this action. <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945).  This argument does not help Smith in this case, however.  Courts apply <u>Int'l Shoe</u>'s "minimum contacts" test to determine whether an individual is subject to personal jurisdiction by a particular forum.  <u>Id.</u>  Here, Smith is not trying to argue that he is not subject to jurisdiction in Florida.  Smith is trying to argue that he is not subject to Florida tort law for any of his actions related to this suit.  Thus, the Court cannot conclude that Smith is not subject to Florida law on the strength of his "minimum contacts" argument.

    B.   <u>Official Immunity</u>

    Smith argues that Georgia's official immunity doctrine shields him from all claims based on state law.  Official

immunity bars suits against Georgia public officials acting in their official capacity, except for ministerial acts performed negligently or discretionary acts performed with actual malice or an intent to injure.  Cameron v. Lang, 274 Ga. 122, 123, 549 S.E.2d 341, 344 (2001).  "[A]ctual malice as used in the context of official immunity requires a deliberate intention to do wrong."  Bateast v. Dekalb County, 258 Ga. App. 131, 132, 572 S.E.2d 756, 758 (2002) (citing Merrow v. Hawkins, 266 Ga. 390, 467 S.E.2d 336 (1996)).   Actual malice requires more than "poor judgment, rude behavior, and reckless disregard for the rights and safety of others."  Selvy v. Morrison, 292 Ga. App. 702, 705, 665 S.E.2d 401, 405 (2008).  Even ill will does not demonstrate actual malice, unless the ill will is "combined with the intent to do something wrongful or illegal."  Adams v. Hazelwood, 271 Ga. 414, 415, 520 S.E.2d 896, 898 (1999).

Here, Plaintiff argues that Smith acted with actual malice. (Pl. Br. in Resp. 12.)  This Court must therefore decide whether, under Plaintiff's version of the facts, there is evidence that Smith acted with a deliberate intent to do wrong.

The Georgia Court of Appeals addressed the actual malice standard in Bateast.  Ms. Bateast sued two Dekalb County police officers for false arrest and malicious prosecution.  Bateast, 258 Ga. App. at 131.  According to Bateast's version of the facts, the officers had pulled Bateast and her boyfriend over

- 50 -

because their vehicle had expired tags.  Id.  Upon the officers'
request, Bateast provided multiple forms of identification,
including her photo-I.D. badge from work, her birth certificate,
and her Mississippi driver's license.  The officers told her
that they could not find her in their system using the
information she provided, and she was arrested for giving a
false name and date of birth.  Id. at 131-32.  Once inside the
patrol car, however, Bateast could see from the patrol car's
computer screen that both her name and her Georgia mailing
address had been found.  When she questioned one of the officers
about this, he ignored her and turned off the monitor.

The Georgia Court of Appeals found enough evidence to allow
a jury to make a reasonable inference that the officers arrested
Bateast even though they knew she had not committed the crime
for which she was accused.  Id. at 132.  The Bateast court
concluded that such unscrupulous police work would amount to a
"deliberate[] inten[tion] to do a wrongful act."  Id.

Here, a question of fact remains as to whether Smith acted
with actual malice.  Plaintiff has presented evidence that even
though Smith knew there was no warrant for Plaintiff, he still
instructed Harper to go to Flagler Beach and "serve the
warrant."  (Harper Dep. 101.)  Plaintiff's evidence shows that
Smith sent Harper across state lines to arrest Plaintiff on a
failure to appear citation, despite his knowledge that "you

can't even extradite on a misdemeanor." (Smith Dep. 114.) Plaintiff's evidence also shows that Smith instructed Harper to bring Plaintiff to the Coffee County jail, where Plaintiff was held for three days without being brought before a magistrate -- a clear violation of Gerstein v. Pugh, 420 U.S. 103, 125 (1975). Finally, there is evidence that Smith did all of these things to curry favor with a friend and political campaign contributor.

Smith's conduct with respect to Plaintiff was at least as egregious as the police officers' conduct in Bateast. Plaintiff offers evidence that would allow a jury to make a reasonable inference that Smith deliberately intended to do wrong to Plaintiff. Thus, this Court concludes that whether Smith acted with actual malice in this case remains a question of fact. As such, Smith is not entitled to immunity under Georgia's official immunity doctrine.

Smith also argues that Florida's tort immunity doctrine shields him from any liability for claims under Florida law. Smith cites Fla. Stat. § 768.28(9)(a), which provides tort immunity to law enforcement officers who act in good faith:

> No officer, employee, or agent *of the state or any of its subdivisions* shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acts in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property....

Id. (emphasis added).  The plain meaning of the statute's text indicates that the tort immunity statute only confers immunity on officers of the State of Florida and its subdivisions.  Smith is an officer of Coffee County, which is a subdivision of the state of Georgia.  Thus, Florida's tort immunity doctrine does not shield Smith from any of Plaintiff's claims brought pursuant to Florida law.

Because Smith does not enjoy immunity from state tort law claims under either Georgia's or Florida's immunity doctrine, this Court will now examine each of Plaintiff's state tort law claims on the merits.

### C.   State Law Claims

1.   *False Arrest and Wrongful Imprisonment*

Counts X and XI of the Amended Complaint assert claims for false arrest and wrongful imprisonment.  Smith argues that, to the extent Plaintiff was arrested, he was not arrested by Smith. Therefore, Smith argues, he can only be liable, if at all, on a false imprisonment theory.

While it is true that Smith did not personally drive to Flagler Beach, Florida to apprehend Plaintiff, he may still be liable for false arrest under Georgia law.  A person who does not actually make an arrest may still be charged with

responsibility for the act of the arresting party if it can be shown that "the party making the arrest was acting under the express authority of the one sought to be charged." J.C. Penney Co. v. Green, 108 Ga. App. 155, 158, 132 S.E.2d 83, 85 (1963). Here, there is evidence that Smith instructed Harper to "serve the warrant" on Plaintiff. (Harper Dep. 101.) The Court therefore concludes that Smith is not entitled to summary judgment on Plaintiff's false arrest claim.

Next, Smith argues that he cannot be liable for Georgia's tort of false imprisonment because Plaintiff was not unlawfully detained. See O.C.G.A. § 51-7-20 ("False imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."). "[D]etention effectuated pursuant to procedurally valid process, such as an arrest warrant, is not 'unlawful.'" Franklin v. Consol. Gov't of Columbus, 236 Ga. App. 468, 470, 512 S.E.2d 352, 355 (1999).

Plaintiff has adduced evidence, however, that his detention was not "effectuated pursuant to procedurally valid process." Id. Under Plaintiff's version of the facts, no valid warrant existed. (Carter Dep. 20.) Also, Plaintiff's evidence suggests that he was held for three days without presentment to a judicial officer for a determination of probable cause. (Worrell Dep. 46); see also Gerstein, 420 U.S. at 125. Thus, a

- 54 -

factual dispute exists as to whether Plaintiff was unlawfully detained.

Smith also argues that he cannot be found liable for false imprisonment because all he did was tell Harper that "he could turn Plaintiff over to the Jail staff." (Smith's Br. in Supp. 38.) However, a jury could make a reasonable inference from the facts alleged by Plaintiff that Smith's involvement in Plaintiff's detention at the Coffee County jail was more complicit. Additionally, Georgia sheriffs are charged with the responsibility of maintaining county jails. <u>Lawson</u>, 292 Ga. App. at 529. Thus, the Court concludes that Smith is not entitled to summary judgment on Plaintiff's false imprisonment claim.

The Court therefore **DENIES** Smith's Motion for Summary Judgment on Counts X and XI.

### 2. *Assault and Battery*

Count XII asserts claims for assault and battery. The Court will first address Smith's potential vicarious liability for these torts, and will then address each tort in turn.

Smith argues that he cannot be liable for these torts because he "and anyone for whose acts he allegedly is liable is <u>authorized</u> to touch Plaintiff." (Smith's Br. in Supp. 39) (emphasis in original). Smith relies on his "constructive custody" theory to justify this assertion. However, the Court

has already disposed of this argument in § II.B of this Order. Smith fails to make any other argument as to why he should not be held vicariously liable for the acts of Harper.

The Court finds that under the facts viewed in the light most favorable to Plaintiff, a jury could reasonably conclude that Harper acted under the direction of Smith as Smith's agent. An agency relationship is created "whenever one person, expressly or by implication, authorizes another to act for him." Ellis v. Fuller, 282 Ga. App. 307, 309, 638 S.E.2d 433, 435 (2006). Plaintiff has adduced evidence that Smith gave Harper a copy of Plaintiff's failure to appear citation and told Harper to "serve the warrant." (Harper Dep. 101.) Smith also suggested that Harper take a Coffee County patrol car to complete this task. (Id. at 97); (Smith Dep. 134.) A jury could reasonably infer the existence of an agency relationship between Smith and Harper based on these facts. As such, Smith "may be held liable for [Harper's] tortious act . . . where the act was committed within the scope of the agency." Stewart v. Storch, 274 Ga. App. 242, 245, 617 S.E.2d 218, 221 (2005). Therefore, the Court must decide whether sufficient evidence exists from which a jury could find that if Harper assaulted or battered Plaintiff while he was Smith's agent, Harper committed those torts "within the scope of the agency." Id.

In <u>Ellison v. Burger King Corp.</u>, 294 Ga. App. 814, 815, 820, 670 S.E.2d 469, 471, 474 (2008), the manager of a Burger King restaurant "who was charged with responding to customer complaints" came out from behind the counter to respond to a customer who said that she was not being served.  Things degenerated:

> [The plaintiff] averred that the manager "put her hands around my neck in a semi head lock position . . . and started shaking like three times or whatever. Then the manager turned loose and said, 'Are you all right now?'" The employees asked if Ellison was ready to order, and Ellison uneventfully ordered a grilled chicken salad, which she was served.

<u>Id.</u> at 815.  Because the manager was charged with responding to customers' complaints, the court held that the manager was acting in the course of her employment when she put the complaining customer-plaintiff in a headlock.  <u>Id.</u> at 820.  In the eyes of the Georgia Court of Appeals, the relationship between the manager's duties and the manager's actions was tight enough to support vicarious liability.  <u>See id.</u>  "Although [<u>Ellison</u> was] decided in the context of the employer/employee relationship, the same rules apply to the principal/agent relationship."  <u>Stewart</u>, 274 Ga. App. at 245 n.7.

To determine whether vicarious liability may exist here, the Court must test the tightness of the relationship between the instructions Harper received and Harper's alleged actions.  The <u>Ellison</u> court held that when an employee tasked with

responding to customers' complaints battered a complaining customer, that battery fell within the scope of employment.  294 Ga. App. at 820.  In the present case, a jury could find that when an agent tasked with physically capturing a third party batters or assaults that third party, the battery or assault falls within the scope of the agency.  See Stewart, 274 Ga. App. at 245 n.7 (same rules apply in principal/agent as employer/employee relationship.)  Put differently, the relationship between physically capturing someone and assaulting or battering that person is tighter than the relationship between responding to a customer's complaint and battering that customer.  See Ellison, 294 Ga. App. at 815.  Therefore, if the latter battery falls within the scope of the agency, so does the former.

As to whether there is evidence sufficient for a jury to find that a battery or assault occurred, the Court finds as follows:  A battery is an "unlawful touching" to which the complainant did not consent.  Ellison, 294 Ga. App. at 816-17.  An "unlawful touching" means an objectively "offensive touching."  Id.  For purposes of civil battery, "any unlawful touching of a person's body, even though no physical injury ensues, violates a personal right and constitutes a physical injury to that person."  Vasquez v. Smith, 259 Ga. App. 79, 81, 576 S.E.2d 59, 61 (2003); accord Hill v. Mull, No. 504-329, 2006

WL 3022280, at *13 (M.D. Ga. Oct. 23, 2006).  A touching made in the course of an unlawful arrest may be offensive.  Perrin v. City of Elberton, No. 303-106, 2005 WL 1563530, at *18 (M.D. Ga. July 1, 2005).

Plaintiff recalls that when Harper arrived at the Shark House restaurant to apprehend him, he took Plaintiff by the arm. Plaintiff deposed that Harper did not "physically drag [ him] out" of the Shark House by the arm, and recalls no physical injury from being touched on the arm.  (McDaniel Dep. 127-28.) However, a plaintiff need not allege any physical coercion or injury to recover on a battery claim in Georgia.  Vasquez, 259 Ga. App. at 81.  Moreover, because Harper touched Plaintiff in the course of effecting an unlawful arrest, that touching could be reasonably viewed as offensive.  Perrin, 2005 WL 1563530, at *18.  If Plaintiff proves that Harper took him by the arm, a jury could conclude that a battery occurred.  Thus, genuine issues of fact remain on Plaintiff's battery claim.

Assault is a different tort.  Georgia's courts have indicated that assault has objective and subjective elements. The test is more commonly stated in objective terms: "An assault occurs when all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another."  Id.; Bullock v. Jeon, 226 Ga. App. 875, 878, 487 S.E.2d 692, 696 (1997); accord Brown

v. Manning, 764 F. Supp. 183, 186 (M.D. Ga. 1991).  A reasonable
person's apprehension may be predicated on a threat instead of
physical conduct.  Wallace v. Stringer, 250 Ga. App. 850, 853,
553 S.E.2d 166, 169 (2001).  Summary judgment may be proper if a
subjective element is not met because the plaintiff "makes no
claim that he . . . apprehended a violent injury."  Kuritzky v.
Emory Univ., 294 Ga. App. 370, 373, 669 S.E.2d 179, 183 (2008).

Disputed factual issues remain as to whether Harper's
actions toward Plaintiff, allegedly taken on Smith's behalf as
Smith's agent, would have caused a person "reasonably to
apprehend a violent injury."  See Everett, 268 Ga. App. at 543.
When Plaintiff first saw Harper in the Shark House restaurant,
Harper had the Shark House cook pinned against a wall and was
handcuffing him.  When the cook pointed out Plaintiff, Harper
walked up to Plaintiff.  "You're Jamie McDaniel?" he asked.
(McDaniel Dep. 114-15.)  The Court cannot conclude that, as a
matter of law, a reasonable person would not have apprehended
violent injury at this point.  Whether a reasonable person would
have feared injury at this juncture is a disputed issue of
material fact.

Whether Plaintiff has adduced evidence of subjective
apprehension is a close question but, viewing the facts and
drawing all inferences in Plaintiff's favor, the Court holds
that issues of material fact remain.  In describing Harper's

visit to the Shark House, Plaintiff deposed that after Harper asked who he was, "[Harper] said, you're coming with me.  And he had a gun.  He had a badge, and he's a pretty big guy, so I did exactly what he said."  (McDaniel Dep. 115.)  "[H]e didn't have to physically drag me out," Plaintiff explained later in his deposition, "because I was not going to put up any resistance, because like I said, he has [sic] a gun.  He's a big guy, you know.  I'm coming.  Sure.  Let's go."  (Id. at 128.)  Although Plaintiff never expressly stated that he feared injury, a reasonable jury could infer from the foregoing language that Plaintiff was apprehensive after seeing how Harper handled the cook.  Therefore, viewing the evidence as it must at this stage, the Court concludes that whether Plaintiff apprehended violent injury is a disputed material issue of fact.

The Court therefore **DENIES** Smith's Motion for Summary Judgment on Count XII.

3.   *Invasion of Privacy*

Count XIII asserts a claim for "intruding into Plaintiff's private affairs and solitude."  (Am. Compl. ¶ 108.)  In order to prevail on such a claim under Georgia law, Plaintiff must show an "unreasonable intrusion" into his privacy.  Yarbray v. So. Bell Tel. & Telegraph Co., 261 Ga. 703, 705, 409 S.E.2d 835, 837 (1991).  To prove an "unreasonable intrusion," Plaintiff must make two showings:  first, he must show a "prying or

intrusion . . . into private concerns," and second, he must show that the intrusion "would be offensive or objectionable to a reasonable person."  Id.  Plaintiff focuses on Harper's actions and argues that those actions constituted an "unreasonable intrusion," and that Harper made that unreasonable intrusion at Smith's direction.

Harper's conduct clearly meets the second prong of the above-described test.  A reasonable person would find it "offensive or objectionable" to be unlawfully arrested, forcibly removed from his place of employment, and transported across state lines hundreds of miles against his will.  See id.

The first prong of the test, however, asks whether the challenged conduct constituted "prying or intrusion . . . into private concerns."  See id.  Acts that occur in public places do not generally constitute intrusions on privacy.  See Summers v. Bailey, 55 F.3d 1564, 1566 (11th Cir. 1995) ("Traditionally, watching or observing a person in a public place is not an intrusion upon one's privacy."); accord Pierri v. Cingular Wireless, LLC, 397 F. Supp. 2d 1364, 1382-83 (N.D. Ga. 2005) ("To establish a claim of 'intrusion,' a plaintiff must usually establish that the defendant committed a physical intrusion, analogous to trespass, into the plaintiff's solitude or private affairs.").  However, acts that occur in public places may constitute intrusions upon seclusion if they are sufficiently

repetitive.  See Anderson v. Mergenhagen, 283 Ga. App. 546, 552, 642 S.E.2d 105, 110 (2007) (unrelenting surveillance, picture-taking, and following, although in public places, could constitute unreasonable intrusion because "relatively harmless activity can become tortious with repetition").  Where the defendant's act does not affect the plaintiff's privacy, there has been no unreasonable intrusion even if the act was extraordinarily offensive.  See generally Yarbray, 261 Ga. 703.

Harper's apprehension of Plaintiff at Smith's direction -- although it was offensive -- occurred in a public place and occurred only once.  Therefore, Harper did not intrude on Plaintiff's private seclusion, see Assoc. Serv., Inc. v. Smith, 249 Ga. App. 629, 636, 549 S.E.2d 454, 461 (2001), nor did Harper repetitively harass Plaintiff, see Anderson, 283 Ga. App. at 552.  Because Harper's actions did not constitute an intrusion into Plaintiff's privacy, Plaintiff's privacy claim fails under Georgia law.  The Court therefore concludes that Smith is entitled to summary judgment on Plaintiff's privacy claim, at least insofar as such claim arises out of Georgia law.

However, Plaintiff's Amended Complaint also asserts an invasion of privacy claim under Florida law.  Smith argues that he is not subject to Florida law on the basis of "minimum contacts," or, alternatively, that he is shielded from liability under Florida law by Florida's immunity doctrine.  Fla. Stat. §

768.28(9)(a).  As discussed in §§ III.A-B above, both of these arguments fail.  Smith otherwise fails to address the merits of Plaintiff's invasion of privacy claim under Florida law.

Nevertheless, the Court concludes that there is no genuine issue of material fact as to whether Plaintiff suffered an invasion of his privacy under Florida law, and that Smith is entitled to judgment as a matter of law.  Florida recognizes the tort of invasion of privacy, at least to the extent that the tort consists of "intrusion upon the plaintiff's physical solitude or seclusion, as by invading his home."  Guin v. City of Riviera Beach, 388 So.2d 604, 605 (Fla. App. 1980) (quoting W. Prosser, Torts § 117 (4th ed. 1971)).  Under Florida law, an intrusion amounting to an invasion of privacy requires "physically or electronically intruding into one's private quarters."  Agency for Health Care Admin. V. Associated Indus. of Florida, Inc., 678 So.2d 1239, 1252 n.20 (Fla. App. 1996). In Florida, therefore, invasion of privacy is "a tort in which the focus is the right of a private person to be free from public gaze."  Allstate Ins. Co. v. Ginsberg, 863 So.2d 156, 162 (2003).

Here, it is not contested that Plaintiff's capture occurred in a public place:  the Shark House restaurant.  Plaintiff, therefore, did not suffer an intrusion into his home or "private quarters."  Agency for Health Care Admin., 678 So.2d at 1252

n.20.  Rather, at the time of his apprehension, Plaintiff was waiting tables in the Shark House dining room, and thus already subject to the "public gaze."  Ginsberg, 863 So.2d at 162.  As such, Plaintiff has failed to show that he has a cause of action under Florida law for invasion of privacy.

The Court therefore **GRANTS** Smith's Motion for Summary Judgment on Count XIII.

4. *Intentional Infliction of Emotional Distress*

Count XIV asserts a claim for intentional infliction of emotional distress (IIED).  Smith argues that his involvement respecting the events giving rise to this suit was very limited, and that in any event his actions were undertaken in good faith.  Accordingly, he argues, his alleged conduct was not so "extreme and outrageous" as to justify Plaintiff's IIED claim against Smith.  Yarbray, 261 Ga. at 706.  As this Court has already discussed in § III.C.2, however, a reasonable jury could conclude from Plaintiff's evidence that Harper acted under the direction of Smith as Smith's agent.  As such, a jury could find that Harper's tortious conduct is attributable to Smith.  This Court must therefore determine whether Harper's alleged acts support an IIED claim.

"Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of

law." <u>Yarbray</u>, 261 Ga. at 706.   However, "[i]f a reasonable person might find the conduct extreme and outrageous, causing severe emotional distress, the jury then must find the facts and make its own determination." <u>Mableton Parkway CVS, Inc. v. Salter</u>, 273 Ga. App. 477, 482-83, 615 S.E.2d 558, 564 (2005).

To be actionable, the conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Everett</u>, 268 Ga. App. at 545.   "Only where the distress inflicted is so severe that no reasonable person could be expected to endure it does the law intervene." <u>Id.</u>   "The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim, 'Outrageous!'" <u>Wilcher v. Confederate Packaging, Inc.</u>, 287 Ga. App. 451, 453, 651 S.E.2d 790, 792 (2007).

In <u>Fleming v. U-Haul Co. of Georgia</u>, 246 Ga. App. 681, 681, 541 S.E.2d 75, 76 (2000), the plaintiff rented a U-Haul truck in October 1997.   The truck broke down as the plaintiff was driving it, so he called the 1-800 number listed on the rental agreement.   <u>Id.</u>   Although the person who answered said that someone would come to the plaintiff's aid, no one ever arrived.

Id.  The plaintiff left the keys with the truck, hitchhiked home, and had no further contact with any U-Haul representative until February 1998, when he rented another U-Haul vehicle without mentioning the previous incident.  Id. at 682-81.  As he was driving the second truck, the plaintiff was pulled over by police for failing to maintain his lane.  Id. at 682.  Upon reviewing the plaintiff's driver's license and rental agreement, the officer told plaintiff that there was an outstanding warrant for his arrest.  Id.  The officer took the plaintiff to jail, where he remained for eight days before making bond.  Id.  He was indicted for conversion.  Id.  The plaintiff then brought suit against U-Haul for intentional infliction of emotional distress.  The trial court granted summary judgment, but the Georgia Court of Appeals held that:

> In our view, a rational and impartial jury could
> decide that it is both atrocious and utterly
> intolerable in a civilized society for the lessor of a
> valuable motor vehicle to demand the arrest of its
> lessee for conversion, simply because the lessee did
> not return the vehicle to the designated place at the
> designated time and did not return to claim a cash
> deposit, where, as in this case, the lessor has
> imputed knowledge of all the additional and
> extenuating circumstances as reported by Fleming to
> the 1-800 operator. The trial court erred in
> concluding as a matter of law that the facts
> authorized by this record do not rise to the requisite
> level of outrage and egregiousness in character, and
> extremity in degree, that no reasonable person is
> expected to endure. The grant of summary judgment as

to Fleming's claim for the intentional infliction of
emotional distress was also in error.

Id. at 685.

In <u>Nicholson v. Windham</u>, 257 Ga. App. 429, 430, 571 S.E.2d
466, 468 (2002), the plaintiff worked for what she described as
a "real estate transaction closing mill."  The "mill" allegedly
engaged in illegal activity, including tampering with evidence,
obstruction of justice, mail fraud, and wire fraud.  <u>Id.</u> at 430-
31.  When the plaintiff complained about the illegal activity
and refused to participate in it, the "mill" fired her.  <u>Id.</u> at
431.  She brought a claim for intentional infliction of
emotional distress against her former employer.  <u>Id.</u>  The trial
court dismissed the claim, but on appeal, the Court of Appeals
wrote:

> [The plaintiff] claimed that the defendants tried to
> require her "to become a criminal in order to perform
> her obligations under a contract" and that such
> conduct was so outrageous and extreme "as to go beyond
> all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized
> community." Nicholson alleged that she "was directed
> by members of the RICO Enterprise to ignore and not to
> disclose the conduct or evidence of the illegal and
> fraudulent conduct...." According to Nicholson, "[a]s
> a result of the acts identified in this Complaint and
> such other acts to be shown by evidence, including the
> conspiracy ... to commit illegal acts ... and the
> further conspiracy to cover up those acts, [she] ...
> suffered injuries to person and property." She claimed
> to have sustained "emotional distress that defies
> description."

Id. at 433.  The Court of Appeals then reversed the trial

court's dismissal of the claim.   Id.

The facts of this case are at least as egregious as those in Fleming and Nicholson.  There is evidence from which a jury could find that as a favor to friends of the Sheriff, McDaniel was subjected to the Following:  While he was waiting tables at the Shark House, a large man with a gun and badge apprehended him and then ordered him into a Coffee County Sheriff's car. Plaintiff was transported against his will from Flagler Beach, Florida to Coffee County, Georgia.  He spent three days in the Coffee County jail.  No paperwork was filed, his presence was not recorded, he was not informed of any charges against him, and he never saw a judge.  Upon returning to Florida, Plaintiff discovered that, as a result of his apprehension and abduction, he had lost his job and his apartment.

Upon hearing a recitation of the foregoing facts, an average member of the community would likely exclaim, "Outrageous!"  See Wilcher, 287 Ga. App. at 453.  If proven, therefore, the facts could entitle Plaintiff to recover on his intentional infliction of emotional distress claim.  Because a reasonable person could find this conduct extreme and outrageous, summary judgment is improper.  Mableton Parkway, 273 Ga. App. at 482-83.

The Court therefore **DENIES** Smith's Motion for Summary Judgment on Count XIV.

5. *Breach of Legal Duty*

Finally, Plaintiff's claim entitled "Breach of Legal Duty," numbered Count XV, includes the following language: "[T]he laws, rules, and regulations pertaining to recovery of bail bonds, to bail recovery agents, to bail enforcement agents, and/or to recovery of debts, created legal obligations to Plaintiff." (Am. Compl. ¶ 114.)  "Defendants intentionally or negligently, or with reckless disregard of the consequences to Plaintiff, breached their duty or duties of due care causing Plaintiff damages."  (Am. Compl. ¶ 115.)  "Defendants were negligent per se."  (Am. Compl. ¶ 116.)

Smith has shown that, under the facts of the case, he did not owe Plaintiff any specific duty of care.  (Smith's Br. in Supp. 42.)  Plaintiff presents no argument or evidence in opposition to dispute Smith's Motion for Summary Judgment as to Count XV.  Indeed, Plaintiff never mentions Count XV in any opposition brief.  Accordingly, Smith's Motion for Summary Judgment as to Count XV is granted as unopposed.  Local Rule 7.5 ("Failure to respond within the applicable time period shall indicate that there is no opposition to a motion."); Brasseler U.S.A., I, L.P. v. Stryker Sales Corp., 93 F. Supp. 2d. 1255, 1265 (S.D. Ga. 1999).

Plaintiff also fails to specify any law, rule, or regulation that he contends Smith violated, either in the

Amended Complaint or in his Response to Smith's Motion for
Summary Judgment.  Because Plaintiff fails to specify the
particular rule or regulation he contends Smith violated, Smith
is entitled to summary judgment on the claim of negligence per
se.[7]  See Quinn v. City of Cave Springs, 243 Ga. App. 598, 600,
532 S.E.2d 131, 133 (2000).

The Court therefore **GRANTS** Smith's Motion for Summary
Judgment on Count XV.


D.   Punitive Damages

Count XVIII asserts a claim for punitive damages.  Punitive
damages are permitted in § 1983 claims if the defendant acts
with "reckless or callous indifference" to the plaintiff's
federal rights, Smith v. Wade, 461 U.S. 30, 56 (1983), and on
Georgia claims when clear and convincing evidence shows "willful
misconduct . . . [or] wantonness," O.C.G.A. § 51-12-5.1(b).
Based on the evidence adduced, the Court concludes that a jury
could rationally find that these standards are met.

---

[7] This Court denied Defendant Alan Paulk, Sr.'s and Defendant Alan Paulk,
Jr.'s Motions for Summary Judgment with respect to Count XV.  However,
Plaintiff specified the law that those Defendants allegedly violated in
Plaintiff's response to those Defendants' motions.  Here, Plaintiff did not
specify the law that Smith allegedly violated in either the Complaint or
Plaintiff's Response to Smith's Motion for Summary Judgment.  Thus, the
Court's denial of summary judgment in Paulk, Sr.'s and Paulk, Jr.'s motions
is distinguishable.  See Quinn, 243 Ga. App at 600 (affirming summary
judgment on plaintiff's claim of negligence per se only after plaintiff
failed to specify the allegedly violated rule in either his complaint or his
response to the defendant's motion).

The Court therefore **DENIES** Smith's Motion for Summary Judgment on Count XVIII.

### E.   Litigation Expenses

Finally, Smith moves for summary judgment on Plaintiff's claim for attorneys fees under O.C.G.A. § 13-6-11.  That statute permits a jury to allow litigation expenses as part of the damages where the defendant has acted in bad faith and has been stubbornly litigious.  Id.  For purposes of O.C.G.A. § 13-6-11, "bad faith" denotes "bad faith connected with the transaction and dealings out of which the cause of action arose."  Monterrey Mexican Rest. of Wise, Inc. v. Leon, 282 Ga. App. 439, 451, 638 S.E.2d 879, 890 (2006) (internal quotation marks omitted). Here, a reasonable factfinder could conclude that Smith knowingly disregarded Plaintiff's rights by conspiring to seize Plaintiff and return him to Atlanta as a favor to the Paulks. Thus, this Court concludes that there is sufficient evidence for Plaintiff to prove that Smith acted in bad faith.

The Court therefore **DENIES** Smith's Motion for Summary Judgment on the issue of litigation expenses.

### **CONCLUSION**

The Court **GRANTS** Smith's Motion for Summary Judgment on Counts VI, VIII, IX, XIII, and XV.  (Dkt. No. 151.)  The Court

- 72 -

**DENIES** the motion as to Counts IV, V, VII, X, XI, XII, XIV, and XVIII.  (Dkt. No. 151.)  As to Count I, the Court **GRANTS** Smith's Motion for Summary Judgment insofar as Count I alleges a violation of Fifth Amendment due process, and **DENIES** Smith's Motion insofar as it alleges violations of extradition law and the Fourth and Fourteenth Amendments.  (Dkt. No. 151.)  The Court also **DENIES** Smith's Motion for Summary Judgment on the issue of litigation expenses.  (Dkt. No. 151.)

    **SO ORDERED,** this __29th__ day of October, 2009.

HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA